UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF MICHIGAN,<br><br>      Plaintiff,<br><br>  v.<br><br>EXPRESS SCRIPTS, INC.; EVERNORTH HEALTH, INC., formerly known as Express Scripts Holding Company; and PRIME THERAPEUTICS LLC,<br><br>      Defendants. | No. 2:25-cv-11215-JJCG-KGA<br><br>Hon. Jonathan J.C. Grey<br><br>Hon. Kimberly G. Altman<br><br>JURY TRIAL DEMANDED |

## <u>AMENDED COMPLAINT</u>

Attorney for the Plaintiff

Jonathan S. Comish (P86211)
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632
comishj@michigan.gov

Dated: October 1, 2025

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................... 1

II.   PARTIES .................................................................................................. 13

III.  JURISDICTION AND VENUE ................................................................. 16

IV.   INDUSTRY BACKGROUND ..................................................................... 19

    A.    The U.S. Retail Pharmacy Business .................................... 19

    B.    The Destruction of the U.S. Retail Pharmacy Landscape ... 21

    C.    The PBM Industry ............................................................... 24

        1.    PBM Services ............................................................ 25

        2.    PBM Drug Pricing and the Adjudication of Pharmacy Reimbursement Claims ............................................... 29

        3.    PBM Market Concentration and Vertical Integration 32

        4.    PBM Steering Practices .............................................. 35

V.    DEFENDANTS' ANTICOMPETITIVE SCHEME ........................ 41

    A.    The Prime-ESI Agreement ................................................... 41

    B.    Effects of Defendants' Conduct in the State of Michigan .... 51

VI.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET ................................................................................. 60

    A.    The Relevant Market: The Market for Retail Pharmacy Dispensing Services. ........................................................... 60

    B.    The Relevant Geographic Market ......................................... 64

    C.    Defendants' Market Power in the Michigan Market for Retail Prescription Drug Dispensing Services .................... 66

VII.  ANTICOMPETITIVE EFFECTS ....................................................... 69

VIII.  FRAUDULENT CONCEALMENT .............................................. 69

IX.  CAUSES OF ACTION ................................................................ 74

    A.  Claim 1: Agreement in Restraint of Trade in Violation of
Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) ...... 74

    B.  Claim 2: Agreement in Restraint of Trade in Violation of the
Michigan Antitrust Reform Act (M.C.L. § 445.772) ............. 76

    C.  Claim 3: Public Nuisance (M.C.L. § 600.3801(3) and
Common Law) ........................................................................ 78

    D.  Claim 4: Statutory Public Nuisance
(M.C.L. § 600.3801(3)) ........................................................... 82

    E.  Claim 5: Unjust Enrichment ................................................. 83

X.  PETITION FOR RELIEF ............................................................. 84

XI.  JURY DEMAND........................................................................... 85

The People of the State of Michigan ("the State"), by and through its Attorney General, Dana Nessel, brings this civil enforcement action on behalf of itself and as *parens patriae* on behalf of people of the State, pursuant to 15 U.S.C. § 15c(a) and Mich. Comp. Laws ("M.C.L.") §§ 14.28 and 14.101, against Express Scripts, Inc; Evernorth Health, Inc. (formerly known as Express Scripts Holding Company) (together with Express Scripts, Inc., "Express Scripts" or "ESI"); and Prime Therapeutics LLC ("Prime") (collectively, the "Defendants") to enforce public rights and protect residents and its general economy against violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; Section 2 of the Michigan Antitrust Reform Act ("MARA"), M.C.L. § 445.772; and for claims of public nuisance under M.C.L. § 600.3801(3) and Michigan common law, and unjust enrichment.

## I.     INTRODUCTION

1.     In the first six months of 2024, nearly 300 pharmacies in Michigan closed. Approximately half of Detroit's neighborhoods are now "pharmacy deserts," as are more than 40 towns in northern Michigan, where residents must drive more than 10 miles to reach a pharmacy. The result: a direct negative impact on the health and wellbeing of the

1

State's people; an increase in healthcare costs to individuals and health plan sponsors; and a loss of small businesses that make communities vibrant, prosperous, and unique. These consequences flow directly from the anticompetitive and wrongful acts committed by Defendants, as alleged herein.

2. This case concerns an ongoing unlawful agreement between Defendants ESI and Prime—both pharmacy benefits managers ("PBMs") and direct horizontal competitors—to fix and suppress the compensation amounts they pay to non-PBM-affiliated pharmacies in Michigan for prescription drugs (the "Prime-ESI Agreement" or "Agreement"). Through this unlawful Agreement—together with other anticompetitive conduct—Defendant ESI has maintained monopoly and monopsony power within the State of Michigan to the detriment of the State, its residents, and its general economy.

3. Over 80% of all outpatient prescription drug expenditures in the United States (which total some $405 billion annually) are made by so-called third-party payors ("TPPs") of prescription drugs. TPPs include private insurance companies, large employers that sponsor

health plans, and public programs like Medicaid and Medicare. TPPs use PBMs to administer prescription drug benefits to their members.

4.    PBMs are powerful yet obscure healthcare middlemen. When PBMs first emerged in the 1960s and 1970s, they primarily processed pharmacy reimbursement claims for health plans. But the role of PBMs has expanded dramatically. Today, PBMs play a major role in designing pharmacy benefits for health plans and determining the prices that health plans (and their members) pay for prescription drugs. Among other services they perform, PBMs maintain drug formularies (which dictate what drugs are covered by insurance and how much insureds are required to pay out of pocket); handle price and rebate negotiations with pharmacies and drug manufacturers; and maintain pharmacy networks (which determine where and how insureds can get their prescriptions filled).

5.    The PBM industry has become increasingly concentrated. Today, just three PBMs—Caremark, ESI, and OptumRx (the "Big Three")—are responsible for processing nearly 80% of all prescription drug claims for approximately 270 million insured individuals (whom PBMs refer to as "covered lives"). Given the current level of PBM

3

consolidation, pharmacists, health insurers, and drug manufacturers have little choice but to interact with the large, dominant PBMs when purchasing or distributing prescription drugs.

6. Major PBMs have also become vertically integrated with other upstream and downstream sectors of the healthcare industry, meaning they are part of the same corporate families as pharmacies, insurance companies, healthcare providers, and even drug private labelers (companies that partner with drug manufacturers to produce and package prescription drugs). Such vertical integration creates significant conflicts of interest. In particular, PBMs that are vertically integrated with pharmacies, including Defendants, have a financial incentive to steer covered lives (plan enrollees) to affiliated pharmacies, even if a rival, unaffiliated pharmacy may offer the same or better pricing and services.

7. PBMs exert substantial influence over unaffiliated retail pharmacies, which rely on reimbursements from PBMs to stay afloat. To access and serve insured customers, a pharmacy must enter into a network contract with the PBMs that manage those customers' pharmacy benefits. Network contracts specify the prices the PBM will

4

pay the pharmacy for prescription drugs (on behalf of plan sponsors), as well as any fees the pharmacy must pay the PBM as a condition of network participation.

8. The Big Three PBMs (including Defendant ESI) leverage their control over huge numbers of plan enrollees to extract steep contractual discounts from pharmacies that wish to participate in their networks. Pharmacies must either accede to the contractual demands of these PBMs or lose access to their covered lives. The immense market power of the Big Three allow them to impose mandatory fees on pharmacies, many of which are imposed long after the point-of-sale, with little to no transparency, as described below. For many pharmacies, the pressures exerted by the PBM industry have spelled financial ruin.

9. ESI and other large PBMs have played a primary role in the loss of retail pharmacies across the country, including in the State of Michigan. In Michigan, as in other states, local pharmacy closures affect not only small business owners and their employees, but also their patients. In some rural and medically underserved areas, local

retail pharmacies are the main healthcare option for residents who depend on them to get flu shots, EpiPens, or other lifesaving medicines.

10. Defendant ESI is the second largest PBM in the United States, with roughly 23% of the national PBM services market, *i.e.*, the market in which PBMs sell services (like claims adjudication, pharmacy network maintenance and contracting, and rebate negotiation) to TPPs. Defendant Prime (a direct competitor of ESI) is the sixth largest PBM in the nation and possesses roughly 3% of the national PBM services market.

11. Under competitive market conditions, *i.e.*, absent an illegal conspiracy, PBMs like ESI and Prime compete against each other to attract retail pharmacies to join their networks by paying better reimbursement rates, charging lower fees, and offering more patient volume. They do so because TPPs choose which PBMs to hire based, in part, on the size and breadth of their pharmacy networks. A PBM with an inadequate pharmacy network will be unable to ensure that plan enrollees have access to convenient and accessible pharmacy options and will thus not be attractive to potential TPP clients.

6

12.     In the context of such competition, ESI, as the second largest PBM in the nation, can generally convince pharmacies to accept lower rates of compensation than they would from smaller PBMs, like Prime, which represent far fewer customers. In order for smaller PBMs like Prime to successfully compete with the Big Three, they must generally offer pharmacies better contractual terms.

13.     However, Defendants have conspired to eliminate competition among themselves for pharmacy business in order to extract illegal profits from the marketplace. In December 2019, Prime and ESI entered into an unlawful agreement to fix the rates of compensation they pay pharmacies (the "Prime-ESI Agreement" or "Agreement"). Under the Agreement, which went into effect April 2020, Prime must pay pharmacies the same (lower) network rates and extract the same (higher) fees negotiated by ESI, supplanting the terms Prime had negotiated with those pharmacies. The effect of this arrangement has been to suppress the net compensation paid to retail pharmacies (*i.e.*, total reimbursements, less any fees) on Prime transactions by at least 20%.

14.     In exchange for access to ESI's buying power and pharmacy network rates (contractual provisions which are normally kept confidential and treated as competitively sensitive by PBMs), Prime agrees to pay administrative fees to ESI for each transaction Prime pays at the ESI rate. The fees Prime is required to pay ESI under the Agreement have enabled ESI to share in the supra-competitive profits generated by the Agreement at the expense of pharmacies. The "savings" and fees that Defendants have extracted from pharmacies via the Agreement, including in Michigan, have not been passed on to health plans (or, for that matter, patients), but rather kept by Defendants as profits.

