## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF MICHIGAN, | |
| Plaintiffs, | Case No. 2:25-cv-11215-JJCG-KGA |
| v. | Hon. Jonathan J.C. Grey |
| EXPRESS SCRIPTS, INC., *et al*, | |
| Defendants. | |

## REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

# **<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

I. The State Lacks *Parens Patriae* Standing to Seek Damages. ...........................1

II. The State Lacks *Parens Patriae* Standing to Seek Injunctive Relief..............3

III. The State Also Lacks Antitrust Standing. ......................................................6

IV. The State's Federal and State Antitrust Claims Are Time-Barred..................6

V. The State's Antitrust Claims Should Be Dismissed for Failure to State a Claim. ...........................................................................................................9

    A. The Court Should Review the Subcontract. ........................................10

    B. The Subcontract Is Not "Horizontal Price Fixing." ...........................12

    C. The Complaint Does Not State a Claim Under the Rule of Reason. ................................................................................................15

VI. The State Fails to Plead a State Law Public Nuisance Claim. ......................18

VII. The State Fails to Plead a State Law Unjust Enrichment Claim...................20

VIII. Evernorth Is Not a Proper Defendant. ..........................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*,
2025 WL 2886701 (6th Cir. Oct. 10, 2025) ........................................................6

*Acrisure, LLC v. Hudak*,
618 F. Supp. 3d 642 (W.D. Mich. 2022) ..........................................................20

*Amir v. AmGuard Ins. Co.*,
606 F. Supp. 3d 653 (E.D. Mich. 2022) ...........................................................11

*Benjamin Franklin Franchising SPE LLC v. David Michael Plumbing Inc.*,
2024 WL 3997056 (E.D. Mich. Aug. 29, 2024).................................................20

*Brave Optical, Inc. v. Luxottica of Am., Inc.*,
2025 WL 962827 (S.D. Ohio Mar. 31, 2025)...................................................8, 9

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)...........................................................................................12, 13

*Cascade Elec. Co. v. Rice*,
70 Mich. App. 420 (1976) .................................................................................20

*Cont'l TV, Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977)..............................................................................................13

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
523 F.2d 389 (6th Cir. 1975) ...............................................................................9

*Ealey v. Benjigates Ests.*,
LLC, 2013 WL 6409987 (E.D. Mich. Dec. 9, 2013).........................................20

*Esurance Prop. & Cas. Ins. Co. v. Mich. Assigned Claims Plan*,
968 N.W.2d 482 (Mich. 2021).............................................................................19

*F.T.C. v. Mylan Lab'ys, Inc.*,
62 F. Supp. 2d 25 (D.D.C.)...................................................................................2

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
244 F.3d 521 (6th Cir. 2001) .............................................................................17

*Georgia v. Penn. Railroad*,
   324 U.S. 439 (1945)............................................................................3, 4

*Grand Rapids Plastics, Inc. v. Lakian*,
   188 F.3d 401 (6th Cir. 1999) ...................................................................8

*Hadid v. Hartman & Tyner, Inc.*,
   1999 WL 33453817 (Mich. Ct. App. Mar. 5, 1999)..............................19

*Hadley v. Chrysler Grp., LLC*,
   624 F. App'x 374 (6th Cir. 2015)..............................................................5

*Hamilton Cnty. Bd. of Comm'rs v. NFL*,
   491 F.3d 310 (6th Cir. 2007) ...................................................................7

*In re Automobile Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014) ..................................................4, 5

*In re Keurig Green Mtn. Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ....................................................13

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023) ................................................18

*In re Theos Dark Chocolate Litig.*,
   750 F. Supp. 3d 1069 (N.D. Cal. 2024)..................................................10

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ................................................................8, 9

*Int'l Bhd. of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*,
   762 F.3d 592 (7th Cir. 2014) .................................................................15

*Mayor of Detroit v. Arms Tech., Inc.*,
   258 Mich. App. 48 (2003) .....................................................................18

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
   524 F.3d 726 (6th Cir. 2008) .................................................................17

*Miller v. Allstate Ins. Co.*,
   751 N.W.2d 463 (Mich. 2008)..................................................................3

*Moyer v. Government Employees Insurance Company*,
114 F.4th 563 (6th Cir. 2024) ...............................................................11

*Murray v. Chrysler Grp., LLC*,
2013 WL 5340782 (E.D. Mich. Sept. 23, 2013) ................................13

*New York v. Facebook*,
549 F. Supp. 3d 6 (D.D.C. 2021).............................................................4

*New York v. Microsoft Corp.*,
209 F. Supp. 2d 132 (D.D.C. 2002).........................................................3

*Ogden v. Little Caesar Enters., Inc.*,
393 F. Supp. 3d 622 (E.D. Mich. 2019) ............................................13

*Ohio v. American Express*,
585 U.S. 529 (2018)....................................................................15, 16

*Osterhaus Pharmacy, Inc. v. Express Scripts, Inc.*,
768 F. Supp. 3d 1186 (W.D. Wash. 2025) ..........................................15