15.     The Prime-ESI Agreement has unlawfully increased ESI's market power. In 2019, ESI managed pharmacy benefits for roughly 75 million covered lives. Through the Agreement, ESI added Prime's roughly 30 million covered lives to its own, enabling ESI to represent over 100 million plan members in negotiations with pharmacies. The increased scale ESI achieved through its unlawful arrangement with Prime has allowed ESI to extract greater contractual concessions from pharmacies than would be possible in a competitive market, further

8

suppressing net compensation amounts paid to pharmacies, including in Michigan.

16.    Through the Agreement, ESI's market power became particularly magnified in Michigan. According to available data, since 2021, ESI has controlled upwards of 89% of the Michigan PBM Services Market, likely the largest market share ever achieved by a single PBM within a single U.S. state. In some metropolitan statistical areas of Michigan, like Jackson and Muskegon, ESI's share of the PBM Services Market exceeds 90%, as shown below:

| Metropolitan Statistical Area | ESI Market Share |
|---|---|
| Jackson | 96 |
| Muskegon | 94 |
| Grand Rapids-Kentwood | 92 |
| Flint | 90 |
| Saginaw | 89 |
| Ann Arbor | 88 |
| Battle Creek | 88 |
| Niles | 88 |
| Bay City | 87 |
| Detroit-Warren-Dearborn | 86 |
| Kalamazoo-Portage | 85 |
| Monroe | 82 |
| Midland | 71 |
| Lansing-East Lansing | 69 |

17.    ESI's dominance in Michigan's PBM services market has enabled ESI to dictate where a supermajority of Michigan residents can

9

obtain prescription drugs using their plan benefits, and on what terms. ESI has leveraged this power to steer pharmacy business from its covered lives (including those who reside in Michigan) to ESI's two affiliated mail-order pharmacies: (1) "Express Scripts Pharmacy" and (2) "Accredo," which dispenses specialty drugs. This self-preferencing has enabled ESI to dramatically increase its share of the market for pharmacy services nationally and in the State of Michigan, and reap millions in additional revenues at the expense of consumers and non-affiliated retail pharmacies.

18.   Defendants' anticompetitive conduct has resulted in a variety of harmful anticompetitive effects, including artificially low pharmacy compensation rates, reductions in the output of pharmacy services, decreases in the quality of those pharmacy services, and reductions in consumer pharmacy choice. These anticompetitive effects have harmed both pharmacies and consumers in the State of Michigan.

19.    According to one study, between January and August 2024, there were 272 pharmacy closures in Michigan, more than any other state during that period, as illustrated below:



*Blue flags = Chain pharmacy closures*
*Yellow flags = Independent pharmacy closures*

20.    Approximately 50% of Detroit neighborhoods qualify as "pharmacy deserts," which are communities where residents have limited or no convenient access to a retail pharmacy. The same is true of many northern Michigan communities, where some residents must

11

drive 45 minutes or more to access pharmacy services. Increased travel times and other costs associated with pharmacy closures deter patients (particularly the elderly, disabled, and economically disadvantaged) from filling their prescriptions. Reduced prescription adherence is associated with negative health consequences which burden the State's healthcare system and lead to increased medical costs.

21.     Less competition also means higher prices. Retail prices at independent pharmacies are often lower than prices at PBM-affiliated chain pharmacies. This is particularly true for generics, which cost on average only 12% as much at independent pharmacies as they do at chains like CVS. While insured patients are largely insulated from the impact of high retail prices (because they are responsible only for their co-pays or co-insurance contributions), uninsured patients are generally charged full retail prices. In Michigan, about 4.4% of the population (or 433,300 people) are uninsured.

22.     The loss of pharmacy options and the steering of covered lives to ESI-affiliated pharmacies have resulted in increased costs for Michigan health plans. According to a recent report by the Federal Trade Commission ("FTC"), pharmacies affiliated with ESI have

marked up specialty drugs by hundreds or even thousands of percentage points over their acquisition costs. ESI also reimburses its affiliated pharmacies at far higher rates than independent pharmacies. Such markups have allowed ESI and its affiliated pharmacies to net billions in additional revenues, at the expense of Michigan health plans and enrollees, whose costs and premiums have increased annually.

23.    The People seek damages, trebled, for its injuries and those suffered by the people of Michigan resulting from Defendants' wrongful conduct; to enjoin Defendants' wrongful conduct; and for such other relief as is afforded under the laws of the United States and the State of Michigan.

## II.    PARTIES

24.    The Attorney General of Michigan, Dana Nessel, brings this action on behalf of the People of the State of Michigan as Plaintiff. The Attorney General is the chief legal officer of Michigan. She is granted authority under federal and state antitrust and consumer protection laws to bring actions to protect the health, safety, and economic wellbeing of Michigan residents and to obtain injunctive and other relief from harms that result from the violations alleged herein. The Attorney

13

General seeks monetary, equitable, and other relief under federal and state antitrust laws in her sovereign or quasi-sovereign capacities.

25.   Defendant Express Scripts, Inc. ("Express Scripts") is a Delaware corporation headquartered in St. Louis, Missouri. Before its acquisition in 2018, Express Scripts previously described itself as "the largest independent PBM company in the United States." Since December 2018, Express Scripts has been owned by The Cigna Group, a health insurance company.

26.   Defendant Evernorth Health, Inc. ("Evernorth") is a Delaware corporation headquartered in St. Louis, Missouri. Evernorth owns Express Scripts and actively participates in the unlawful conduct alleged herein by shaping the company policies at issue and participating in the development, approval, and implementation of Defendants' unlawful conduct.

27.   On information and belief, Evernorth and its executives are directly involved in major strategic decisions concerning Express Scripts, including those involving ESI's partnerships with other PBMs and the promotion of ESI's vertically affiliated mail-order pharmacies, Accredo and Express Scripts Pharmacy.

14

28.     In September 2020, Express Scripts Holding Co. changed its name to Evernorth Health, Inc. In announcing the change, The Cigna Group—which is the parent company of Evernorth Health, Inc. and Express Scripts, Inc.—characterized Evernorth as "a new brand for Cigna's growing, high-performing health services portfolio . . . anchored by Evernorth Health, Inc., a wholly-owned subsidiary of Cigna Corporation, and the parent company of the Express Scripts, Accredo, and eviCore companies." Cigna also explained that Evernorth's role would be to "bring[] together and coordinate[] premier health services offerings to deliver innovative and flexible solutions for health plans, employers, and government programs." Eric Palmer—the current President and Chief Executive Officer of Evernorth Health, Inc.— described the role of Evernorth as "connect[ing] and coordinat[ing] best-in-class health services—in *pharmacy benefits management*, care and intelligence—to drive the most value for clients, customers, and patients." Palmer also described the roles of his Evernorth colleagues as "partner[ing] with employers, health plans, unions, government, physicians and more to solve their biggest challenges." When Express Scripts has boasted about its costs per patient remaining low despite

rising drug prices, Palmer has chalked that success up to "#TeamEvernorth." And on a recent interview with the New York Stock Exchange, Matt Perlberg, Evernorth's President of Pharmacy and Care Delivery, stated that Evernorth used its "supply chain expertise as well as [its] clinical expertise" to help "patients and plan sponsors save money" through, in part, partnerships with other healthcare companies.

29. Defendant Prime Therapeutics LLC, a PBM, is a limited liability company organized under the laws of Delaware, headquartered in Eagan, Minnesota.

### III. JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

31. In addition to pleading violations of federal law, the Michigan Attorney General alleges violations of Michigan state law, as set forth below, and seeks civil penalties, damages, and equitable relief under those state laws. All claims under federal and state law are based

16

on a common nucleus of operative fact, and the entire law enforcement action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding. The Court has jurisdiction over the non-federal claims under principles of pendent jurisdiction. Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

32.    This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1).

33.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in this State, including through the provision of PBM services to TPPs that operate in and/or sponsor health plans with enrollees who reside in this District, and through the adjudication of reimbursement claims to pharmacies that are located in this District.

34.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, have engaged or are engaging in anticompetitive and illegal conduct that has a direct, foreseeable, and

17

intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. The acts complained of herein have, and will continue to have, substantial effects in this District.

35.   Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce, including in the provision of PBM services (such as pharmacy network maintenance and rebate contracting).

36.   Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because certain unlawful acts by Defendants were performed in this District, including the fixing of reimbursement rates paid to pharmacies in this District, and those and other unlawful acts caused harm to interstate commerce in this District.

37.   In addition, the State's claims concern harm to the People of the State of Michigan only. No other forum would be more convenient for the parties and witnesses to litigate this case.

## IV.   INDUSTRY BACKGROUND

### A.   The U.S. Retail Pharmacy Business

38.   Retail pharmacies are brick-and-mortar establishments licensed to dispense prescription medications directly to consumers. They include chain pharmacies, independent pharmacies, and pharmacies located within retailers such as supermarkets and mass merchants.

39.   Retail pharmacies account for approximately 86% of all physical pharmacies in the United States. Pharmacies within hospitals, clinics, and long-term care facilities account for the rest.

40.   Retail pharmacies have several revenue streams, including name-brand drugs, generic drugs, over-the-counter drugs, as well as other health, wellness, and general convenience store merchandise. A typical independent pharmacy generates more than 90% of its revenues from dispensing prescription drugs.

41.   In addition to dispensing prescription drugs, retail pharmacies provide a range of important healthcare services. These services include medication counseling, immunizations, screenings for conditions like high blood pressure and diabetes, and medication therapy management.

19

42.     Brick-and-mortar pharmacies and the pharmacists who staff them are crucial for many patients who have complicated prescription regimens, are less technologically savvy, or live in areas where mail service is infrequent or inconsistent.