*Palmer v. BRG of Georgia*,
498 U.S. 46 (1990)....................................................................13, 14

*Peck v. Gen. Motors Corp.*,
894 F.2d 844 (6th Cir. 1990) ...............................................................8

*Precision, Inc. v. Kenco/Williams, Inc.*,
66 F. App'x 1 (6th Cir. 2003) .............................................................21

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) .............................................................18

*Robinson v. Nat'l Collegiate Athletic Ass'n*,
2025 WL 2773123 (E.D. Mich. Sept. 26, 2025) ..................................7

*Rouse v. Caruso*,
2011 WL 918327 (E.D. Mich. Feb. 18, 2011).....................................21

*Southaven Land Co. v. Malone & Hyde, Inc.*,
715 F.2d 1079 (6th Cir. 1983) .............................................................6

iv

*State v. Detroit Lumbermen's Ass'n*,
  1979 WL 18703 (Mich. Cir. Ct. Oct. 29, 1979) ...................................................2

*Sun Microsys. v. Hynix*,
  622 F. Supp. 2d 890 (N.D. Cal. 2009)..............................................................21

*Texaco v. Dagher*,
  547 U.S. 1 (2006)...........................................................................................15

*Toys "R" Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ..........................................................................17

*United States v. Brewbaker*,
  87 F.4th 563 (4th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024) .....................14

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
  822 F.2d 656 (7th Cir. 1987) ..........................................................................17

*Weiner v. Klais & Co.*,
  108 F.3d 86 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz
  v. Sorema*, 534 U.S. 506 (2002)......................................................................11

## Statutes & Rules

Clayton Antitrust Act, 15 U.S.C.A § 15 .................................................................2

Mich. Comp. Laws § 14.28.....................................................................................3

Mich. Comp. Laws §§ 445.771, 777–778.........................................................1, 2, 3

Mich. Comp. Laws § 600.3801..............................................................................19

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Statutes:**

1. Clayton Antitrust Act, 15 U.S.C. § 15
2. Mich. Comp. Laws § 14.28
3. Mich. Comp. Laws §§ 445.771, .777–.778
4. Mich. Comp. Laws § 600.3801

**Cases:**

1. *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 2025 WL 2886701 (6th Cir. Oct. 10, 2025)
2. *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653 (E.D. Mich. 2022)
3. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)
4. *Brave Optical, Inc. v. Luxottica of Am., Inc.*, 2025 WL 962827 (S.D. Ohio Mar. 31, 2025)
5. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979)
6. *Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)
7. *Esurance Prop. & Cas. Ins. Co. v. Michigan Assigned Claims Plan*, 968 N.W.2d 482 (Mich. 2021)
8. *Hamilton Cnty. Bd. of Comm'rs v. NFL*, 491 F.3d 310 (6th Cir. 2007)
9. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)
10. *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008)
11. *Miller v. Allstate Ins. Co.*, 751 N.W.2d 463 (Mich. 2008)
12. *Ohio v. American Express*, 585 U.S. 529 (2018)
13. *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997)
14. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983)
15. *United States v. Brewbaker*, 87 F.4th 563 (4th Cir. 2023), cert. denied, 145 S. Ct. 545 (2024)

The State filed suit without conducting any investigation into the 2019 Subcontract on which its claims are based.  Defendants attached that Subcontract to their motion to illustrate fundamental defects in the Complaint that require dismissal.  But instead of engaging with the actual Subcontract, the State has doubled down on those defects, arguing the Court should ignore the express terms of the very agreement at issue in this lawsuit.  It should not—the express terms of the Subcontract make clear why the State's Complaint fails to state a claim.

The State's Opposition Brief ("Opp.") fails to overcome any of the defects in its Complaint, including that: (i) the State lacks standing to seek either damages or injunctive relief; (ii) the State's claims are untimely; and (iii) the State's antitrust and state law claims all fail as a matter of law.  The terms of the Subcontract make further amendment futile.  The Complaint should be dismissed with prejudice.

## I.      The State Lacks *Parens Patriae* Standing to Seek Damages.

The State concedes it cannot recover damages as *parens patriae* under federal antitrust law (Opp. 31), so Claim 1 in the Complaint should be dismissed.[1]  (*See* Compl. ¶¶ 164–172, 207(b).)  The State then pivots to claiming it seeks antitrust damages only under Michigan law (Opp. 31), but that claim also fails.  Michigan's Antitrust Reform Act ("MARA"), M.C.L. § 445.778, clearly permits the State to

---

[1]  Opp. 31 ("Defendants are correct that federal antitrust law limits *parens patriae* recovery for monetary damages to 'natural persons'. . . [b]ut the State does not seek to recover damages under federal antitrust [law]".).

seek damages only in its individual capacity and does not confer standing on the State to recover damages on behalf of private entities or citizens, as here.[2]