43.     In medically underserved rural and urban communities, retail pharmacies can be the sole providers of medication counseling and management, as well as the primary providers of immunizations, emergency contraception, and rescue medications like EpiPens for allergic reactions.

44.     Independent pharmacies are retail pharmacies that are not affiliated with large pharmacy chains or PBMs. Independent pharmacies often have deep roots in the community, are pharmacist-owned, and offer services that large chains do not, such as custom compounding of prescriptions and home delivery. Some 15.1 million Americans rely on independently owned pharmacies; these patients are more likely to have lower incomes, live in rural areas and to be at least 65 years old. They also face more health complications than the general population, and they are more likely to need more one-on-one counseling to juggle multiple medications.

### B.   The Destruction of the U.S. Retail Pharmacy Landscape

45.   The retail pharmacy landscape in the United States has been decimated over the last 20 years. About 1 in 3 of all retail pharmacies have closed since 2010. Since 2023, independent drugstores have been closing at rate of almost one per day. Between 2013 and 2022, 10% of all independent pharmacies in rural areas went out of business.

46.   Michigan is no exception. Only 771 independent pharmacies remained in the State by the end of 2023. And 91 of them permanently closed their doors between January and August 2024.

47.   For example, Schmidt & Sons Pharmacy, a family-owned business that has served Michigan residents for over five decades, and at one time operated four locations in Blissfield, Clinton, Tecumseh, and Dundee. Together, these locations employed more than 60 people. But due to increasingly low reimbursement from PBMs, Schmidt & Sons has been forced to close all but one location. Commenting on their Blissfield branch closure in April 2025, Schmidt & Sons Pharmacy said, "Sadly, decreased reimbursement, without congressional PBM (pharmacy benefit managers) reform happening soon enough, has forced

us to add Blissfield to the long list of towns in this country without a community retail pharmacy."

48.   The long decline of retail pharmacies across the nation (and in Michigan) is largely attributable to the increasing market power of PBMs, which use their buying power to reduce reimbursement rates for and steer business away from unaffiliated retail pharmacies.

49.   Historically, PBMs' practices have done the most harm to independent pharmacies. But more recently, the Big Three have also contributed to the decision of non-affiliated chain pharmacies—including behemoths like Rite Aid and Walgreens—to close their doors.

50.   In October 2023, Rite Aid filed for Chapter 11 bankruptcy. As part of its restructuring process, Rite Aid closed 800 retail pharmacies stores and ultimately emerged from bankruptcy as a privately held company.

51.   In October 2024, Walgreens announced that it planned to close 500 stores in 2025, and another 700 by 2027. These closures were

part of a corporate restructuring process from which Walgreens would also emerge as a privately held company.

52.     These chain drugstore closures have hit Michigan particularly hard. Since 2024, numerous Walgreens and 185 Rite Aid pharmacies have closed in Michigan alone. Michigan had the most Rite Aid closures of any state nationwide.

53.     The loss of these chain pharmacies has dramatically exacerbated the pharmacy desert crisis in Michigan and the United States. According to public health experts, rural and suburban areas qualify as pharmacy deserts if the nearest drugstore is more than five or two miles away, respectively; the radius drops to just half a mile in low-income neighborhoods with low vehicle ownership, as it can be hard for residents to walk or take public transportation to the nearest pharmacy. Today, an estimated 48.4 million people, or 1 in 7 Americans, live in pharmacy deserts.

54.     Studies show that people living in pharmacy deserts are more likely to stop taking their medication, particularly the elderly. Pharmacy deserts are also associated with lower COVID vaccination rates, since approximately three-quarters of all COVID vaccines were

administered at pharmacies. Pharmacy deserts are also associated with reduced access to contraception, and neighborhoods that qualify as pharmacy deserts have among the highest rates of unintended pregnancies and teen births. Pharmacy deserts also lack access to naloxone and are associated with higher rates of death from opioid overdoses.

### C.     The PBM Industry

55.     PBMs operate as middlemen in the healthcare industry, interfacing between various parts of the prescription drug supply chain, including drug manufacturers, pharmacies, health insurance companies, and patients. In theory, PBMs are supposed to control healthcare costs by leveraging their large patient bases to negotiate lower prices with drug manufacturers and pharmacies. The savings PBMs negotiate are then supposed to be passed on to insurers and patients. But as the New York Times recently reported, PBMs frequently do the opposite, increasing drug costs, pocketing negotiated discounts as profit, steering patients toward pricier drugs, charging steep markups on what would otherwise be inexpensive medicines, and extracting billions of dollars in hidden fees from health plans and

24

pharmacies. As part of their effort to increase the revenues they generate through their own pharmacy operations, PBMs have decimated the U.S. retail pharmacy industry, creating a bona fide public health crisis.

### 1. PBM Services

56. PBMs offer a variety of services to health plans. Many PBMs, including Defendants, process (or "adjudicate") the claims that pharmacies submit to health plans for reimbursements. Claims adjudication is the process by which PBMs determine (1) whether an individual has prescription-drug benefits, (2) whether the drug in question is covered by the patient's health plan, (3) the total reimbursement rate to be paid to the pharmacy based on existing network agreements, and (4) the amount of money the pharmacy is to collect directly from the consumer.

57. PBMs, including Defendants, are also often responsible for designing and maintaining drug formularies for health plans. Formularies are lists of drugs covered by insurance. PBMs determine what drugs are covered (or not). They also assign covered drugs to formulary "tiers," which determine what the patient's co-pay or co-

25

insurance requirement will be. When a drug is slotted into a preferred tier, the health plan covers a relatively high share of the cost; when a drug is slotted into a less preferred tier, the patient must shoulder more of the cost.

58. PBMs—including both Express Scripts and Prime prior to the unlawful Agreement alleged herein—also often handle price negotiations for health plans with two key parts of the drug supply chain: (1) drug manufacturers and (2) unaffiliated pharmacies. With drug manufacturers, PBMs negotiate "rebates," which are refunds the manufacturer gives the PBM after a drug is dispensed to a plan member. Manufacturers are willing to offer these rebates in exchange for inclusion of that manufacturer's product on the PBM's formulary, which drives drug sales. Because the placement of a drug on a PBM's preferred formulary tier substantially increases drug sales, manufacturers often offer larger rebates for favorable tier placement.

59. Rebates from manufacturers are supposed to reduce costs for health plans and patients, but PBMs do not always pass on the negotiated rebates in full to their clients. And because manufacturer rebates are generally calculated as an agreed-upon percentage of the

26

drug's list price, rebates can incentivize manufacturers to simply raise their list prices.

60. PBMs also negotiate pricing contracts with pharmacies as part of their overall responsibility for maintaining pharmacy "networks" for health plans. The purpose of a PBM pharmacy network is to ensure that health plan members have ready and affordable access to prescription drugs. Pharmacies that agree to participate in a PBM's pharmacy network enter into "network contracts" with PBMs that set payment terms, participation fees, and other conditions. PBMs, due to their market power, often dictate these terms. Typically, non-affiliated retail pharmacies that belong to a PBM's network agree to offer steep discounts off their retail drug prices to PBM (and the health plans it represents) in exchange for participation in the PBM's network (and the increased business such participation brings).

61. PBMs do not always pass on the full extent of negotiated pharmacy discounts to their clients, instead keeping as profit the difference between (a) what they pay the pharmacy and (b) what they collect from the health plan for each drug. This is known as "spread" pricing or spread retention. Moreover, PBM network contracts almost

27

always include most-favored nation clauses ("MFNs") that ensure the PBM will receive the same price as (or a better one than) cash-paying customers. These MFNs prevent pharmacies from offering discounts to uninsured, cash-paying customers unless the pharmacies are willing to have these discounted rates applied on all PBM transactions, which would be financially ruinous for most pharmacies (who depend on receiving in full the upper ranges of their negotiated rates with PBMs to stay afloat). MFNs also lead to increases in the retail, cash-pay prices pharmacies charge to ensure the pharmacy will receive in full the rates they have negotiated with PBMs, which are (functionally) pharmacies' primary customers.

62.    As discussed in further detail below, PBMs' increasing market power has enabled them to impose onerous pricing terms on unaffiliated pharmacies as a condition of network participation, which have pushed many retail pharmacies to close their doors, and many more to the brink of collapse, harming patients, health plans, and local economies.

63.    PBMs often charge pharmacies fees to participate in their networks, including what are known as direct and indirect

28

remuneration ("DIR") fees. DIR fees collected by PBMs from pharmacies in Medicare Part D networks; they encompass various costs like network participation fees, performance penalties, and administrative fees. These fees are often determined after the point of sale and assessed in an irrational or unreasonable manner. For example, a pharmacy may be penalized if a patient does not complete its refills, or if he chooses to do so at a different establishment, even though this is not in the pharmacy's control. DIR fees have sparked controversy due to their unpredictability and financial impact on retail pharmacies. Such fees can also force pharmacies to raise prices (or favor higher-priced drugs) to stay afloat.

### 2. PBM Drug Pricing and the Adjudication of Pharmacy Reimbursement Claims

64. In the United States, about 82% of prescription drug expenditures are made by TPPs such as private health insurance plans, Medicare and Medicaid, and other public programs. Consumer out-of-pocket expenditures account for only around 14% of spending. Most pharmacies thus rely on reimbursements from TPPs to stay in business.

65. TPPs use PBMs to make payments to pharmacies in almost all cases. When an insured patient fills a prescription, the dispensing

29

pharmacy typically collects only a small portion of the cost of the drug from the patient at the point of sale, usually in the form of a "co-pay" or "co-insurance." The pharmacy must then send a claim for reimbursement to the patient's health plan for the balance, which is adjudicated by the PBM.

66. To access and serve patients whose benefits are managed by a particular PBM (*i.e.*, the PBM's "covered lives"), a pharmacy must enter into a network contract with that PBM. Network contracts dictate how much the PBM must reimburse the pharmacy for prescription drugs and what fees the pharmacy must pay to the PBM to participate in its network.