While the State argues that MARA authorizes "any person" to "bring an action for . . . damages," M.C.L. §§ 445.771, 445.778(2) (Opp. 31), it ignores M.C.L. § 445.778(1), which specifies that the State can "bring an action for . . . actual damages sustained" only when *the State* is "injured directly or indirectly in its business or property."   The provision in MARA concerning actions by the Attorney General (which the State also ignores) is limited to actions for "injunctive or other equitable relief and civil penalties"; it too does not authorize damages. M.C.L. § 445.777.   Here, the State is not claiming any injury "in its business or property," but rather alleges injuries to citizens and pharmacies.  (Compl. ¶ 179.) Consequently, the State's damages claim is impermissible under Michigan law.[3]

The State also tries to rely, incorrectly, on a general provision in a different statute concerning the Attorney General's ability to *intervene* in matters on behalf

---

[2] The annotations to the MARA statute confirm that it adopts "the private right of action for injury to business or property found in section 4 of the Clayton Act (15 U.S.C.A § 15)."  Mich. Comp. Laws Ann. § 445.778.

[3] *State v. Detroit Lumbermen's Ass'n*, 1979 WL 18703 (Mich. Cir. Ct. Oct. 29, 1979) predates MARA's enactment and is inapposite.  (Opp. 31.)  Likewise, the State's reliance upon federal decisions regarding *settlements* for antitrust damages does not equate to a recognition of the State's authority to bring *parens patriae* suits.  (Opp. 31–32.) Nor is *F.T.C. v. Mylan Lab'ys, Inc.* instructive, as that case included claims for disgorgement and restitution.  62 F. Supp. 2d 25, 47 (D.D.C.).

of the State.  (Opp. 30 (citing M.C.L. § 14.28).)  But even if that statute applies to suits brought by the State, the antitrust-specific legislation—MARA—controls.  *See Miller v. Allstate Ins. Co.*, 751 N.W.2d 463, 470 (Mich. 2008).

Because the State's damages claims are impermissible as a matter of law, it lacks standing and its claims for damages in Claims 1 and 2 should be dismissed.

## II.     The State Lacks *Parens Patriae* Standing to Seek Injunctive Relief.

The State also lacks standing to bring a *parens patriae* claim for injunctive relief because it has failed to allege either a quasi-sovereign interest or a causal connection between the alleged conduct and the alleged harm.  *First*, the State identifies specific injuries to Michigan pharmacies (Compl. ¶ 179), tacking on conclusory allegations of "broad-based harms" to consumers as an afterthought. (Opp. 28.)  But where, as here, "the primary thrust of [the] alleged wrong is injury to a narrowly limited class of individuals, and the harm to the economy as a whole is insignificant by comparison," that is insufficient to confer *parens patriae* standing. *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 152 (D.D.C. 2002).

*Second*, the State contends *Georgia v. Penn. Railroad*, 324 U.S. 439 (1945), stands for the proposition that preventing antitrust harms to a state's citizenry is a quasi-sovereign interest (Opp. 26), but the alleged harm in *Penn. Railroad* was materially different from what is alleged here—namely, alleged harm to state economic development and "prosperity and welfare of the State" itself.   The

3

Supreme Court explicitly stated that there would be no *parens patriae* standing if Georgia merely sought to bring a claim on behalf of industry participants. *Id.* at 450–52. But that is precisely what the State purports to do here; indeed, the State's self-admitted focus on "standing in the shoes of Michigan pharmacies" illustrates why it lacks any legitimate quasi-sovereign interest, and thus standing. (Opp. 35.)[4]

*Third*, the State fails to plausibly plead *any* sufficient causal connection between the Subcontract and the alleged pharmacy closures in Michigan. The State does not deny either that (i) closures of pharmacies throughout Michigan began well before the Subcontract was executed in 2019; or (ii) there are pharmacies that have closed that contract with Defendants directly, *i.e.*, their transactions are excluded from the Subcontract. (*See* MTD 16–17.) For those reasons, the State fails to plausibly allege a causal connection between the Subcontract and the alleged harm (pharmacy closures within the State) that underpins its claim for injunctive relief.

The State relies on *In re Automobile Parts Antitrust Litig.* for the proposition that it can sufficiently allege causation by drawing a "traceable path" from the

---

[4] The State also claims that "[c]ourts have routinely affirmed *parens patriae* standing in comparable antitrust actions," but cites only one case: *New York v. Facebook*, 549 F. Supp. 3d 6, 23 (D.D.C. 2021). (Opp. 27.) Unlike here, the pleaded harm in *Facebook* was quasi-sovereign in nature, based on alleged "consequences for Plaintiffs' economies" and "the damage to their quasi-sovereign interests in economic supervision." 549 F. Supp. at 23.

alleged injury to Defendants' conduct.[5]   (Opp. 29.)  But the State has not pleaded—

and cannot plead—any "traceable path" here.  The State does not plausibly allege

that the Subcontract caused even a *single* pharmacy closure or that it caused any

identified harm to consumers.  Indeed, the State itself alleges that Prime possesses

only "roughly 3% of the national PBM services market" (Compl. ¶ 10), making it

inherently implausible that an alleged 20% decrease in reimbursement rates for

Prime transactions flowing through the Subcontract (Comp. ¶ 13) could itself, alone,

be a material cause of pharmacy closures.  *See Hadley v. Chrysler Grp., LLC*, 624

F. App'x 374, 377-79 (6th Cir. 2015) ("[P]laintiffs have not alleged any concrete

injury traceable to the defendants' misconduct.").   In addition, the State now

effectively admits the tenuous nature of its claims, having amended its Complaint to

remove reference to the number of Walgreens that closed in the state since 2024.