67. The terms contained in these contracts are the result of closed-door negotiations between pharmacies and PBMs; they are confidential and considered competitively sensitive. If a PBM's negotiated network rates with a particular pharmacy are disclosed, a rival PBM might use that information to achieve a competitive advantage in its negotiations with the same pharmacy. And other

pharmacies might use the information to demand increased compensation from the PBM in the future.

68. Most network contracts include MFN provisions that ensure the PBM receives the same or a better price as any cash-paying customer. These provisions require the PBM to reimburse the pharmacy for each drug based on the "lesser of" a range of benchmark prices, including: (a) the Average Wholesale Price ("AWP"), minus a negotiated discount percentage (usually around 15-20%), plus a dispensing fee; (b) the Maximum Allowable Cost ("MAC") for the drug (as set by the PBM for the patient's health plan), plus a dispensing fee; (c) the drug's Ingredient Cost, plus a dispensing fee; (d) the Usual and Customary Price ("U&C") (*i.e.*, the pharmacy's retail price); or (e) the pharmacy's Submitted Claim Amount (*i.e.*, the full reimbursement amount requested from the PBM by the pharmacy, typically based on the U&C price).

69. Most brand drugs dispensed by pharmacies are reimbursed based on AWP minus the negotiated discount. Most generics are reimbursed based on the PBM's MAC list.

70.    MAC is a metric designed by PBMs to control drug costs for their clients by establishing an ostensibly fair but competitive maximum price for each drug. There is little transparency in how PBMs set their MAC prices, although in theory, the MAC price is supposed account for market realities such as the cost to the pharmacy of acquiring the drug. MAC lists are proprietary to each PBM and treated as highly confidential and competitively sensitive.

### 3.    PBM Market Concentration and Vertical Integration

71.    After decades of mergers and acquisitions, the three largest PBMs—Caremark, Defendant ESI, and OptumRx (the "Big Three")—now manage about 80 percent of all prescription claims in the United States. If these Big Three PBMs were standalone companies, each would rank among the 40 largest companies in the United States by revenue. The Big Three PBMs, together with the next three largest PBMs—Humana Pharmacy Solutions, MedImpact, and Prime—manage roughly 94 percent of prescription-drug claims in the United States.

72.    As illustrated in the chart below (based on data collected by the FTC), ESI alone accounts for roughly 23% of the PBM Services market nationwide. Prime, by contrast, accounts for just 3%.



**Figure 4. PBM Services Shares, 2016-2023**[59]
(% of total equivalent prescription claims managed)

73.    Given the current level of PBM consolidation, pharmacists, health insurers, and drug manufacturers have little choice but to interact with the large, dominant PBMs when purchasing or distributing prescription drugs.

74.    Large PBMs, including, most notably, ESI, also operate as "aggregators" of market power through so-called "partnerships" or "collaborations" with smaller PBMs. These arrangements—which are

33

little more than horizontal price-fixing agreements—allow ESI and other PBMs to increase their buying and negotiating power, to leverage their increased market power to compel pharmacies to accept below-cost reimbursement amounts and drug manufacturers to offer eye-popping, distortionary discounts. These "partnerships" also enable smaller PBMs, like Prime, to purchase the buying and negotiating power of the larger PBMs, and to achieve more lopsided outcomes in negotiations than they would in a competitive market.

75.    The Big Three PBMs are also vertically integrated with other up- and down-stream segments of the drug supply chain, including insurance companies, pharmacies, healthcare providers, and drug private labelers. ESI, for example, is owned by the Cigna Group, which also owns Cigna Healthcare (the fourth-largest insurer), Express Scripts Pharmacy (the second-largest mail-order pharmacy in the United States), and Accredo (the second-largest specialty-drug

34

pharmacy). The below chart, produced by the FTC, illustrates the

extent of this vertical integration:



| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
|---|---|---|---|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | ❤CVS caremark 34% | EXPRESS SCRIPTS 23% | Optum Rx 22% | Humana Pharmacy Solutions 7% | Medimpact 5% | PRIME THERAPEUTICS 3% |
| "PBM GPO"/ Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

### 4.    PBM Steering Practices

76.    PBMs that are vertically integrated with pharmacies,

including ESI, are financially incentivized to steer patients to their own

affiliated pharmacies, even if an unaffiliated rival pharmacy may offer

health plans and their members the same drugs at a better price.

77.    PBMs steer patients to their affiliated pharmacies in a

number of ways. PBMs can create narrow and preferred pharmacy

networks consisting of their vertically integrated pharmacies. PBMs use

preferred pharmacy networks to encourage patients to visit certain locations by offering lower cost-sharing or out-of-pocket costs. The relatively low co-pay requirements collected by PBM-affiliated preferred pharmacies are designed to attract patient traffic even if unaffiliated, competing pharmacies offer lower prices to those same patients' health plans.

78.   PBMs can diminish competition against their affiliated pharmacies by simply removing non-affiliated pharmacies from their preferred networks or by making it difficult for PBMs to gain admission to their networks in the first place. PBMs may subject pharmacies to long wait periods prior to network admission or require that they post excessive bonds. A pharmacy without access to major PBM's covered lives will likely go out of business. Thus, a key factor contributing to the higher risk of closure for independent pharmacies is the frequent exclusion from preferred pharmacy networks.

79.   PBMs can also hamstring nonaffiliated pharmacies by paying them below-cost reimbursement amounts, assessing them with astronomical back-end fees (including DIR fees), or subjecting them to

36

other discriminatory pricing terms, such as caps on the number of refills a patient may fill at non-affiliated pharmacy.

80.    PBMs also adjust their formularies in ways that steer patients seeking to fill prescriptions for high-cost, high-margin drugs away from competitors, such as by designating certain products as "specialty" drugs. A specialty drug is a high-cost prescription medication, often used to treat complex or chronic conditions, which may require special handling, administration, or patient monitoring. Spending on specialty drugs in the United States more than doubled from $113 billion in 2016 to $237 billion in 2023.

81.    The designation of a drug as a specialty medication triggers exclusivity provisions in contracts with certain TPPs that require the use of particular specialty pharmacies. ESI, for example, requires that many of the specialty drugs dispensed to its covered lives be handled by its affiliated special pharmacy, Accredo. For specialty drugs administered in a clinical setting, PBM contracts may require that a patient's provider obtain the drug from a PBM-affiliated pharmacy (known as "white bagging"), or they may require the patient to do so and then bring the drug to the provider's office for administration

37

("brown bagging"), even when the provider could have otherwise obtained the drug for the patient from the pharmacy typically used by the provider.

82.   Because specialty drugs command high prices and yield high margins, PBMs have a strong financial incentive to increase specialty drug designation and usage, and to capture specialty prescriptions at their affiliated pharmacies. As an internal PBM board presentation stated, "[s]teering to . . . captive specialty pharmacies" is a "major" driver of value for PBMs.

83.   According to the FTC, pharmacies affiliated with the Big Three (including ESI) have marked up numerous specialty generic drugs dispensed at their affiliated pharmacies by thousands of a percent, and many others by hundreds of a percent, over their National Average Drug Acquisition Cost ("NADAC"). NADAC is an index of drug acquisition costs based on surveys of invoices voluntarily provided to the Centers for Medicare & Medicaid Services ("CMS") primarily by small, independent pharmacies.



Figure 1. Number of Specialty Generic Drugs Dispensed by Affiliated and Unaffiliated Pharmacies by Markup Category, Segmented by Commercial and Medicare Part D Claims, 2020-2022

84. As the FTC has reported, there exists a strong positive correlation between a drug's price (and profit margins) and the share of prescriptions for that drug filled at PBM-affiliated pharmacies. The more a drug's price had been marked up, the more likely patients are to fill prescriptions for that drug at a PBM-affiliated pharmacy.

85. The FTC has also found that the Big Three often pay their affiliated pharmacies higher reimbursement rates than those they pay unaffiliated pharmacies for these expensive drugs. The below chart from the FTC compares reimbursement rates paid to pharmacies affiliated with the Big Three PBMs and the average reimbursement rates paid to unaffiliated pharmacies for the same set of drugs from

39

2020 to 2022. During this period, pharmacies affiliated with ESI and the rest of the Big Three were almost always reimbursed at higher rates than unaffiliated pharmacies (sometimes more than double what unaffiliated pharmacies were paid for the same drug). The disparity between affiliated and unaffiliated reimbursement rates is larger for commercial plan prescriptions (shown as circles) compared with Medicare Part D prescriptions (triangles).



**Figure 3. Ratios of PBM-Affiliated and Unaffiliated Pharmacy Reimbursement Rates for Specialty Generic Drugs Dispensed by All Big 3 PBMs as Specialty Drugs, Segmented by Commercial and Medicare Part D Claims, 2020-2022 Averages**

86.     Such practices have allowed the Big Three PBMs and their affiliated pharmacies to net billions in additional revenues at the

expense of patients, employers, and plan sponsors, who have seen their costs increased annually in the last few years.

## V. DEFENDANTS' ANTICOMPETITIVE SCHEME

87.   A cartel is a group of rivals that conspire to fix prices, allocate markets, or otherwise illegally limit competition. Cartels can be organized by competing sellers of goods or services (who seek to raise prices to increase their revenues) or by buyers (who seek to suppress prices to reduce their costs). Either way, the goal of cartel members is the same: to act (collectively) like a monopolist.

88.   This Complaint alleges that ostensible rivals ESI and Prime created a buyers' cartel to suppress the prices they pay for retail pharmacy dispensing services, including in the State of Michigan, in order to extract supracompetitive profits.

### A.   The Prime-ESI Agreement

89.   On December 19, 2019, ESI and Prime agreed to provide the same reimbursement rates and impose and the same fees on pharmacies across the country, including in Michigan. Specifically, ESI and Prime announced a "three-year . . . collaboration" pursuant to which ESI would "provide services to Prime related to retail pharmacy network and pharmaceutical manufacturer contracts" (the "Prime-ESI

41

Agreement" or "Agreement"). This was code for an unlawful horizontal agreement between rival PBMs not to compete for an essential input—retail pharmacy dispensing services.