(ECF No. 41 ¶ 52.)[6]

_____

[5] The State misleadingly omits the remainder of this quotation, which specifies that the alleged injury must not be "the result of the independent action of a third party." 29 F. Supp. 3d 982 at 997 (E.D. Mich. 2014).

[7] The redactions in this brief of references to the contents of the Subcontract Agreement are made pursuant to E.D. Mich. LR 5.3(b)(3)(B) and subject to Defendants' pending motion for leave to file under seal.  *See* ECF No. 26.

## III.    The State Also Lacks Antitrust Standing.

The State also fails to allege that it is an "efficient enforcer" of the antitrust laws under the *Southaven* factors, and it therefore lacks antitrust standing. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983); (*see* MTD 19–20).  The State does not even attempt to argue that those factors give it standing, but instead incorrectly asserts that the factors are unnecessary because it has alleged a price-fixing conspiracy.  (Opp. 32–34.)  But alleging a price-fixing conspiracy does not render the *Southaven* factors irrelevant.  *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.,* 2025 WL 2886701, at *6–9 (6th Cir. Oct. 10, 2025) (affirming dismissal after applying *Southaven* factors to an allegation of horizontal price-fixing); (MTD 19–20).[8]  Analysis of those factors makes clear that the State lacks antitrust standing.

## IV.    The State's Federal and State Antitrust Claims Are Time-Barred

The State's claims should also be dismissed for the independent reason that

---

[8] Furthermore, based on the State's own allegations, Michigan consumers are not direct purchasers and so lack standing to sue Defendants for damages under federal antitrust law pursuant to the "bright line" rule established in *Illinois Brick*. (MTD 12–13.)  Tellingly, the State does not even mention *Illinois Brick* or address the indirect purchaser rule at all in its Opposition.  The State simply claims that "it would not matter" if it failed to allege direct injury to consumers because the State has standing based on "injuries sustained by Michigan pharmacies." (Opp. 35.)  That is wrong for the reasons previously explained. *See Supra* § II.

6

they are all time-barred.

*First*, with respect to fraudulent concealment, the State ignores that the Sixth Circuit requires a plaintiff to plead affirmative acts of concealment with the same degree of particularity required by Rule 9(b).  *See Robinson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 2773123 (E.D. Mich. Sept. 26, 2025) (citation omitted); *see also Hamilton Cnty. Bd. of Comm'rs v. NFL*, 491 F.3d 310, 319 (6th Cir. 2007). The State does not even attempt to argue that it has satisfied this basic requirement. The only acts or statements alleged in the Complaint are benign corporate policies that have nothing to do with the Subcontract Agreement and could not plausibly be construed as efforts at "fraudulent concealment." (Compl. ¶¶ 150–151.)  The State's vague and conclusory assertions to the contrary fall far short of what the law requires.  (*See* MTD 23–25.)  If generic allegations of the kind asserted here were sufficient to allow time-barred claims to survive a motion to dismiss, statutes of limitations would never preclude any claim from reaching costly discovery.

*Second*, with respect to the "continuing violation" theory, the State has no answer to the Sixth Circuit cases cited by Defendants which hold that only overt acts—none of which have been alleged here—restart the limitations period.  (*See* MTD 26–28.)  The State tries to avoid this binding precedent by arguing, incorrectly, that those decisions are inapplicable because this case involves allegations of conspiracy and price fixing, as opposed to monopolization.  (Opp. 41–42.)  But the

Sixth Circuit has never recognized such a contrived distinction and, to the contrary, has repeatedly applied the very same rule to conspiracy and price-fixing cases. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (rejecting continuing violation theory based on "participation in the alleged conspiracy"); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) ("individual payments . . . were only a manifestation of the previous agreement"); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (rejecting continuing violation theory where plaintiffs "felt the adverse impact of GMC and GMAC's conspiracy as recently as 1988").

*Brave Optical, Inc. v. Luxottica of Am., Inc.*, which the State brushes aside as being "out of step" (Opp. 41 n.15), is instructive, as it carefully considered the existing Sixth Circuit precedent. There, like here, the court considered allegations of "an unlawful 'horizontal agreement' between competitors to fix . . . reimbursement rates." 2025 WL 962827, at *5 (S.D. Ohio Mar. 31, 2025). After considering the same Sixth Circuit precedent cited by Defendants here, the court concluded that "under Sixth Circuit caselaw, the only overt violations Plaintiffs plausibly allege are the [agreements] themselves, not the later transactions predicated on those agreements." *Id.* at *6; *see also id.* ("[A] defendant's 'final act to effectuate [the alleged] conspiracy occurred' when it agreed with its competitors to fix prices, not when the plaintiffs suffered the conspiracy's 'rippling effect[s]'"

(quoting *In re Travel Agent*, 583 F.3d at 902)).  The court further considered the same statement from *Klehr v. A.O. Smith Corp.* cited by the State here (Opp. 42), and found (1) it was dicta, (2) it involved a different statute, and (3) the Sixth Circuit had adopted a view "under which not every above-price sale restarts the limitations period." *Id.* at *7.