90. The Prime-ESI Agreement went into effect nationwide (including in the State of Michigan) on April 1, 2020 for private health plans and Medicaid, and on January 1, 2021 for Medicare. Despite the original three-year term, the Agreement contemplated that there would be multiple extensions, which have carried the deal forward indefinitely. In a recent arbitration proceeding challenging the same Prime-ESI Agreement ("the AHF Arbitration"), Prime conceded that the Agreement is ongoing nationwide, and has been extended until at least December 31, 2025.

91. Prior to April 2020 (when the Agreement went into effect), Prime and ESI, as rival PBMs, competed against each other in the PBM Services Market, which required them to compete to attract retail pharmacies to their networks. ESI, as the second-largest PBM in the nation, could negotiate lower prices and extract higher fees from retail pharmacies than could its smaller rival, Prime. Indeed, before the Agreement went into effect, Prime had to pay pharmacies roughly 20%

more than large competitors like ESI. As Prime President and CEO Ken Paulus explained in a September 28, 2021 interview with *Managed Healthcare Executive*, before the Prime-ESI Agreement, "[Prime was] the highest paying retail pharmacy network pharmacy payer in the marketplace . . . paying 20% more than the market" for prescription drugs. Prime viewed the agreement with ESI as a "crystalizing event" that enabled ESI "to sharpen [its] pencil" with respect to its retail pharmacy reimbursements by fixing them with ESI's lower rates.

92.     According to Paulus, it was Prime that came up with the idea for a pricing collaboration with ESI as a way of generating supra-competitive profits. Initially, Prime offered up its "covered lives" to all the "Big Three" PBMs in exchange for access to one of their pharmacy networks as part of what Paulus called an "RFP process." Ultimately, ESI offered Prime the best deal:

> When we [Prime] went to the market, and we put out to the Big Three [PBMs], and actually a couple of others, was there interest in working with Prime, take our 30-35 million lives with whatever number they represent, and working together to improve the cost of goods sold for our clients. We had several, you know, organizations respond, we went through a very robust RFP process and Express Scripts landed at the top.

43

93.     The Prime-ESI Agreement eliminated price competition between ESI and Prime for pharmacy services, enabling Prime to pay pharmacies the exact same (lower) reimbursement rates (and extract the same fees) as ESI. As Judge Widman recently held in related arbitration, "Prime aligned its payment rates to pharmacies . . . to ESI's payment rates under ESI's networks. Prime used ESI's more favorable—*i.e.*, lower—retail network rates as payment standards for Prime's own national retail networks. Prime [then] adjudicated and paid claims from . . . pharmacies consistent with the then-current ESI pricing rules." On the basis of this finding, Judge Widman ordered Prime to pay AHF, a pharmacy network, over $10 million in treble damages.

94.     On or around January 2, 2020, Prime sent a letter to pharmacies informing them that "Prime's health plans [would] begin to transition to ESI's commercial and Medicaid pharmacy networks starting April 1, 2020," but that Prime would continue to "operate [its] claims processing platform, as well as manage and deliver a wide range of [PBM] services to [its] clients and their members, including pharmacy network management, formulary management and clinical

44

programs." In other words, Prime and ESI would continue to operate as separate, competing PBMs in most respects, including claims adjudication; enrollment and member services for plan beneficiaries; drug formulary development; custom network options; and value-based care strategies—but not for negotiating contractual reimbursement rates or fees with pharmacies. As Prime's President and CEO Ken Paulus told *Managed Healthcare Executive*:

> The beauty of the relationship [between Prime and ESI] is that we [Prime] didn't really hand over the keys. […W]e really didn't change anything at Prime other than that. We still process our own claims. We own the claim system. We do all of our own PAs, contact center, utilization management – we do everything ourselves. But that piece [retail pharmacy contracting] sits off behind the scenes, and then feeds our systems. […W]e're basically still doing all the functions of the PBM except for the procurement [of pharmacy contracts].

95. Paulus's comments make clear that the Agreement did not result in the combination of assets or capabilities owned by the two PBMs. Nor did it result in the creation or sale of any new product or service. It merely effectuates a naked price-fixing arrangement between Prime and ESI.

45

96.   In exchange for use of and access to ESI's pharmacy network rates—competitively-sensitive information ("CSI") that would not be shared between rivals in a competitive market—Prime agreed to pay ESI transaction-based "admin[istrative] fee[s]," enabling ESI to share in the supra-competitive profits generated by the unlawful Agreement.

97.   And to ensure that ESI's negotiated network rates would hold for all Prime transactions (and that Prime would not outbid ESI in pharmacy negotiations using ESI's competitively sensitive negotiated rates and other information), the Agreement included strict pricing "guardrails" (like "minimums," "maximums," and "targets"), which Prime was required to adhere to in the aggregate each year of the collaboration. Prime was prohibited from deviating from these "guardrails" or going below ESI's pricing price for every pharmacy provider in each of Prime's pharmacy networks. In other words, Prime expressly agreed not to outbid ESI for pharmacy dispensing services.

98.   ESI monitored compliance with the Agreement through regular meetings and reports. ESI even issued financial adjustments to ensure consistent prices across the two PBMs, making a "true-up payment" to Prime based on year-end results when Prime did not

46

precisely achieve the identical aggregate reimbursement rates negotiated by ESI.

99.     The Agreement also replaced Prime's prior performance-quality pharmacy price concession ("PPC") incentive program with ESI's direct and indirect reimbursement ("DIR") program for network pharmacies in Medicare Part D. The goal of this feature of the Agreement was to fix the fees Defendants assess on pharmacies, thereby reducing by an additional 9% the net compensation paid to Prime's network pharmacies. Unlike the reimbursement rate setting that affected front-end payments to retail pharmacies, the importation of ESI's DIR program allowed Prime to make back-end adjustments to recapture payments it had already made to those network pharmacies. ESI's DIR program also substituted for Prime's original contractual incentive program, and it subjected non-affiliated pharmacies to contractual terms that belonged to Prime's competitor ESI, another form of price-fixing.

100.    The purpose and effect of all of these elements of the Agreement was to suppress net compensation (*i.e.*, reimbursements paid less fees extracted) to retail pharmacies below competitive levels.

47

101. To effectuate the Agreement, Prime and ESI exchange CSI—including the confidential terms of their contracts with retail pharmacies and drug manufacturers—in part through a secretive, off-shore, jointly-owned group purchasing organization ("GPO") called "Ascent." According to Prime CEO Paulus,

> The core of the [Prime] relationship [with ESI] is around a GPO, a group purchasing organization, by the name of Ascent. Express Scripts had this vehicle that they use for their own purchasing in pharmacy for a few years. . . .
>
> And the model is pretty straightforward, actually. We, together, co-own this GPO. We're [Prime] a minority owner, their [ESI] majority owner. [The GPO] is based in Switzerland. It's fully transparent. We have direct access to all of the contracts in the GPO. We have employees that work in the GPO with their employees. So it's a real shared effort.
>
> I think we [Prime and ESI] both benefited from it. We took our lives and together created a GPO in this market, that's 100 million lives, a big chunk of the United States. And then we . . . said[] we want to work with you, let's find a way to make healthcare more affordable and advance formularies and rebates and **pharmacy strategies** together in ways that are helpful.

102. Since the Agreement has gone into effect, pharmacy reimbursement claims made on Prime transactions have been routed

48

automatically to ESI and tagged with bank identification numbers (or "BINs") denoting them as ESI claims, rather than Prime claims. ESI's negotiated reimbursement rates (and fees) have then been applied to those claims, supplanting Prime's negotiated rates and fees and suppressing pharmacy compensation amounts below competitive levels.

103.   On information and belief, net compensation amounts paid to pharmacies on Prime transactions are now over 20% lower than what they were before the Agreement went into effect. But those price decreases have not driven retail pharmacies out of Prime's pharmacy network. When asked whether Prime had "los[t] some dispensers" or whether its pharmacy "network change[d]" as a result of the Agreement, Paulus has stated,

> Not really. But it wasn't without some difficult conversations. We didn't really lose anybody; I think our network is virtually the same. But I think a lot of our partners got used to Prime paying 20% more than the market, and I understand that.

104.   Paulus's comments make clear that the Agreement enables Prime and ESI to collectively exercise monopsony power over retail pharmacies. In the absence of a restraint conferring collective monopsony power on its participants, Prime would not be able to

49

profitably impose a durable 20% decrease in reimbursement rates on retail pharmacies without those pharmacies leaving Prime's networks.

105. The Agreement has been highly profitable for Prime. By supplanting its own negotiated rates and fees with those of ESI, Defendants have been able to generate profits (at the expense of pharmacies) that would not be possible under normal competitive conditions. Prime has stated that it has "saved" at least $2.5 billion as a result of its Agreement with ESI, cost reductions that reflected its nationwide reduction of reimbursements to retail pharmacies. ESI has also profited significantly from the administrative fees Prime has generated under the Agreement.

106. The "savings" generated by Prime and ESI pursuant to the Agreement have not been passed on to health plans or patients. In the AHF arbitration, Judge Widman noted that Prime's "evidence" of supposed procompetitive benefits for health plans and patients fell well short of the mark—"despite [Prime] having at least one witness who probably could have presented compelling testimony and documentation if it existed." According to Judge Widman, "Prime's evidence of [purported] benefits to patients was primarily 'how' [Prime] could pass

through the cost savings to patients, 'ways' it could do that, and forms it can take," rather than "specific concrete evidence of actual pass-throughs."

### B. Effects of Defendants' Conduct in the State of Michigan

107. On information and belief, the Prime-ESI Agreement has operated and continues to be in effect nationwide, including in the State of Michigan, where both Prime and ESI operate. The Agreement's anticompetitive effects—including but not limited to the suppression of retail pharmacy compensation amounts—have been felt by the People of theState of Michigan as they have nationwide.