*Finally*, the State argues it had no reason to exercise due diligence, even though the Subcontract was publicly announced and other plaintiffs filed timely claims in other jurisdictions.  (Opp. 43–44; MTD 26.)  Here again, the State ignores Sixth Circuit law.  *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) (lawsuit pre-dating plaintiff's suit should have caused plaintiff to investigate and failure to do so "was not the exercise of due diligence required in order to employ the fraudulent concealment doctrine").  If a public announcement and other lawsuits targeting the Subcontract are not sufficient to trigger a need to exercise due diligence, it is difficult to imagine what would.

## V. The State's Antitrust Claims Should Be Dismissed for Failure to State a Claim.

The State's antitrust claims fail on the merits because (i) the terms of the Subcontract clearly belie the State's conclusory allegations; (ii) the Subcontract is not "horizontal price fixing" within the *per se* rule; and (iii) the State fails to adequately plead an antitrust violation under the rule of reason.

**A.      The Court Should Review the Subcontract.**

In support of their motion, Defendants submitted the Subcontract to show that, on its face, it is not a "horizontal price-fixing conspiracy" with "no purpose except stifling competition," and therefore does not fall within the *per se* rule. (Opp. 30–31.) In response, adopting a strategy that itself speaks volumes, the State refused to address the Subcontract, arguing instead that the Subcontract (i) was not incorporated by reference in the Complaint, and (ii) does not reflect the "full" agreement between Prime and Express Scripts. Both arguments are wrong.

Contrary to the State's argument, the Subcontract was incorporated by reference into the Complaint and should be considered by this Court. The State cannot credibly contend that the Subcontract is not the very same thing as the "Prime-ESI Agreement" the State describes throughout its Complaint.[9] The Complaint is replete with explicit references that confirm they are one and the same thing: The Complaint identifies the parties bound by the Subcontract (Compl. ¶ 2), the date it was signed (*id.* ¶ 13), ███████████████████ ███████████████████████████████████████████ ██████ , and various other allegations specific to the Subcontract (*see, e.g., id.* ¶¶ 14–

---

[9] Even if the State did not name the Subcontract in its Complaint (which it does), incorporation by reference—and consideration of the Subcontract by this Court—is absolutely appropriate as the Subcontract "forms the basis of plaintiff's claim". *In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1080 (N.D. Cal. 2024).

16, 89, 91–93. 97, 107, 108, 133, 159, 166, 175, 184).  And because the Subcontract "contradicts the factual allegations in the complaint, the document trumps the allegations." *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 664 (E.D. Mich. 2022) (internal quotation marks omitted).

Nor can the State dispute that it explicitly relies on the Subcontract—which, again, is the same as the "Prime-ESI Agreement"—as the basis for its claims.  (*See, e.g.*, Compl. ¶¶ 89–106); *see also Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (2002). Instead, the State cites a single inapplicable case, *Moyer v. Government Employees Insurance Company*, and argues that Defendants must provide "a complete set of governing documents" addressing the Prime-Express Scripts relationship.  (Opp. 8– 9.)  In *Moyer*, defendants attached seemingly incomplete versions of documents that "contained redlines, handwritten notes, and electronic comments." 114 F.4th 563, 567–68 (6th Cir. 2024).  By contrast, here, Defendants attached the complete final, executed Subcontract that was referenced throughout the Complaint.  This Court should conclude—as is indeed the case—that it was incorporated by reference.

The State cannot avoid this result by mischaracterizing the Complaint and now speculating that the "Prime-ESI Agreement" may somehow be part of a broader "multifaceted conspiracy" that "may not have been reduced entirely to writing." (Opp. 9.)  The Complaint alleges neither a "multifaceted" conspiracy nor the

11

existence of an agreement not "reduced entirely to writing," and the State cannot replead through their Opposition. Its passing references to other, tangentially related contracts (Opp. 9) do not support a contrary conclusion because the Subcontract contains the precise provisions that the State incorrectly labels "price fixing" (MTD 31–32), and the Complaint itself describes the Subcontract as the singular "anticompetitive scheme" in this lawsuit (Compl. 41).[10]

## B.   The Subcontract Is Not "Horizontal Price Fixing."

The State's repeated incantation of the phrase "horizontal price fixing" does not make it true, nor is it a substitute for well-pleaded facts. *First*, as noted above, even a cursory review of the Subcontract confirms that it is a vertical services agreement with many procompetitive elements that cannot plausibly be characterized as *per se* illegal. (MTD 29–30.) But even if the Court declines to review the Subcontract at this stage, it should reject the State's conclusory labeling of the Subcontract as "horizontal price-fixing," and the suggestion that its conclusory label suffices to require application of the *per se* rule.[11] (Opp. 13.) Indeed, the

---

[10] The State argues that Defendants implicitly "confirm[ed] that other governing documents exist" by seeking a stay of discovery after producing the Subcontract. (Opp. at 10.) But Defendants sought to stay third-party discovery that would have included tens of thousands of contracts with pharmacies and drug manufacturers and "all documents produced" in a confidential arbitration. (*Id*. at 10–11.)