108. The Prime-ESI Agreement unlawfully increased their market power. Pursuant to the Agreement, Prime's roughly 30 million covered lives were added to Express Scripts' pre-existing member volume of 75 million covered lives. ESI would henceforth represent over 100 million covered lives in its negotiations with drug manufacturers and pharmacies. As one PBM analyst put it, thanks to the Agreement, "pharmacies will face the largest PBM ever." ESI's roughly 40% increase in covered lives (and therefore market power)—which it achieved

51

overnight through unlawful means—has enabled to ESI to extract additional concessions from unaffiliated retail pharmacies.

109.  ESI's market power became particularly pronounced in the State of Michigan following the Agreement. On information and belief, between 2021 and 2023 (if not longer), ESI maintained some 89% of the Michigan PBM Services Market, likely the largest share of the market ever achieved by a single PBM within a single U.S. state. In other words, ESI became the PBM for almost all Michigan TPPs (of which Blue of Cross Blue Shield of Michigan is by far the largest, with roughly two-thirds of the State's insurance market). ESI's buying power in the input market for Michigan retail pharmacy dispensing services was likely even greater, as under the Agreement, ESI absorbed all of Prime's covered lives for purposes of retail pharmacy contracting.

110.  ESI's market power in the Michigan markets for PBM Services and Retail Pharmacy Dispensing Services means that ESI controls both where a super-majority of Michigan residents get their prescription drugs dispensed (and on what terms) as well as the amount retail pharmacies in Michigan will be paid for those transactions.

111.   ESI uses its market power, gained in part through its unlawful agreement with Prime, to steer millions of Michigan covered lives to ESI-affiliated pharmacies—even if non-affiliated pharmacies offer better prices or services. ESI employs numerous tactics to steer Michigan covered lives to ESI's two affiliated pharmacies, Express Scripts Pharmacy and Accredo, both of which are mail-order pharmacies.

112.   ESI's agreement with Prime has allowed it to artificially suppress the reimbursement rates Michigan retail pharmacies receive and subject them to artificially high fees. In many instances, the reimbursements ESI and Prime pay Michigan pharmacies do not even cover their acquisition costs (meaning the pharmacies lose money on the transactions). Michigan retail pharmacies are forced to accept these low payment amounts in order to participate in ESI's pharmacy networks and thereby access ESI's nearly 8.6 million Michigan covered lives. Because ESI controls so many potential pharmacy customers in Michigan, most Michigan retail pharmacies would go out of business without being part of ESI's networks.

53

113. Even with access to ESI's network, low reimbursements and high fees make it difficult for unaffiliated retail pharmacies in Michigan to survive. The closure of Michigan retail pharmacies benefits ESI, because it drives more prescription transactions to its mail-order pharmacies.

114. ESI also frequently excludes Michigan retail pharmacies from its networks, functionally forcing them out of the market. In many cases, ESI gives no explanation for these exclusions and merely cites boilerplate provisions in its lopsided network agreements that give ESI the unilateral discretion to "terminate… any Pharmacy[] from participating" in its networks for any reason.

115. ESI also requires any Michigan retail pharmacy seeking admission to its network to "furnish a performance bond (Surety Bond) in the amount of $500,000." This amount represents over 10% of an average independent pharmacy's annual gross revenue. Pharmacies must maintain these bonds for at least two years, at which point, "[d]epending on the applicant's pharmacy practices, as well as the performance under the Provider Agreement, Express Scripts may require a provider to maintain a Surety Bond beyond the initial 2-year

period." In other words, to obtain access to ESI's Michigan network, pharmacies must indefinitely post half-a-million dollars with a third-party, a requirement many independent pharmacies cannot possibly meet. ESI says that the purpose of the surety bond requirement is to "guarantee" that a pharmacy "will carry out the performance of their contract according to the terms and conditions agreed to by the parties."

116. ESI's surety bond requirement is a pretext for a steering policy aimed to block competing pharmacies from participating in ESI's networks. Surety bonds are typically used to guarantee the performance of a specific obligation, like completing a construction project, paying certain taxes, or adhering to the terms of a professional license. Pharmacies' contractual obligations to PBMs are far more complex and diverse than the specific, concrete obligations that surety bonds are typically designed to guarantee, and pharmacies' adherence to licensing requirements is enforced by public regulators, not privately by the PBM industry.

117. ESI also requires that many, and sometimes all, of the drugs it designates as "specialty drugs" be dispensed by its affiliated special pharmacy, Accredo, rather than any competing specialty pharmacy.

This requirement applies in Michigan as it does throughout the country and precludes non-ESI-affiliated Michigan pharmacies from competing for the sale of high-price, high-margin specialty drugs. At the same time, ESI foists low or no-margin drugs on non-affiliated retail pharmacies, both in Michigan and throughout the country, ensuring that non-affiliated pharmacies are left to fill the unprofitable prescriptions.

118. Not only does ESI steer Michigan covered lives to its affiliated mail-order and specialty pharmacies, but it also pays its affiliated pharmacies higher reimbursement rates than it pays non-affiliated Michigan retail pharmacies. ESI pays its affiliated pharmacies more for prescriptions drugs dispensed to Michigan covered lives than it pays unaffiliated pharmacies, further advantaging PBM-affiliated pharmacies over the competition.

119. These tactics are effective. In Michigan and across the country, members of commercial health plans managed by ESI filled a significantly larger proportion of their prescriptions at PBM-affiliated pharmacies, particularly for high-margin specialty prescriptions.

120.  ESI's practices have had devasting effects on the People of the State of Michigan and their businesses, and the State of Michigan's general economy and welfare. ESI engages in this steering and self-preferencing activity with the purpose and effect of disadvantaging Michigan's retail pharmacies and forcing many of them out of business.

121.  ESI's practices have pushed Michigan's already distressed retail pharmacies further into financial extremis, leading to a wave of retail pharmacy closures across the State and creating numerous pharmacies deserts.

122.  In 2020, Michigan had 1,026 independent pharmacies. By 2023, that number had dropped to 793. Between January and August of 2024 alone, Michigan experienced 272 pharmacy closures, more than any other state during that period. Ninety-one of those closures were independent pharmacies. These closures have also impacted non-ESI-affiliated chain pharmacies. In the Spring 2024, the drugstore chains Walgreens and Rite-Aid, which are not affiliated with ESI, announced a slew of closures.

123.  Many of those closures are attributable, at least in part, to ESI's exercise of market power in the State of Michigan. These closures

have hit low-income, medically disadvantaged rural and urban communities the hardest.

124. In urban areas, public health experts define pharmacy deserts as neighborhoods further than one mile from the nearest pharmacy. In low-income urban areas with low rates of vehicle ownership, pharmacy deserts are defined as neighborhoods further than 0.5 miles from the nearest pharmacy, because many residents may struggle to walk or use public transportation to access their nearest pharmacy. Under these definitions, approximately half of Detroit's neighborhoods are now considered "pharmacy deserts."

125. For rural communities, a pharmacy desert is defined as a neighborhood further than 10 miles from the nearest pharmacy. Under this definition, over 40 rural towns in northern Michigan (and likely more rural neighborhoods) are also pharmacy deserts, as residents must drive more than 10 miles to reach a pharmacy. In many instances, residents must drive over 20 miles to reach a pharmacy.

126. Having a high person-to-pharmacist ration may indicate a shortage of pharmacists in a region, which can lead to longer wait time and reduced quality of patient care. The south-central region of

58

Michigan (surrounding Lansing) has the highest ration of people to pharmacists, followed by the Upper Peninsula.



There are more pharmacies and *Pharmacists* in densely populated areas.

Average Number of People per *Pharmacist* by Michigan Prosperity Region.

127.  As of June 2024, there were 2,338 total retail pharmacies in Michigan (or about 0.23 per 1,000 people in the State). In the Detroit "48228" ZIP code there are only 10 pharmacies to serve about 54,000 people. In the Rochester Hills "48307" ZIP code, there are 16 pharmacies for about 43,000 residents. In Canton Township, the "48187" ZIP code has 15 pharmacies for roughly 53,000 people.

128. By driving more and more non-affiliated Michigan retail pharmacies to close their doors through the payment of artificially low reimbursement rates, high DIR fees, and other anticompetitive tactics designed to force the use of ESI's affiliated mail-order pharmacies, ESI has intentionally contributed to the creation of brick-and-mortar pharmacy deserts in the State of Michigan.

## VI. DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

129. This case concerns a horizontal price-fixing arrangement between Prime and ESI to fix prices paid for a key input: retail pharmacy services in the State of Michigan. That agreement is *per se* illegal, so alleging market power is unnecessary with respect to the State's conspiracy claims under federal and state law. To the extent a market definition and market power must be alleged for any claim asserted herein, the State alleges as follows.

### A. The Relevant Market: The Market for Retail Pharmacy Dispensing Services.

130. If a relevant antitrust market is necessary, the relevant market is the input market for retail pharmacy dispensing services for purchase by PBMs on behalf of third-party payors (the "Retail Pharmacy Dispensing Services Market"). PBMs buy retail pharmacy

dispensing services from pharmacies, maintain pharmacy "networks," and provide TPP clients and their members with access to prescription drugs and pharmacy services. In this market, PBMs like Prime and ESI function as buyers (and aggregators of buying power) of pharmacy dispensing services from retail pharmacies, whereas retail pharmacies function as suppliers of those services. Without the ability to purchase pharmacy dispensing services from retail pharmacies, PBMs like Prime and ESI would not be able to compete in the market for PBM services against other PBMs. Without the ability to sell pharmacy dispensing services to PBMs like Prime and ESI, pharmacies would not be able to operate.

131. As an input market, the outer boundaries of the market for retail pharmacy dispensing services for purposes of the antitrust laws are defined based on which buyers are considered reasonable economic substitutes for one another from the perspective of sellers of the relevant good or services. From the perspective of retail pharmacies, PBMs are not reasonably substitutable with other potential purchasers of retail pharmacy dispensing services, such as cash-paying consumers, because over 80% of all prescription drugs purchases are made by PBMs

61

on behalf of health plans. The vast majority of retail pharmacies would go out of business if they did not receive payments for selling dispensing services to PBMs.