[11] The Supreme Court and lower courts have repeatedly held that such wholly conclusory labels are insufficient to require application of *the per se* rule when (as here) the relationship between the parties is not purely horizontal. *See Broad. Music,*

Complaint itself alleges that Prime pays Express Scripts "administrative fees" for "each transaction Prime pays at the [Express Scripts] rate" (Comp. ¶ 14), which confirms the vertical nature of the Subcontract, rendering the *per se* rule inapplicable. *See Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57 (1977).

*Second*, contrary to the State's argument (Opp. 13), the fact that Prime and Express Scripts compete in some respects does not automatically make the Subcontract horizontal in nature. *See BMI*, 441 U.S. 1, 23 (1979). ██████████ ████████████████████████████████████████████ ████████████████████████ (*See* Ex. 1 §§ 3.1, 4.1, 6.10(b), (e); Sched. 3 § 2.1.) Courts recognize that companies that compete in some respects can also provide services to one another, and that those relationships are vertical in nature and outside the scope of the *per se* rule. *See Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 634 (E.D. Mich. 2019); *Cont'l TV, Inc.* 433 U.S. at 54–55. Were it otherwise, the scope of the *per se* rule would be expanded and risk chilling a broad range of legitimate, procompetitive business arrangements.

*Third*, the State incorrectly argues that this Court should "disregard" the vertical nature of the Subcontract, citing two cases that bear no resemblance to the allegations here: *Palmer v. BRG of Georgia*, 498 U.S. 46 (1990) and *In re Keurig*

---

*Inc. v. Columbia Broad. Sys., Inc.* ("*BMI*"), 441 U.S. 1, 8–9 (1979); *Murray v. Chrysler Grp., LLC*, 2013 WL 5340782, at \*5 (E.D. Mich. Sept. 23, 2013).

*Green Mtn. Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019). But both

of those cases concerned *express agreements not to compete*—which are plainly

horizontal arrangements.[12]



(*See* MTD 7.)

Furthermore, the State effectively concedes that the Subcontract is at least a

form of "hybrid restraint" (Opp. 15 n.4), which courts have consistently held are not

subject to the *per se* rule. (MTD 34.) And the State also does not even address

*United States v. Brewbaker*, which held that hybrid restraints, which combine

horizontal and vertical components, *must* be analyzed under the rule of reason.

87 F.4th 563, 576, 581 (4th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024).

The State instead devotes several pages to the "ancillary restraints" doctrine

(Opp. 16–18), even though Defendants did not even mention it in their motion. In

explaining why the Subcontract is not within the scope of the *per se* rule, Defendants

cited key principles articulated by the Supreme Court and other courts regarding the

proper scope and application of the *per se* rule when it comes to collaborations

---

[12] *Palmer* involved a geographic market allocation agreement in which the defendants, which had previously competed with each other in Georgia, explicitly agreed that one "would not compete" in Georgia, and the other "would not compete" outside of Georgia. 498 U.S. at 47. *Keurig* also concerned an explicit "Non-Competition" agreement, similar to the situation in *Palmer*. (*See* Opp. 15.)

14

between competitors.  *See, e.g., Texaco v. Dagher*, 547 U.S. 1, 7–8, (2006).  The State's attempt to mischaracterize Defendants' arguments as arising under the "ancillary restraints" doctrine is both misconceived and irrelevant.  Under the fundamental principles articulated in the cases cited by Defendants, the Subcontract cannot plausibly be characterized as *per se* unlawful.

Finally, the *Osterhaus* decision is not binding on this court and, regardless, the district court there rejected an argument that PBMs are "effectively purchasing cooperatives," which Defendants have not made here.  *See Osterhaus Pharmacy, Inc. v. Express Scripts, Inc.*, 768 F. Supp. 3d 1186, 1197 (W.D. Wash. 2025).[13]

### C.      The Complaint Does Not State a Claim Under the Rule of Reason.

The State's argument that it has alleged "direct anticompetitive effects" and therefore does not need to define a relevant market or the existence of market power (Opp. 18–19) is fundamentally mistaken.  *First*, contrary to the State's argument, the Complaint alleges that PBMs operate in a two-sided market, which requires the State to allege a net anticompetitive effect, accounting for the impact of the Subcontract on both sides of that market.  *See Ohio v. American Express*, 585 U.S. 529 (2018).