132. The market for retail pharmacy dispensing services satisfies the test for market definition used by federal antitrust enforcement agencies known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP") without triggering a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. In the case of monopsony, the test asks whether a hypothetical monopsonist could profitably impose a small but significant, non-transitory decrease in price (SSNDP) without triggering a sufficient number of suppliers to switch to other buyers such that the SSNDP would be unprofitable to the monopsonist. If the SSNDP is profitable, the market is properly defined. If the SSNDP is not profitable, the market is too narrowly defined and does not encompass sufficient economic substitutes.

133.  Here, the SSNDP test is satisfied, and the market is properly defined. Pursuant to the Prime-ESI Agreement, Prime has been able to decrease its pharmacy compensation rates by over 20% throughout the United States, including in the State of Michigan. Yet those increases have not driven enough pharmacies out of Prime's pharmacy network such that the SSNIP has become unprofitable to Prime. This confirms that retail pharmacies have no reasonable economic substitutes to which they could turn to in response to a small but significant non-transitory decrease in compensation paid by PBMs on behalf of TPP clients for pharmacy dispensing services.

134.  The market for pharmacy dispensing services can be corroborated by practical indicia of the contours of competition. With regard to industry or public recognition of the market, there is widespread recognition in both the PBM and pharmacy industries that retail pharmacy dispensing services are distinct from those provided by mail-order pharmacies. As industry participants have observed, many patients prefer or require services from retail pharmacies, including when they need to have their prescriptions filled immediately, where an established relationship with a particular pharmacist exists, or when

63

patients simply wish to speak to a pharmacist in person regarding their medication. Given these differences, PBMs must maintain networks that include retail pharmacies in order to retain TPP clients, because those clients seek to ensure their members have access to convenient, same-day, in-person pharmacy options. Therefore, mail-order pharmacy dispensing services are not a reasonable substitute for retail pharmacy dispensing services from the perspective of PBMs.

135.   With regard to distinct prices, the prices of retail pharmacy dispensing services sold to PBMs are distinct from those sold to cash-paying customers. Whereas PBMs purchase pharmacy services pursuant to agreed-upon contract rates that reflect steep volume discounts, cash-paying customers pay retail prices.

136.   With regard to the peculiar characteristics and uses, the market for retail pharmacy dispensing services is unique because retail pharmacies are able to fill prescriptions on a same-day basis and offer patients in-person advice from a pharmacist.

## B.    The Relevant Geographic Market

137.   The relevant geographic market is the United States, or narrower markets therein, including the State of Michigan. In an input

case, a geographic market is defined as the area a supplier (here, pharmacies) can turn to look for other purchasers if a defendant purchaser (ESI and Prime) imposes an anticompetitive price increase. The retail pharmacy dispensing market is localized to the State of Michigan because PBMs operate within state-regulated health insurance frameworks which vary state-by-state. Michigan also imposes regulations on PBMs specifically, such that pharmacies can only provide retail pharmacy dispensing services to PBMs who are licensed to operate in the State of Michigan. In operating under these regulations, PBMs compete only with others operating in the State of Michigan to obtain retail pharmacy dispensing services. ESI and Prime are (or have been) the dominant purchasers of retail pharmacy services on behalf of TPPs that sponsor health plans with members residing in the State of Michigan. This includes the largest payor in the State, Blue Cross Blue Shield of Michigan. Absent their anticompetitive scheme, Prime and ESI would compete with other PBMs to build their networks of retail pharmacies within the State of Michigan in order to service TPP clients with members in the State of Michigan.

65

C. **Defendants' Market Power in the Michigan Market for Retail Prescription Drug Dispensing Services**

138. To the extent proof of market power is needed, Defendants' collective buying power can be established with direct evidence (like their collective ability to control prices and profitably push them below competitive levels), obviating the need for a market definition. Such evidence exists here. ESI and Prime would not have been able to profitably impose massive 20% reductions in retail pharmacy compensation rates on Prime transactions—well in excess of the small but significant non-transitory decrease in prices of a hypothetical monopsonist—unless they collectively possessed buying power over retail pharmacists. Absent the Agreement, Prime would face competitive harms for under-paying pharmacists, such as network defections, making the payment of artificially low compensation unprofitable.

139. Moreover, pharmacies have no choice but to deal with ESI because ESI controls 89% of covered lives in Michigan. If pharmacies were to opt-out of ESI's network, they would lose access to millions of patients; in other words, most pharmacies have no choice but to participate in ESI's network.

66

140. To the extent necessary, Defendants' collective buying power can also be inferred based on their combined market share plus evidence of barriers to entry and exit. A PBM's share of the input market for retail pharmacies in a particular geographic area is roughly based on its share of the PBM Services market in that area (which is in turn based on the percentage of covered lives and their claims that PBM manages). Between 2021 and 2023, ESI was the PBM for roughly 89% of all covered lives in Michigan; this alone is enough to infer Defendants' collective monopsony power over retail pharmacies in Michigan.

141. The "Herfindahl-Hirshman Index" ("HHI"), a common indicator of market concentration, confirms as much. HHI approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 when a market is controlled by a single firm. The U.S. Department of Justice considers any market with an HHI above 1,800 to be "highly concentrated." In 2021, a study by an American Medical Association economist demonstrated that the Michigan PBM Services market had a radically

high HHI of 7,910, the most concentrated state-level PBM services market in the country.

142.   High barriers to entry (and exit) also exist. On the PBM side, there are high barriers to entry that make it difficult for new PBMs to enter the market for pharmacy benefit management services. These barriers include state and federal regulatory requirements and the costs associated with developing pharmacy networks, building client relationships, and developing the kinds of technologies and infrastructures that enable PBMs to electronically adjudicate millions of pharmacy reimbursement claims each day.

143.   On the pharmacy side, pharmacies face high exit barriers. In the United States, over 80% of all prescription drug costs are covered by third-party payors. These payors all use PBMs to negotiate prices with pharmacies, process drug claims, and pay reimbursements. Given this reality, pharmacies have no substitutes from which to seek reimbursement for generic drugs but from PBMs retained by third-party payors. (And in Michigan, the PBM retained is, for the vast majority of pharmacy customers, ESI.) The only way for pharmacies to "exit" this third-party payor system is to refuse to fill prescriptions for

the vast majority of patients who will not or cannot pay cash, which would spell financial ruin for most pharmacies.

## VII.  <u>ANTICOMPETITIVE EFFECTS</u>

144.  Defendants' misconduct has resulted in a host of anticompetitive effects, including the payment of artificially high prices for PBM services and prescription drugs by Michigan health plans and members; the payment of artificially low compensation amounts to Michigan pharmacies; and decreased output, quality, and choice of pharmacy services for the People of the State of Michigan.

## VIII. <u>FRAUDULENT CONCEALMENT</u>

145.  Defendants have affirmatively and fraudulently concealed their unlawful conspiracy by various means and methods from its inception. Defendant ESI has also concealed its monopolization and monopsonization of the Michigan Market for PBM Services and the Michigan Market for Pharmacy Dispensing Services.

146.  Defendants concealed their unlawful behavior in at least two ways. First, they misled pharmacies about how ESI and Prime set their reimbursement rates. Second, they actively worked to conceal the true nature of the Agreement and ensure its secrecy.

147. Express Script's explanation of its reimbursement methodology to pharmacies was false and misleading. Moreover, ESI and Prime intentionally hid from pharmacies that their compensation rates were to be determined pursuant to an unlawful Agreement to use ESI's CSI to set reimbursement rates for pharmacies in Prime's network.

148. ESI also made false and misleading statements to conceal that it colluded with Prime (its competitor) to work in concert to artificially suppress payments to pharmacies, including in the State of Michigan.

149. ESI and Prime spent years claiming that they set pharmacy compensation at competitively determined rates, when in fact they were fixed by the Agreement.

150. ESI and Prime also publicly misrepresented that they did not engage in anticompetitive conduct. For example, ESI's published Code of Conduct states that employees must not "work[] or perform[] services for any Express Scripts competitor," and that "Express Scripts must comply with antitrust and other laws regulating competition." Its own Code of Conduct notes that "[a]greements with competitors to fix

prices . . . or engage in collusion (including price sharing)" were unlawful.

151.   Similarly, Prime's Code of Conduct provides that employees must "follow the laws and other requirements that apply to your job and our business," and that Prime is "committed to complying with antitrust laws," which prohibit "[p]rice fixing" and "[m]onopolization." Employees are "required to adhere to fair competition and business practices and avoid even the appearance of anticompetitive conduct." Prime also maintains a non-public "Antitrust Policy" that, on information and belief, further clarifies that Prime knew its Agreement with ESI was unlawful but hid the true nature of the Agreement from its network pharmacies.

152.   Defendants also took steps to conceal the true nature of their anticompetitive arrangement from drug manufacturers and from pharmacies in their networks.

153.   Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put the People on inquiry notice.

71

154. ESI privately shared its own non-public pricing data with Prime, via mechanisms that remain publicly unknown, and Prime in turn used this pricing data to extract additional revenues by lowering its pharmacy reimbursement rates. The inner workings and true nature of this Agreement are secrets that are not shared with the public or with pharmacies in Defendants' networks.

155. ESI and Prime regularly attended invitation-only industry events where they discussed behind closed doors how the Agreement would allow them to reduce costs by suppressing pharmacy reimbursement rates.

156. Defendants had private communications and meetings to discuss pharmacy reimbursement rates and the sharing of competitively sensitive information among Defendants and their competitors.

157. The State therefore had neither actual nor constructive knowledge of the facts giving rise to its claim for relief. The State did not discover, nor could it have discovered through the exercise of reasonable diligence, the true nature of Defendants' Agreement until shortly before filing this Complaint.

158. Through Defendants' knowing and active concealment of their misconduct, the State did not receive information that should have put it, or any reasonable person or pharmacy standing in its shoes, on sufficient notice of collusion worthy of further investigation.