---

[13]  The State's reliance on an arbitrator's interim award in *AIDS Healthcare Foundation*—which the State blatantly mischaracterizes as a "Final Judgment" (Opp. 2)—should be rejected.  The award was never confirmed by a district court, and "[i]t is black letter law that arbitration awards are not entitled to the precedential effect accorded to judicial decisions."  *Int'l Bhd. of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 597 (7th Cir. 2014).

The Complaint expressly alleges all the key elements of a two-sided market: (i) that PBMs "are "middlemen" (Compl. ¶ 55) that "negotiate pricing contracts with pharmacies as part of their overall responsibility for maintaining pharmacy 'networks' for health plans" (Compl. ¶ 60); (ii) indirect network effects, because health plans value broader pharmacy networks and pharmacies value health plans with more members (Compl. ¶ 11); and (iii) a transactions market, flowing between consumers on both sides of the platform (Compl. ¶ 65 ("When an insured patient fills a prescription . . . the pharmacy must then send a claim for reimbursement to the health plan . . . which is adjudicated by the PBM.")).  Nothing more is needed to allege a two-sided transaction platform.  Because the market is two-sided, the State cannot allege a direct anticompetitive effect merely by alleging a price decrease on one side of that market, *i.e.*, "that Prime paid pharmacies 20% less" as a result of the Subcontract.  The State must allege net anticompetitive effects across both sides of the market, accounting for the cost savings achieved by health plans and their beneficiaries.  *Amex*, 585 U.S. at 546–47.

*Second*, the State has also failed to *both* define the relevant geographic market *and* allege that Defendants have market power in that market.  As to the relevant market, the State's argument that market definition and market power are "fact intensive" inquiries ignores that courts regularly emphasize the importance of pleading standards in extremely costly antitrust claims and have dismissed claims

16

where the market definition and market power allegations are (as here) facially inadequate at the pleading stage. *See, e.g.*, *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) ("[T]he fact that market definition generally requires discovery has not prevented this court, and others, from affirming grants of motions to dismiss on the basis of an insufficiently pled or totally unsupportable proposed market"); *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531, 533 (6th Cir. 2001) (affirming dismissal based on unsupported allegations of market power).

As to market power, the State fails to identify Defendants' competitors in the Michigan market, as is required to define the geographic market. (MTD 40.) And contrary to the State's argument, an alleged 26% market share in the purported United States market is insufficient to establish market power within the State. (Opp. 23.) The State's cited authority does not say otherwise. In *Renfield*, the court merely stated in dicta that "the lowest possible market share legally sufficient to sustain a finding *of monopolization* is between 17% and 25%," *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987); the court did not hold that a 26% share in one market automatically equated to market power within another, different market. In *Toys "R" Us*, the court found evidence of direct anticompetitive effects, making a showing of market power unnecessary. *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). And in *RealPage*, only five of

17

the plaintiffs' 33 submarkets had a market share of less than 30%.  *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 526–27 (M.D. Tenn. 2023); *see also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) ("A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power").

## VI.    The State Fails to Plead a State Law Public Nuisance Claim.

The State's common law and statutory nuisance claims share the same fundamental deficiency: the State cannot identify a single case that applies nuisance law to circumstances like those in the Complaint, or where a public nuisance claim was not premised on damages caused by the use of property.

Instead, the State offers the Court broad language divorced from any factual context or judicial application. For example, the State quotes language—purportedly from the Michigan Court of Appeals—for the proposition that "private nuisance is related to the use of land[,] . . . public nuisance is not similarly limited." (Opp.  37). But this language is a quotation of the trial court's opinion, which was *reversed*. *Mayor of Detroit v. Arms Tech., Inc.*, 258 Mich. App. 48, 55, 71 (2003).[14]

---

[14]  While the Court of Appeals reversed on other grounds, the appellate court hardly embraced the trial court's reading when it expressly declined to reach its other rulings and directed the entry of judgment in favor of the defendants.  Even the trial court's opinion supports Defendants' position that nuisance is limited to tangible property.  In the passage the State cites, the trial court merely observed that public nuisance claims could arise from not only land, but harmful **products**.  *Id.* at 55.

The State's reliance on quoted language from *Hadid v. Hartman* is equally unavailing. (Opp. 37.)  That case involved allegations that a shattered glass door in the lobby of an apartment building constituted a public nuisance—precisely the type of tangible, property-based harm that Defendants argued is required (but missing here) for a nuisance claim. *Hadid v. Hartman & Tyner, Inc.*, 1999 WL 33453817, at *1 (Mich. Ct. App. Mar. 5, 1999).