159. The State could not have been on inquiry notice of Defendants' scheme and the true extent and effect of the Prime-ESI Agreement until the January 17, 2025 order in the AHF arbitration against Prime, which details the inner working of the Agreement, the extent of its anticompetitive effects, and Defendants' complete lack of any procompetitive justifications for the Agreement.

160. The State exercised reasonable diligence at all times and could not have discovered Defendants' alleged misconduct sooner because of Defendants' deceptive and secretive actions which concealed their misconduct.

161. The State filed its case as soon as it became aware of the anticompetitive conduct alleged herein, in reliance on its own investigation.

162. Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of

73

limitations concerning the claims and rights of action of the State arising from the conspiracy and ESI's monopolization.

163.  Defendants' misconduct also constitutes a continuing violation of the antitrust laws. Although formed in 2019, Express Scripts and Prime's unlawful Agreement has continued to the present. Defendants continue to engage in the anticompetitive conduct alleged herein and have taken no affirmative steps to withdraw from it or otherwise disavow it. Each claim processed by Express Scripts and Prime subject to their unlawful agreement constituted an overt act that inflicted a new and accumulating injury on the People of Michigan, and these acts have occurred daily within the past four years.

## IX.   CAUSES OF ACTION

### A.   Claim 1: Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)

164.  The State repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

165.  Defendants Express Scripts and Prime—both PBMs and direct business competitors—entered into a horizontal agreement to fix the reimbursement rates they pay Michigan pharmacies, as well as the fees they charge Michigan pharmacies.

166.   The Prime-ESI Agreement is unlawful under a *per se* mode of analysis. It is also unlawful under either the rule of reason or quick look mode of analysis.

167.   The Agreement reduces Michigan consumers' choice of pharmacies, the quality and convenience of pharmacy services in Michigan, and the output of pharmacy services to Michigan consumers. The Agreement also artificially deflates reimbursement rates paid to and artificially inflates fees extracted from Michigan pharmacies, thereby misallocating Michigan's economic resources.

168.   The Agreement does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale.

169.   There are no procompetitive justifications for the Agreement; any proffered justifications, to the extent cognizable, could be achieved through less restrictive means. Any procompetitive effects are substantially outweighed by the Agreement's anticompetitive effects.

170.   As a direct and proximate result of Defendants' unlawful Agreement, persons in the State of Michigan have suffered injury to

75

their business or property, including pharmacies who receive lower reimbursement rates for drugs they sell. They will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

171. Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce to adjudicate claims for prescription drugs submitted by pharmacies to health plans and in the provision of PBM services.

172. The conduct of Defendants in furtherance of the unlawful Agreement described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

### B. Claim 2: Agreement in Restraint of Trade in Violation of the Michigan Antitrust Reform Act (M.C.L. § 445.772)

173. The State repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

174. Defendants Express Scripts and Prime—both PBMs and direct business competitors—entered into a horizontal agreement to fix

76

the reimbursement rates they pay Michigan pharmacies, as well as the fees they charge Michigan pharmacies.

175. The Prime-ESI Agreement is unlawful under a *per se* mode of analysis. It is also unlawful under either the rule of reason or quick look mode of analysis.

176. The Agreement reduces Michigan consumers' choice of pharmacies, the quality and convenience of pharmacy services in Michigan, and the output of pharmacy services to Michigan consumers. The Agreement also artificially deflates reimbursement rates paid to and artificially inflates fees extracted from Michigan pharmacies, thereby misallocating Michigan's economic resources.

177. The Agreement does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale.

178. There are no procompetitive justifications for the Agreement; any proffered justifications, to the extent cognizable, could be achieved through less restrictive means. Any procompetitive effects are substantially outweighed by the Agreement's anticompetitive effects.

77

179.   As a direct and proximate result of Defendants' unlawful Agreement, the People of the State of Michigan have suffered injury to their business or property, including Michigan pharmacies who receive lower reimbursement rates for drugs they sell. They will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

180.   Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce to adjudicate claims for prescription drugs submitted by pharmacies to health plans and in the provision of PBM services.

181.   The conduct of Defendants in furtherance of the unlawful Agreement described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

### C.   Claim 3: Public Nuisance (M.C.L. § 600.3801(3) and Common Law)

182.   The State hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

183.   A common-law public nuisance is defined as "an unreasonable interference with a right common to the general public,"

78

such as the public health or public safety. Even an otherwise lawful activity can become a nuisance when it unreasonably interferes with the public health or safety.

184. Defendants ESI and Prime, both PBMs operating within the State of Michigan, have engaged in intentional and harmful practices with the aim and effect of driving retail pharmacies out of business. These unfair and anticompetitive practices include horizontally consolidating the market shares of rival PBMs through an unlawful conspiracy (the Prime-ESI Agreement); artificially suppressing below competitive levels the net compensation amounts paid to Michigan retail pharmacies; steering covered lives (and their transactions) in Michigan to Defendants' mail-order and specialty pharmacies through intentional plan, formulary, and pharmacy network designs; and paying affiliated mail-order pharmacies higher rates of reimbursement than those paid to non-affiliated Michigan retail pharmacies.

185. In so doing, Defendants created a public nuisance detrimental to the public health, safety, and welfare of the residents of the State of Michigan. Defendants' actions have resulted in the closure of retail pharmacies across the State, creating pharmacy deserts and

thereby hindering the access to essential medication and healthcare services for Michigan residents, especially those in rural and urban medically-underserved communities.

186. The health and safety of the citizens of the State, all of whom require access to pharmacies, is a matter of great public interest and of legitimate concern to the State's citizens and residents.

187. Defendants' actions undermine the livelihood of retail pharmacists, causing economic harm and job loss in the community.

188. The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefits.

189. Defendants, by their acts and omissions as described herein, were substantial factors in causing the aforementioned pharmacy access crisis, and in so doing created a public nuisance. Defendants knew or should have known that their behavior would create or substantially contribute to a public nuisance.

190. In addition and independently, Defendants' conduct invades a legally protected interest. Defendants' conduct constitutes an

80

unreasonable interference because, *inter alia*, each Defendant has violated Michigan antitrust law. *See* M.C.L. §§ 445.772-73.

191.  The interference is unreasonable because Defendants' nuisance-creating conduct:

    a.  Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

    b.  At all relevant times was and is proscribed by state and federal laws and regulations; and/or

    c.  Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

192.  The public nuisance caused by Defendants has significantly harmed, and continues to significantly harm, a considerable number of, if not all, Michigan residents.

193.  The People of the State of Michigan have sustained injury because of the public nuisance described herein.

194. The People of the State of Michigan have sustained specific and special injuries because damages include, *inter alia,* increased health services-related expenditures by residents, as described in this Complaint.

195. As a direct and proximate result of Defendants' intentional and/or negligent and reckless conduct and the public nuisance created by Defendants, public resources are being unreasonably consumed in providing pharmacy access or other healthcare services to Michigan residents in pharmacy deserts, thereby eliminating available resources which would otherwise be used to serve the public at large in Michigan.

196. Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia,* injunctive relief, abatement of the public nuisance, payment to Plaintiff of monies necessary to abate the public nuisance, all damages as allowed by law, attorney fees and costs and pre- and post-judgment interest.

### D. Claim 4: Statutory Public Nuisance (M.C.L. § 600.3801(3))

197. The State hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

82

198.   M.C.L. § 600.3801(3) provides that "[a]ll . . . nuisances shall be enjoined and abated as provided in this act and the court rules." Subsection (3) does not limit abatement to the specific nuisances listed in subsections (1) or (2), but applies to "[a]ll" nuisances.

199.   Defendants' conduct constitutes a statutory public nuisance for the same reasons as set out in the preceding section.

200.   To abate the ongoing nuisance associated with pharmacy deserts created by Defendants misconduct, Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, injunctive relief, abatement of the public nuisance, and payment to Plaintiff of monies necessary to abate the public nuisance.

### E.   Claim 5: Unjust Enrichment

201.   The State hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

202.   By common law and the principles of justice, a person or entity may not be inequitably enriched by receiving a benefit at another's expense.

203.   As described herein, Defendants Prime and ESI have obtained revenue and profits from their systematic and intentionally

83

anticompetitive practices intended to disadvantage and/or force retail pharmacies out of business in the State of Michigan.

204. These practices have resulted in a significant financial gain for Defendants at the expense of retail pharmacies and the consumers they serve.

205. Defendants have been unjustly enriched by engaging in price-fixing, profiting from artificially low pharmacy net compensation rates, and leveraging their market positions to promote their own mail-order pharmacies to the detriment of unaffiliated retail pharmacies in Michigan.

206. The State acting as *parens patriae* is entitled to restitution equal to the amount of Defendants' unjust enrichment to redress the economic harm caused to retail pharmacies and consumers in the State of Michigan.

## X.   PETITION FOR RELIEF

207. The State petitions for the following relief:

a) A determination that the conduct set forth herein is

unlawful under Section 1 of the Sherman Antitrust Act

and Section 2 of MARA, and constitutes a public nuisance and unjust enrichment under Michigan law;

b) A judgment and order requiring the Defendants to pay damages to the State, trebled;

c) A judgment and order requiring the Defendants to pay disgorgement and restitution to the State;

d) An order enjoining the Defendants from engaging in further unlawful conduct and abating the public nuisance caused by Defendants' unlawful conduct;

e) An award of attorneys' fees and costs;

f) An award of pre- and post-judgment interest on all amounts awarded; and

g) Such other and further relief as the Court deems just and equitable.

## XI.   **JURY DEMAND**

208.   The State demands a jury trial on all issues triable as of right before a jury.

Respectfully submitted,

THE PEOPLE OF THE STATE OF MICHIGAN

Dated: October 1, 2025

By: /s/ Jonathan S. Comish
Jonathan S. Comish (P86211)
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632
comishj@michigan.gov

By: /s/ Natasha J. Fernández-Silber

Natasha J. Fernández-Silber (P83334)
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
nfernandezsilber@edelson.com

*Attorneys for Plaintiff*

86