Likewise, on statutory nuisance, the State again cites no case in which M.C.L. § 600.3801 has *ever* been applied to conduct beyond what is expressly enumerated in the statute.  Instead, the State argues that the word "all" in subsection (3) (covering remedies) somehow expands the applicability of the statute beyond the specific conduct that is enumerated in subsections (1) and (2).  (Opp. 37–38.)  But subsections (1) and (2) define a nuisance for purposes of the entire statute. § 600.3801(1), (2).  When subsection (3) refers to "all nuisances," it clearly means all instances of the *statutorily defined conduct*.  And while the State purports to invoke the provision's "unambiguous plain text," (Opp. 38), subsections (1) and (2) would be entirely nugatory under the State's reading, which is improper.  *See Esurance Prop. & Cas. Ins. Co. v. Mich. Assigned Claims Plan*, 968 N.W.2d 482, 488 (Mich. 2021).  The State's novel theory would expand nuisance liability to cover almost any imaginable scenario involving alleged harm to businesses or consumers, swallowing all sorts of torts and other wrongs within what has traditionally been a

19

narrow, well-defined cause of action.

## VII.    The State Fails to Plead a State Law Unjust Enrichment Claim.

The State's arguments against dismissal of its unjust enrichment claim likewise fall flat. *First*, while the State argues that express contracts do not bar unjust enrichment claims where the alleged misconduct "occurs entirely *outside*" the contract (Opp. 39), the State makes clear that its unjust enrichment claim seeks recovery for "artificially inflated fees" (*id.*), which are not "outside" the contract at all. Indeed, the State expressly alleges, the "[n]etwork contracts specify . . . any fees the pharmacy must pay the PBM" (Compl. ¶ 7). For this reason, the claim here stands in stark contrast to the claim in *Cascade Elec. Co. v. Rice*, where the court permitted a claim of quantum meruit despite the express contract because "recovery [wa]s sought for items *not contemplated* in the original contract." 70 Mich. App. 420, 426 (1976) (emphasis added).[15]   *Second*, courts routinely dismiss unjust enrichment claims where, like here, they are foreclosed by an express contract. *See, e.g.*, *Acrisure, LLC v. Hudak*, 618 F. Supp. 3d 642, 649 (W.D. Mich. 2022) (unjust enrichment claim "not viable" where "there is an express contract"); *Ealey v. Benjigates Ests.*, LLC, 2013 WL 6409987, at *5 (E.D. Mich. Dec. 9, 2013) ("[T]he

---

[15]   Courts interpret the exception described in *Cascade* narrowly. *See Benjamin Franklin Franchising SPE LLC v. David Michael Plumbing Inc.*, 2024 WL 3997056, at *3 (E.D. Mich. Aug. 29, 2024) (explaining the "narrow" *Cascade* exception does not apply where there are no allegations "that [the plaintiff] performed any extra work beyond what was contemplated by the [contract]").

20

complained of transaction was covered by an express contract"). The State also fails to address, and thus concedes,[16] that it does not identify a quasi-sovereign interest in pursuing the unjust enrichment claim. (Opp. 39.)

## VIII. Evernorth Is Not a Proper Defendant.

The State's allegations regarding Evernorth's alleged role in this case are boilerplate and devoid of any substance. The State cites *Sun Microsys. v. Hynix*, 622 F. Supp. 2d 890, 901-02 (N.D. Cal. 2009), to argue that a "parent may be liable for antitrust violations of [a] subsidiary *if it participated in [the] conspiracy*," (Opp. 45) (emphasis added). But the State only makes unsupported generic assertions that Evernorth "shap[ed] the company policies" and was "involved in major strategic decisions." (Compl. ¶¶ 26-27.) If such generic allegations were sufficient, plaintiffs could rope any parent company into any antitrust lawsuit. That is not the law. *See Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1, 4 (6th Cir. 2003). Evernorth should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Complaint is legally deficient, amendment would be futile, and the Court should dismiss it in full with prejudice.

Dated:  October 16, 2025                              Respectfully submitted,

*/s/ Timothy G. Cameron*                         */s/ Meghan McCaffrey (with permission)*

---

[16] *Rouse v. Caruso*, 2011 WL 918327, at \*18 (E.D. Mich. Feb. 18, 2011) ("[A] court may treat . . . arguments that plaintiff failed to address as conceded").

21

Timothy G. Cameron
Andrew C. Finch
Michael J. Zaken
**CRAVATH, SWAINE &
MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
tcameron@cravath.com
afinch@cravath.com
mzaken@cravath.com


Scott T. Seabolt (P55890)
**HICKEY HAUCK BISHOFF
JEFFERS & SEABOLT, PLLC**
706 South Main Street
Plymouth, MI 48170
(734) 544-5525
sseabolt@hhbjs.com

*Counsel for Defendant Prime
Therapeutics LLC*

Mike Bonanno
Meghan McCaffrey
Alec Levy
Michael Sebring
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
mikebonanno@quinnemanuel.com
meghanmccaffrey@quinnemanuel.com
aleclevy@quinnemanuel.com
michaelsebring@quinnemanuel.com


Howard B. Iwrey (P39635)
**DYKEMA GOSSETT PLLC**
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
hiwrey@dykema.com

Cody D. Rockey (P78653)
**DYKEMA GOSSETT PLLC**
2723 South State Street, Suite 400
Ann Arbor, MI 48104
(734) 214-7655
crockey@dykema.com

*Counsel for Defendants Express
Scripts, Inc. and Evernorth Health, Inc.*

22