## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE PEOPLE OF THE STATE OF
MICHIGAN,

                    Plaintiff,

      v.

EXPRESS SCRIPTS, INC., *et al.*,

                Defendants.

Case No. 2:25-cv-11215-JJCG-KGA

Hon. Jonathan J.C. Grey

## DEFENDANTS' JOINT MOTION TO DISMISS

Defendants Prime Therapeutics LLC, Express Scripts, Inc. and Evernorth Health, Inc. (collectively, "Defendants"), respectfully move this Court for an Order dismissing with prejudice the Amended Complaint filed by Plaintiff the People of the State of Michigan (the "State") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim, respectively.

Defendants rely on the accompanying brief and the exhibits attached thereto in support of their Motion to Dismiss.

Pursuant to Local Rule 7.1(a)(2)(A), Defendants conferred with the State, explained the nature of their Motion to Dismiss, and requested, but did not obtain, concurrence in the relief sought.

Dated:  March 23, 2026                          Respectfully submitted,

/s/ *Timothy G. Cameron*                         /s/ *Meghan McCaffrey* (with permission)
Timothy G. Cameron                               Mike Bonanno
Andrew C. Finch                                  Meghan McCaffrey
Michael J. Zaken                                 Alec Levy
**CRAVATH, SWAINE & MOORE**                      Michael Sebring
**LLP**                                          **QUINN EMANUEL URQUHART &**
Two Manhattan West                               **SULLIVAN LLP**
375 Ninth Avenue                                 1300 I Street NW, Suite 900
New York, NY 10001                               Washington, D.C. 20005
Telephone: (212) 474-1000                        Tel: (202) 538-8000
tcameron@cravath.com                             mikebonanno@quinnemanuel.com
afinch@cravath.com                               meghanmccaffrey@quinnemanuel.com
mzaken@cravath.com                               aleclevy@quinnemanuel.com
                                                 michaelsebring@quinnemanuel.com

Scott T. Seabolt (P55890)                        Howard B. Iwrey (P39635)
**HICKEY HAUCK BISHOFF**                         **DYKEMA GOSSETT PLLC**
**JEFFERS & SEABOLT, PLLC**                      39577 Woodward Avenue, Suite 300
706 South Main Street                            Bloomfield Hills, MI 48304
Plymouth, MI 48170                               (248) 203-0700
(734) 544-5525                                   hiwrey@dykema.com
sseabolt@hhbjs.com

*Counsel for Defendant Prime*                    Cody D. Rockey (P78653)
*Therapeutics LLC*                               **DYKEMA GOSSETT PLLC**
                                                 2723 South State Street, Suite 400
                                                 Ann Arbor, MI 48104
                                                 (734) 214-7655
                                                 crockey@dykema.com

                                                 *Counsel for Defendants Express*
                                                 *Scripts, Inc. and Evernorth Health, Inc.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THE PEOPLE OF THE STATE OF
MICHIGAN,

                    Plaintiff,

     v.

EXPRESS SCRIPTS, INC., *et al.*,

                 Defendants.

Case No. 2:25-cv-11215-JJCG-KGA

Hon. Jonathan J.C. Grey

**BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

CONCISE STATEMENT OF THE ISSUES PRESENTED ................................. ix

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ......................... xi

TABLE OF EXHIBITS ...................................................................................... xii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................... 3

    **A.**    Pharmacy Benefits Managers. ............................................................. 3

    **B.**    The Prime-ESI Subcontract. ............................................................... 5

    **C.**    The Amended Complaint ("AC"). ....................................................... 8

LEGAL STANDARD ............................................................................................ 9

ARGUMENT ....................................................................................................... 10

**I.**    The State's Federal Antitrust Claim Should Be Dismissed Because the State Cannot Bring This Suit in Its *Parens Patriae* or Proprietary Capacities and Lacks Antitrust Standing. ................................................. 10

    **A.**    The State Cannot Recover Damages as *Parens Patriae*. .................. 10

    **B.**    The State Lacks *Parens Patriae* Standing To Seek Injunctive Relief. ............................................................................................... 13

        **1.**    The State has not alleged any quasi-sovereign interest. ........... 14

        **2.**    The State fails to allege a sufficient causal connection. ........... 16

    **C.**    The State Cannot Seek Damages or Injunctive Relief in Its Proprietary Capacity. ....................................................................... 18

    **D.**    The State Separately Lacks Antitrust Standing. ................................ 19

**II.**    The Attorney General Is Not Authorized To Bring a Damages Claim Under Michigan Antitrust Law. ............................................................... 22

**III.**    The State's Federal and State Antitrust Claims Are Time Barred. ............... 22

    **A.**    The State Failed To Sue Within the Limitations Period. ................... 22

    **B.**    The State Fails To Allege Fraudulent Concealment ........................ 23

    **C.**    The Continuing Violation Doctrine Does Not Apply. ...................... 27

**IV.** The State's Antitrust Claims Should Be Dismissed on the Merits. ...............29

    **A.** The Subcontract Is Not *Per Se* Unlawful...........................................30

    **B.** The State Fails To Allege a Rule of Reason Violation. .....................35

        **1.** The State fails to plead anticompetitive effects in a properly defined relevant product market................................36

        **2.** The State fails to plead that Defendants have market power in any properly defined relevant geographic market................38

**V.** The State Fails To Plead a State Law Public Nuisance Claim. ...................40

**VI.** The State Fails To Plead a State Law Unjust Enrichment Claim. ...............42

**VII.** Evernorth Is Not a Proper Defendant. .........................................................43

CONCLUSION ................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennesee, Inc.,*
   155 F.4th 795 (6th. Cir. 2025) .................................................................. 20-21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ...................................................................... passim

*Amir v. AmGuard Ins. Co.,*
   606 F. Supp. 3d. 653 (E.D. Mich. 2022)……………………………………10

*Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.,*
   2021 WL 4169711 (E.D. Mich. Sept. 14, 2021) ....................................16

*Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.,*
   596 F. Supp. 3d 860 (E.D. Mich. 2022) .........................................21

*Apple, Inc. v. Pepper,*
   587 U.S. 273 (2019) ................................................................12

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................9, 24-25, 33

*Assoc. Gen. Contrctrs. of Cal., Inc. v. Cal. State Council of Carptrs.,*
   459 U.S. 519 (1983) ................................................................20

*Bassett v. NCAA,*
   528 F.3d 426 (6th Cir. 2008) ......................................................10

*Beazley Ins. Co. v. Foster Poultry Farms,*
   746 F. Supp. 3d 828 (E.D. Cal. 2024) .............................................43

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................9

*Belle Isle Grill Corp. v. Detroit,*
   666 N.W.2d 271 (Mich. Ct. App. 2003) ....................................... 42-43

*Bodie-Rickett & Assocs. v. Mars, Inc.,*
   957 F.2d 287 (6th Cir. 1992) ...................................................20, 22

*Brave Optical, Inc. v. Luxottica of Am., Inc.,*
   2025 WL 962827 (S.D. Ohio Mar. 31, 2025) ..................................23, 28-29

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
   441 U.S. 1 (1979) ...............................................................30, 34

*Browning v. Levy*,
 283 F.3d 761 (6th Cir. 2002)................................................................25

*Cal. Dental Ass'n v. FTC*,
 526 U.S. 756 (1999)............................................................................35

*Cates v. Crystal Clear Techs., LLC*,
 874 F.3d 530 (6th Cir. 2017)................................................................10

*Chapman v. Tristar Prods., Inc.*,
 940 F.3d 299 (6th Cir. 2019)..........................................................14, 43

*City of Lansing v. Woodside Meadows Apts Owner LLC*,
 2024 WL 4892721 (W.D. Mich. Sept. 18, 2024)................................41

*Cohen v. Adena Health Sys.*,
 2024 WL 1804990 (S.D. Ohio Apr. 25, 2024) ...................................20

*Cont'l TV, Inc. v. GTE Sylvania Inc.*,
 433 U.S. 36 (1977)......................................................................... 31-32

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
 523 F.2d 389 (6th Cir. 1975).......................................................... 26-27

*Diei v. Boyd*,
 116 F.4th 637 (6th Cir. 2024)................................................................8

*Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*,
 841 F. Supp. 212 (E.D. Mich. 1993) ...................................................25

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
 100 F.3d 462 (6th Cir. 1996)................................................................27

*Egerer v. Woodland Realty, Inc.*,
 556 F.3d 415 (6th Cir. 2009)................................................................24

*Found. Interior Design v. Savannah Coll.*,
 244 F.3d 521 (6th Cir. 2001)......................................................... 38-39

*Georgia v. Penn. R.R. Co.*,
 324 U.S. 439 (1945)............................................................................19

*Grand Rapids Plastics, Inc. v. Lakian*,
 188 F.3d 401 (6th Cir. 1999)...........................................................23, 28

*Hamilton Cnty. Bd. of Comm'rs v. NFL*,
 491 F.3d 310 (6th Cir. 2007)................................................................24

*Hawaii v. Standard Oil Co.*,
 405 U.S. 251 (1972)............................................................................19

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977)............................................................................. 12-13

*In re Allergan Erisa Litig.*,
  975 F.3d 348 (3d Cir. 2020)....................................................................33

*In re Auto. Parts Antitrust Litig.*,
  2021 WL 148004 (E.D. Mich. Jan. 15, 2021)........................................... 15-16

*In re Auto. Parts Antitrust Litig.*,
  997 F.3d 677 (6th Cir. 2021)....................................................................12

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003).......................................................26

*In re EpiPen Direct Purchaser Litig.*,
  2022 WL 1017770 (D. Minn. Apr. 5, 2022)................................................44

*In re Nat'l Prescription Opiate Litig.*,
  --- N.E.3d ----, 2024 WL 5049302 (Ohio Dec. 10, 2024) ...............................42

*In re Se. Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014)................................................... 30, 33, 39

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009)....................................................................23

*Innov. Ventures, LLC v. Custom Nutrition Labs., LLC*,
  912 F.3d 316 (6th Cir. 2018)...............................................................30, 33

*Jefferson Parish Hosp. Dist. No. 2. v. Hyde*,
  466 U.S. 2 (1984)..................................................................................39

*Kansas v. UtiliCorp Utd., Inc.*,
  497 U.S. 199 (1990)...........................................................................11, 13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................... 17-18

*Med. Ctr. at Elizabeth Pl. v. Premier Health Partners*,
  2016 WL 9460026 (S.D. Ohio Oct. 6, 2016)..............................................29

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017)....................................................................16

*Mount Clemens Recreational Bowl, Inc. v. Dir. of Dep't of Health & Hum. Servs.*,
  998 N.W.2d 917 (Mich. Ct. App. 2022)......................................................41

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978)................................................................................30

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007)..................................................................9, 20

*Ogden v. Little Caesar Enters., Inc.*,
    393 F. Supp. 3d 622 (E.D. Mich. 2019) ...................................................31, 35

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)..................................................................................passim

*Omnicare, Inc. v. Unitedhealth Grp., Inc.*,
    524 F. Supp. 2d 1031 (N.D. Ill. 2007).............................................................12

*Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*,
    221 F.3d 913 (6th Cir. 2000).............................................................................29

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
    838 F.2d 1445 (6th Cir. 1988)............................................................................25

*Precision, Inc. v. Kenco/Williams, Inc.*,
    66 F. App'x 1 (6th Cir. 2003) ...................................................................... 43-44

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019).......................................................................33

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
    592 U.S. 80 (2020)..............................................................................................3

*Sanner v. Bd. of Trade of Chi.*,
    62 F.3d 918 (7th Cir. 1995)...............................................................................12

*Smith v. Glenmark Generics, Inc.*,
    2014 WL 4087968 (Mich. Ct. App. Aug. 19, 2014)........................................43

*Solis v. Emery Fed. Credit Union*,
    459 F. Supp. 3d 981 (S.D. Ohio 2020)............................................................24

*Southaven Land Co. v. Malone & Hyde, Inc.*,
    715 F.2d 1079 (6th Cir. 1983)...........................................................................20

*State ex rel. Oakland Prosecuting Att'y v. Ginell*,
    407 N.W.2d 59 (Mich. Ct. App. 1987)..............................................................40

*State v. McQueen*,
    811 N.W.2d 513 (Mich. Ct. App. 2011)...........................................................41

*Static Control Components, Inc. v. Lexmark Intern., Inc.*,
    697 F.3d 387 (6th Cir. 2012)...................................................................... 20-22

*Storey v. Attends Healthcare Prods., Inc.*,
    2016 WL 3125210 (E.D. Mich. June 3, 2016)..................................................43

*Taxpayers Allied for Const. Tax'n v. Wayne Cnty.*,
 450 Mich. 119 (1995) ......................................................................29

*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006)......................................................................30, 34

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
 552 F.3d 430 (6th Cir. 2008)......................................................36, 40

*United States v. Bestfoods*,
 524 U.S. 51 (1998)................................................................... 43-44

*United States v. Brewbaker*,
 87 F.4th 563 (4th Cir. 2023)...................................................... 34-35

*United States v. Cmty. Health Sys., Inc.*,
 501 F.3d 493 (6th Cir. 2007)...........................................................24

*US Airways, Inc. v. Sabre Holdings Corp.*,
 938 F.3d 43 (2d Cir. 2019)..............................................................37

*Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*,
 2001 WL 34089607 (E.D. Mich. Apr. 16, 2001).............................42

*Weiser v. Benson*,
 48 F.4th 617 (6th Cir. 2022).............................................................18

*White Motor Co. v. United States*,
 372 U.S. 253 (1963).........................................................................30

*Ypsilanti Charter Twp. v. Kircher*,
 761 N.W.2d 761 (Mich. Ct. App. 2008).........................................41

*Z Techs. Corp. v. Lubrizol Corp.*,
 753 F.3d 594 (6th Cir. 2014).....................................................23, 28

## Statutes & Rules

Clayton Antitrust Act, 15 U.S.C. §§ 15, 15a, 15b-15c, 15g, 26.....................passim

E.D. Mich. L.R. 5.3(b)(3)(B) .................................................................6

Federal Rule of Civil Procedure 9(b) ...................................................24

Federal Rule of Evidence 201(b)............................................................8

Mich. Comp. Laws §§ 445.772, .776–.778, .781, .784 (1984).......................passim

Mich. Comp. Laws § 550.821 (2022)...................................................40

Mich. Comp. Laws §§ 600.2940, .3801 (1961) .........................................29, 40-41

Sherman Antitrust Act, 15 U.S.C. § 1 .................................................................29

## CONCISE STATEMENT OF THE ISSUES PRESENTED

1. Whether the Court should dismiss the State's federal antitrust claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because the State lacks statutory authorization and standing to seek relief in its *parens patriae* and proprietary capacities for a violation of federal antitrust law.

   **Defendants' Answer:**   YES.

2. Whether the Court should dismiss the State's federal antitrust claim under Federal Rule of Civil Procedure 12(b)(6) for lack of antitrust standing.

   **Defendants' Answer:**   YES.

3. Whether the Court should dismiss the State's federal and state antitrust claims under Federal Rule of Civil Procedure 12(b)(6) because they are barred by the statutes of limitations, and the State has failed to plead tolling under the fraudulent concealment or continuing violation doctrines.

   **Defendants' Answer:**   YES.

4. Whether the Court should dismiss the State's state antitrust claim for damages under Federal Rule of Civil Procedure 12(b)(6) because it lacks statutory authorization to seek such relief.

   **Defendants' Answer:**   YES.

5. Whether the Court should dismiss the State's federal and state antitrust claims under Federal Rule of Civil Procedure 12(b)(6) for failure to allege a rule of reason violation because the State has failed to plead anticompetitive effects in a properly defined relevant product market and the State has failed to plead that Defendants have market power in any properly defined relevant geographic market.

   **Defendants' Answer:**   YES.

6. Whether the Court should dismiss the State's statutory and common law public nuisance claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

   **Defendants' Answer:**   YES.

7. Whether the Court should dismiss the State's unjust enrichment claim for

ix

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

**Defendants' Answer:**   YES.

8.   Whether the Court should dismiss the Amended Complaint with respect to Defendant Evernorth Health, Inc. under Federal Rule of Civil Procedure 12(b)(6) for failure to allege independent wrongdoing or alter ego status.

**Defendants' Answer:**   YES.

x

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Statutes:**

1.    Sherman Antitrust Act, 15 U.S.C. § 1

2.    Clayton Antitrust Act, 15 U.S.C. §§ 15, 15b–15c, 26

3.    Mich. Comp. Laws §§ 445.772, .776–.778, .781, .784 (1984)

4.    Mich. Comp. Laws § 600.3801 (1961)

**Cases:**

1.    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

2.    *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982)

3.    *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007)

4.    *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983)

5.    *Kansas v. UtiliCorp Utd., Inc.*, 497 U.S. 199 (1990)

6.    *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977)

7.    *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 2001 WL 34089607 (E.D. Mich. Apr. 16, 2001)

8.    *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401 (6th Cir. 1999)

9.    *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014)

10.    *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018)

11.    *Ogden v. Little Caesar Enterps., Inc.*, 393 F. Supp. 3d 622 (E.D. Mich. 2019)

12.    *Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1 (6th Cir. 2003)

13.    *Mount Clemens Recreational Bowl, Inc. v. Dir. of Dep't of Health & Hum. Servs.*, 998 N.W.2d 917 (Mich. Ct. App. 2022)

## TABLE OF EXHIBITS

1. **Exhibit 1 ("Ex. 1") (filed under seal)**: Pharmacy Benefits Management Services Subcontract Agreement (the "Subcontract"), dated December 19, 2019, with amendment thereto.

2. **Exhibit 2 ("Ex. 2")**: Peter Wehrwein, *PBM Leaders: A Conversation with Ken Paulus, Prime Therapeutics President and CEO, Part 3*, MANAGED HEALTHCARE EXEC. (Sept. 28, 2021), https://www.managedhealthcareexecutive.com/view/a-conversation-with-ken-paulus-prime-therapeutics-president-and-ceo-part-3.

3. **Exhibit 3 ("Ex. 3")**: Press Release, Prime Therapeutics LLC, Express Scripts and Prime Therapeutics Collaborate to Deliver More Affordable Care to More than 100 Million Americans (Dec. 19, 2019), https://www.prnewswire.com/news-releases/express-scripts-and-prime-therapeutics-collaborate-to-deliver-more-affordable-care-to-more-than-100-million-americans-300978059.html.

4. **Exhibit 4 ("Ex. 4")**: Cigna Corp., Current Report (Form 8-K) (Jan. 13, 2020).

5. **Exhibit 5 ("Ex. 5")**: Cigna Corp., Annual Report (Form 10-K) (Feb. 27, 2020).

6. **Exhibit 6 ("Ex. 6")**: Press Release, Mich. Dep't of Att. Gen., AG Nessel Joins 38-State and Territory Bipartisan Coalition Urging Congress to Take Action Against Rise in Organized Retail Crime (Feb. 25, 2025), https://www.michigan.gov/ag/news/press-releases/2025/02/25/ag-nessel-joins-38-state-and-territory-bipartisan-coalition.

7. **Exhibit 7 ("Ex. 7")**: *DIFS Insurance & Financial Services Search: Insurance Entity - Active Pharmacy Benefit Managers*, DEP'T OF INS. & FIN. SVCS., https://difs.state.mi.us/locators/Search/InsuranceCompanyList (last visited July 21, 2025).

## PRELIMINARY STATEMENT

The State of Michigan's meritless claims against Prime Therapeutics LLC ("Prime") and Express Scripts, Inc. ("ESI" or "Express Scripts") are a transparent effort to piggyback on an interim award from a private arbitration brought by an independent pharmacy against Prime that was decided under the wrong legal standard.[1]  The State failed to conduct any investigation of the 2019 agreement (the "Subcontract") that was the subject of that arbitration and that the State now challenges here.  Nonetheless, the State proceeded to file a complaint in which it lacks standing and asserts untimely and otherwise deficient claims that warrant dismissal with prejudice.

First, the State lacks any standing to seek damages or injunctive relief under federal or state law.  While purporting to sue on behalf of itself and as *parens patriae* on behalf of Michigan consumers, the Amended Complaint ("AC") focuses almost entirely on purported injuries to Michigan pharmacies, and appears to seek *parens patriae* damages only on behalf of Michigan pharmacies.  As the State concedes, it lacks statutory authorization under *federal* law to seek damages as *parens patriae* on behalf of those pharmacies—which are not resident natural persons of the State— but State law bars those claims for the same reason.  The State further lacks *parens patriae* standing to seek injunctive relief because it fails to articulate a quasi-

---

[1] The State also erroneously names Evernorth Health, Inc.  *See infra* Part VII.

1

sovereign interest, harm to a substantial segment of its population, and a causal link to the Subcontract.  The State also lacks antitrust standing.

Second, the State's antitrust claims are time barred.  Defendants publicly announced the challenged Subcontract in December 2019.  The State then waited more than five years before bringing its case, missing the four-year statutes of limitations by more than one year.  The State's claim of fraudulent concealment is belied by its own allegations showing that the arrangement was announced and discussed from its inception.  Nor can the continuing violation doctrine save the State's untimely claims because the AC lacks any allegation of any new and independent overt acts.

Third, contrary to the AC's conclusory labels of "price fixing," the Subcontract is a vertical services arrangement under which Prime contracted to be able to offer clients the option of selecting Express Scripts' pharmacy networks, which Prime then offers as part of a menu of other, potential services to its health insurance plan customers.  This type of arrangement, which is clear on the face of the Subcontract, has allowed Prime to lower prescription drug costs for those plan customers and, ultimately, their members and must be evaluated under the rule of reason.  But the State fails to allege that the Subcontract violates the rule of reason because it fails to plead any facts showing that the Subcontract has any anticompetitive effects in a properly defined relevant market.

Finally, the State's frivolous efforts to blame Defendants for pharmacy closures in the State and recast the Subcontract as a "public nuisance" or the cause of Defendants' "unjust enrichment" lack any legal foundation and are contradicted by the State's own allegations, which show that pharmacy closures began in 2010, nearly a decade before the Subcontract's formation.  For these reasons, the AC should be dismissed in its entirety with prejudice.

## BACKGROUND

### A.    Pharmacy Benefits Managers.

Pharmacy benefits managers ("PBMs") are "a little-known but important part of the process by which many Americans get their prescription drugs." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83 (2020).  PBMs act as intermediaries that provide different but interrelated services to two key groups in the health care industry: health insurance plans ("plans") and the pharmacies at which members of those plans obtain prescription drugs.  AC ¶¶ 4, 55–56, 60.

PBMs offer a "variety of services" to help plans reduce costs and offer members access to otherwise expensive prescription drug benefits.  *Id*. ¶¶ 56–58, 94–95.  This case implicates two services in particular.  PBMs provide a real-time platform that facilitates reimbursements on behalf of health plans to pharmacies for the cost of prescription drugs.  *Id*. ¶ 56.  When a plan member fills a prescription at a pharmacy, the pharmacy communicates with a PBM.  *Id*. ¶ 65.  The PBM verifies

3

that the member's plan has prescription-drug benefits and that the drug is covered by those benefits. *Id*. The PBM then determines and informs the pharmacy of the amount the member owes at the counter and the amount the plan, through the PBM, will reimburse the pharmacy for the balance of the cost of the dispensed drug. *Id*.

PBMs contract with pharmacies to develop pharmacy "networks" at which plan members can use their prescription drug benefits. *Id*. ¶¶ 60, 66. These contracts often set the rates at which PBMs reimburse pharmacies for the cost of certain drugs. *Id*. ¶¶ 7, 60. Pharmacies enter into these contracts to access the pool of members covered by a PBM's health plan clients. The contracts also provide some financial security because they "require the PBM to reimburse the pharmacy for each drug." *Id*. ¶ 68. PBMs are incentivized to "attract retail pharmacies to join their networks" because PBMs with larger and more diverse networks attract more plans. *Id*. ¶ 11.

In their role as intermediaries, PBMs operate in a two-sided market: On one side of the market are the plans, and on the other side are the pharmacies. PBMs must compete on both sides of this market. They must convince plans to hire them to process claims, assist in benefit design and formulary development, and assemble comprehensive pharmacy networks. *Id*. ¶¶ 11, 57. And they must convince pharmacies to contract with them and join their networks by offering, among other things, access to a larger pool of plan members ("covered lives"). *Id*. ¶ 61.

PBMs thus exhibit what economists call "indirect network effects" because

4

the value of a PBM to plans depends in part on how many pharmacies participate in its networks, and the value of a PBM to pharmacies depends in part on how many plans—and therefore "covered lives"—will fill prescriptions with them.  As a PBM accumulates more plans, the value it provides to pharmacies increases because pharmacies gain access to more members with prescription drug benefits.  At the same time, as a PBM contracts with more pharmacies, its platform becomes more valuable for plans, which can then offer members a broader network of pharmacies for filling prescriptions.  Because pharmacies and plans are free to do business with any PBM, PBMs must take these indirect network effects into account, and balance the interests of both sides of the market to remain competitive.  *Id*. ¶¶ 56–61.

Defendants in this case include two such PBMs.  ESI's parent company is the Cigna Group.  *Id*. ¶ 25.  As alleged, ESI serves "roughly 23% of the national PBM services market."  *Id.* ¶¶ 10, 72.  Prime is the sixth largest PBM nationally, with just "3%" of the "national PBM services market."  *Id*. ¶¶ 10, 72.

### B.    The Prime-ESI Subcontract.

In early 2019, Prime's relatively small base of plans prevented it from assembling pharmacy networks while remaining cost competitive.  AC ¶ 91.  Prime was thus compelled to pay higher reimbursement rates to pharmacies—"Prime had to pay pharmacies roughly 20% more than large competitors," which made Prime the "highest paying retail pharmacy payer in the marketplace."  *Id*.  That was

5

unsustainable.  As Prime's former CEO stated in an interview—from which the AC quotes heavily—Prime was "falling behind," "feeling the lack of competitive rates and performance," and, critically, "losing business."  Ex. 2.[2]  Prime invited better-situated PBMs to propose service offerings that could help Prime provide lower cost options to its customer plans and reverse the trend.  AC ¶ 92.  After a "robust" proposal and negotiation process, ESI "landed at the top."  *Id.*

On December 19, 2019, Prime and ESI entered into and publicly announced the Subcontract.  *Id.* ¶ 89.  Contrary to the AC's conclusory allegations (*id.* ¶¶ 2, 13, 74, 88, 91, 95, 99, 129), the Subcontract by its terms does not "fix" the rates at which Defendants reimburse pharmacies.  Rather, under the Subcontract, ██████████

████████████  ██████████████████████████████████

██████████████████████████████████  ████████

██████████.[3]  Prime contracted with ESI to access ESI's pharmacy networks— access that Prime then offers as part of a larger bundle of services to its health plan customers.

Prime's plan customers can elect to use Prime's networks or ESI's networks.  If a Prime plan customer elects to use ESI's networks, ESI functions as a PBM

---

[2] The AC quotes extensively from the interview, which is central to the State's allegations about the Subcontract.  AC ¶¶ 91–95, 101–04.

[3] The redactions in this brief of references to the contents of the Subcontract are made pursuant to E.D. Mich. L.R. 5.3(b)(3)(B) and subject to Defendants' pending motion for leave to file under seal.  *See* ECF No. 55.

subcontractor. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████    █████████████████████████████████████

███████████████████████████████████   ██ ████████████████  As

the State acknowledges, this arrangement has saved Prime "at least $2.5 billion,"

which benefits Prime's customer plans and members.  AC ¶¶ 91, 105.

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████  ██ █████████████████████████████

████████████████████████████████████████████████

██████████████████████████████   ██  ████████

██████████████████

The existence of the Subcontract was never secret.  Prime and ESI publicly

announced the Subcontract on the day it was signed.  *See* AC ¶ 89; Ex. 3.[4]  ESI's

---

[4] The Court can and should take judicial notice that Prime announced the agreement on December 19, 2019 because it is "currently publicly available," "can be

7

parent (the Cigna Group) disclosed the Subcontract in regulatory filings shortly thereafter, including its 2019 annual report. Exs. 4-5.[5] As the State concedes, on January 2, 2020, Prime sent letters to *all* of its pharmacies notifying them that, among other things, "Prime's health plans [would] begin to transition to ESI's commercial and Medicaid pharmacy networks." AC ¶ 94. And Prime's former CEO was openly and publicly discussing the Subcontract's material provisions in early 2021. *Id*. ¶¶ 91–95, 101, 103–04.

## C.    The Amended Complaint ("AC").

The State filed the initial Complaint on April 28, 2025 (ECF No. 1), over five years after Defendants entered into and publicly announced the Subcontract. The State issued no Civil Investigative Demands to Defendants (despite having the power to do so[6]), asked Defendants no questions, and—to Defendants' knowledge—never obtained or reviewed the Subcontract. The State filed the AC on October 1, 2025. Both the original Complaint and the AC reflect a lack of diligence. The AC contains no specific allegations about Prime's market share in Michigan, or about either Defendant's operations, pharmacy networks, or health plan customers in

---

accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and is "not subject to reasonable dispute." *Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024) (quoting Fed. R. Evid. 201(b)).

[5] As above (*supra* note 4), the Court can take judicial notice of the fact that Cigna discussed the Subcontract in public filings in January and February 2020.

[6] M.C.L. § 445.776 (authorizing written demands for suspected antitrust violations).

8

Michigan.  Indeed, the AC fails to identify a *single* Michigan pharmacy with which Prime or ESI contracts.  *See* AC ¶ 109.

The State purports to sue both "on behalf of itself and as *parens patriae* on behalf of people of the State" of Michigan.  *Id.* Pmbl.  But instead of identifying any injury the State suffered in either capacity, the AC focuses almost entirely on purported injuries to pharmacies.  *See id.* ¶¶ 90–97, 105–06.

## LEGAL STANDARD

The State must allege "sufficient factual matter" to "state a claim to relief that is plausible on its face" to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). This requires the State to provide "more than labels and conclusions, and a formulaic recitation of [the] cause of action's elements."  *Twombly*, 550 U.S. at 545.  Given the "unusually high cost" and "extensive scope of discovery in antitrust cases," *id*. at 558-59 (citations omitted), "federal courts have been 'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage," *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007).

In deciding this motion, this Court can and should consider the Subcontract which is the clear subject of the State's AC and is attached to this motion.  The Court may consider "exhibits attached to [Defendants'] motion to dismiss" that are "referred to in the Complaint and are central to the claims contained therein."

9

*Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).  The AC is replete with explicit references to the Subcontract, identifying its parties, its effective dates, and various specific contractual terms.  *See, e.g.*, AC ¶¶ 11–14, 16, 89, 91–93, 97, 107, 108, 133, 159, 166, 175, 184.  Where, as here, such documents contradict the AC's allegations, the Court need not accept those allegations as true.  *See Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017); *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 664 (E.D. Mich. 2022).

## ARGUMENT

**I.**   **The State's Federal Antitrust Claim Should Be Dismissed Because the State Cannot Bring This Suit in Its *Parens Patriae* or Proprietary Capacities and Lacks Antitrust Standing.**

The State posits three equally invalid bases for its federal antitrust claim: (1) a *parens patriae* claim for damages under 15 U.S.C. § 15c; (2) a *parens patriae* claim for injunctive relief under *id*. § 26; and (3) a proprietary claim for damages and injunctive relief for its own injuries under *id*. §§ 15(a), 26.  None can sustain the State's Sherman Act claim, which fails for the separate threshold reason that the State lacks antitrust standing.

### A.   **The State Cannot Recover Damages as *Parens Patriae*.**

The State seeks damages as *parens patriae* on behalf of "Michigan pharmacies."  It has no standing to do so.  The State previously conceded that it may not recover these damages under federal law because federal law limits *parens*

10

*patriae* recovery for monetary damages to "natural persons".[7]    *See* 15 U.S.C. § 15c(a)(1); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 213, 216 (1990) (holding that state attorneys general "may sue only on behalf of resident natural persons," and may "not represent industrial and commercial purchasers" (*i.e.*, businesses)).   Instead, the State seeks to recover *parens patriae* damages under Michigan law only.   But Michigan law also bars this cause of action. Michigan's Antitrust Reform Act ("MARA"), M.C.L. § 445.778, clearly permits the State to seek damages only in its individual capacity and does not confer standing on the State to recover damages on behalf of private entities or citizens.[8]   M.C.L. § 445.778(1) specifies that "the state … may bring an action for . . . actual damages sustained" only when *the State* is "injured directly or indirectly in its business or property."   Here, the State is not claiming any injury "in its business or property," but rather alleges injuries to pharmacies. (AC ¶ 179.)   Consequently, the State's *parens patriae* damages claim is impermissible under Michigan law and should therefore be dismissed with prejudice.[9]

---

[7] *See* ECF No. 37 at 31 ("Defendants are correct that federal antitrust law limits *parens patriae* recovery for monetary damages to 'natural persons'. . . [b]ut the State does not seek to recover damages under federal antitrust [law]")

[8] The annotations to the MARA statute confirm that it adopts "the private right of action for injury to business or property found in section 4 of the Clayton Act (15 U.S.C.A § 15)." Mich. Comp. Laws Ann. § 445.778.

[9] To the extent the State also seeks damages as *parens patriae* on behalf of "Michigan health plans" (AC ¶ 144), that claim is barred for the same reason.

11

While it is not clear if the State seeks damages as *parens patriae* on behalf of Michigan *consumers*, those claims are also barred under Michigan law.  For the reasons discussed above, MARA only permits the State to bring a claim for damages where the State was directly injured.  And the indirect purchaser rule established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), also bars the State from bringing these claims.  *Illinois Brick* held that an antitrust plaintiff lacks standing to recover damages under the Clayton Act "if the plaintiff did not directly purchase the overcharged product from the alleged violator."  *In re Auto. Parts Antitrust Litig.*, 997 F.3d 677, 683 (6th Cir. 2021) (citing *Ill. Brick*, 431 U.S. at 729–30)).  *Illinois Brick* thus established a "bright line [rule] that allow[s] direct purchasers to sue but bar[s] indirect purchasers from suing."  *Apple, Inc. v. Pepper*, 587 U.S. 273, 282 (2019).

That rule also applies in a purported "buyers' cartel" case (AC ¶ 88), where (as here) only the direct *seller* can seek damages from buyers for allegedly depressing the prices at which they purchased the seller's services.  *See, e.g.*, *Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 927–29 (7th Cir. 1995) (concluding that plaintiff farmers had standing because they "were the sellers in the . . . market" and were not "attempt[ing] to assert an indirect, or secondary, injury"); *Omnicare, Inc. v. Unitedhealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1042 (N.D. Ill. 2007) ("[I]n a buyers' cartel case, it is the most direct seller who is the proper plaintiff under *Illinois*

12

*Brick*." (citation omitted)).   And the rule bars *parens patriae* actions on behalf of indirect purchasers or sellers because 15 U.S.C. § 15c does not confer any new substantive liability; it "simply created a new procedural device . . . to enforce existing rights of recovery" under the Clayton Act.  *Ill. Brick*, 431 U.S. at 733 n.14. Indeed, the Supreme Court itself affirmed dismissal of two states' *parens patriae* consumer damages actions because the "consumers, as indirect purchasers, ha[d] no cause of action of their own" so "the predicate for a *parens patriae* action ha[d] not been established."  *UtiliCorp*, 497 U.S. at 218–19.  Here, the State expressly alleges that pharmacies—not Michigan consumers—are the direct sellers of "retail pharmacy dispensing services" to Defendants.  AC ¶ 130.[10]  Michigan consumers therefore lack *Illinois Brick* standing to sue Defendants for damages under federal antitrust law, and the State cannot recover damages on their behalf as *parens patriae*.

**B.      The State Lacks *Parens Patriae* Standing To Seek Injunctive Relief.**

The State also lacks *parens patriae* standing to seek injunctive relief.  To demonstrate *parens patriae* standing, the State must "assert an injury to . . . a 'quasi-sovereign' interest," which is "an interest[] that the State has in the well-being of its populace."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02 (1982)

---

[10] Indeed, pharmacies have asserted similar claims based on the Subcontract .  *See, e.g.*, Amended Complaint, *Osterhaus Pharm. Inc. v. Express Scripts, Inc.*, No. 24-CV-39 (W.D. Wash. Mar. 1, 2024), ECF No. 46; Complaint, *AIDS Healthcare Found. v. Prime Therapeutics LLC*, No. 21-CV-4979 (C.D. Cal. June 18, 2021), ECF No. 1.

13

("*Snapp*").   The State's interest must "stand apart from the interests of particular private parties" and be "sufficiently concrete to create an actual controversy between the State and the defendant."   *Id*. at 602, 607.   The State must also show that "a sufficiently substantial segment of the [State's] population" has been injured by the challenged conduct.   *Id*. at 607.   Those requirements are not satisfied here.

### 1.     The State has not alleged any quasi-sovereign interest.

It is clear on the face of the AC that pharmacies, not the State, are the "real part[ies] in interest," and that the State fails to "articulate" any distinct quasi-sovereign interest.   *Snapp*, 458 U.S. at 602, 607.   The State mentions a "quasi-sovereign" interest only once, in a wholly conclusory fashion, offering no explanation or factual enhancement.   *See* AC ¶ 24.   Indeed, the gravamen of the State's theory is that the Subcontract directly injured *pharmacies* (*see id.* ¶¶ 121–28, 144, 167, 170, 187), which is why large swaths of its substantive allegations are appropriated from cases brought by *pharmacies* seeking relief for their own purported injuries.   *See id*. ¶¶ 90, 93, 106, 159.   Because the "[i]nterests of private parties are obviously not in themselves sovereign interests," the State fails to allege a viable quasi-sovereign interest.   *See, e.g.*, *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 304–06 (6th Cir. 2019) (state lacked *parens patriae* standing because it alleged "injury to an identifiable group of" its citizens but not "any imperiled quasi-sovereign interests").

14

Nor does the State adequately allege any concrete harm to a "sufficiently substantial segment of its population." *Snapp*, 458 U.S. at 607. Although the State asserts that Michigan consumers have experienced "decreased output, quality, and choice of pharmacy services," as well as "an increase in health care costs" (AC ¶¶ 1, 18, 144, 167), the AC lacks any factual support for those purported injuries. The State does not specify which costs have increased or by how much, or how many consumers have borne them. The State summarily equates the closure of some pharmacies with reduced output but never actually alleges a reduction in filled prescriptions for Michigan consumers or otherwise explains how—or by how much—output or quality of pharmacy services have been reduced.

Instead of offering "specific allegations about the statewide magnitude of these difficulties" as required, *see In re Auto. Parts Antitrust Litig.*, 2021 WL 148004, at *3 (E.D. Mich. Jan. 15, 2021), the State acknowledges that the number of pharmacies *everywhere* (*i.e.*, not just in Michigan (*contra* AC ¶¶ 1, 19, 46, 122)) has decreased over time (*see id.* ¶¶ 45, 50–51, 53) and that uninsured patients "generally" (*i.e.*, not specific to Michigan) pay more out-of-pocket for prescription drugs (*see id.* ¶ 21). The State's generalized allegations are not "sufficiently concrete to create an actual controversy" between the State and Defendants. *Snapp*, 458 U.S. at 602; *see Auto. Parts*, 2021 WL 148004, at *2–3 (Puerto Rico lacked *parens patriae* standing because it failed to allege "specific" facts showing

15

"statewide magnitude" of claimed injuries); *Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.*, 2021 WL 4169711, at \*13 (E.D. Mich. Sept. 14, 2021) (rejecting alleged studies about "higher costs . . . for healthcare services *in general*," rather than "in Michigan," because such "[g]eneral assertions . . . are akin to conclusory allegations").[11]

### 2. The State fails to allege a sufficient causal connection.

The State lacks *parens patriae* standing to seek injunctive relief for another independent reason: it fails to allege a sufficient causal connection between the Subcontract and any claimed injuries to "Michigan pharmacies" or "Michigan consumers," let alone "a sufficiently substantial segment of the [State's] population." *Snapp*, 458 U.S. at 607.

First, the State itself alleges that pharmacy closures—and thus any corresponding reductions in quality or output of pharmacy services—pre-date the 2019 Subcontract by nearly a decade. While the Subcontract is over five years old, the State concedes that the "decimat[ion]" of the "retail pharmacy landscape in the United States" started over "20 years" ago. AC ¶ 45. Indeed, the State claims that "1 in 3 of all retail pharmacies have closed since 2010," *id.*, and that "Michigan is

---

[11] Other courts of appeals have held the same. *See, e.g.*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017) ("The complaint contains no specific allegations about the statewide magnitude of these difficulties or the extent to which they affect more than just an 'identifiable group of individual' egg farmers." (quoting *Snapp*, 458 U.S. at 607)).

no exception," *id*. ¶ 46.

Second, the AC fails to provide the necessary factual allegations linking the impact of the Subcontract to the closure of Michigan pharmacies. The State merely alleges that pharmacies like Rite Aid or Walgreens have closed (*id*. ¶¶ 49–53) without identifying the cause of those closures. The State does not even allege that any closed pharmacies had contracts with the Defendants or that reduced reimbursement rates from Prime's plan customers were the cause of any such closure. Nor could it. To underscore the State's lack of diligence, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, the State now effectively admits the tenuous nature of its claims, having amended its Complaint to remove reference to the number of Walgreens that closed in the state since 2024. (ECF No. 41 ¶ 52.) Without any factual allegations showing that the Subcontract had any impact on the State, the State fails to allege a sufficient causal connection to Michigan pharmacies and consumers.

Finally, the State identifies other, more likely causes of the claimed injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (no causation when alleged injury is "the result of the independent action of some third party not before the

17

Court"). The State alleges that independent retail pharmacies face significant competitive pressure from large chain pharmacies and the general industry trend toward mail-order and specialty pharmacies. *See, e.g.*, AC ¶¶ 21, 113, 117. The State also alleges that, instead of the Subcontract, "[m]any [pharmacy] closures are attributable . . . to ESI's exercise of market power," citing "steering and self-preferencing activity" that have no connection whatsoever to the Subcontract. *Id.* ¶ 120. And the Michigan Attorney General has acknowledged that organized retail theft, including at pharmacies like Rite Aid and Meijer, has caused retailers to lose billions of dollars in revenue. *See* Ex. 6.[12] Having failed to plead facts showing any causal connection between the Subcontract and pharmacy closures, the State lacks *parens patriae* standing to seek injunctive relief.

### C. The State Cannot Seek Damages or Injunctive Relief in Its Proprietary Capacity.

The State also lacks standing to sue for damages and injunctive relief in its proprietary capacity. A state, "like other associations and private parties," may seek damages and injunctive relief under the Clayton Act for direct, tangible injuries to its "proprietary interests." *Snapp*, 458 U.S. at 601–02; *see* 15 U.S.C. § 15(a) (authorizing suits for treble damages by "[a]ny person who shall be injured in his

---

[12] The Court may take judicial notice of the fact that the Attorney General mentioned Rite Aid and Meijer in a press release about the monetary impact of retail theft. *Supra* note 4; *see, e.g.*, *Weiser v. Benson*, 48 F.4th 617, 620 n.3 (6th Cir. 2022) (taking judicial notice of publicly available document from a state agency).

18

*business or property*" (emphasis added)); *id*. § 26 (entitling "[a]ny person . . . to sue for and have injunctive relief . . . against threatened loss or damage").

The State cannot seek relief in its proprietary capacity because the AC contains no allegation that the State suffered any concrete, particularized injury to its own "business or property." *Id*. § 15(a). The State does not allege that it or any State entity has ever sold "retail pharmacy services" to Defendants or that its "commercial interests or enterprises" were otherwise harmed by the Subcontract. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 (1972), *superseded on other grounds by* 15 U.S.C. § 15c. And the State cannot recover damages for injuries to its "general economy." *See id*. at 263–64; *contra* AC ¶¶ 2, 120, 167.

The State likewise fails to plausibly allege an injury to its proprietary interests as a consumer in the marketplace entitling it to injunctive relief. The AC contains no well-pleaded allegations showing that the State or any State entity has been or might be injured in the future unless the Subcontract is enjoined. *Contra* AC ¶¶ 2, 120; *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 447 (1945) (Sherman Act claim for injunctive relief justiciable where Georgia sued "as a proprietor to redress wrongs suffered by it as the owner of a railroad and as the owner and operator of various public institutions").

### D.   The State Separately Lacks Antitrust Standing.

Independently, the State is also barred from seeking damages or injunctive

relief in any capacity because it lacks antitrust standing. *See NicSand*, 507 F.3d at 449–50 ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law."). To have antitrust standing, the State must be the proper party to bring suit under the antitrust laws (the so-called "efficient enforcer"). *See Cohen v. Adena Health Sys.*, 2024 WL 1804990, at *8 (S.D. Ohio Apr. 25, 2024). That turns on factors summarized by the Sixth Circuit in *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Assoc. Gen. Contractors. of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537–44 (1983)), which include the causal connection between the challenged conduct and the claimed harm; the directness of the alleged injury; whether damages are speculative; the potential for duplicative recovery of damages; and the existence of more direct victims. *See id.* These factors "are to be balanced" and "no single factor is conclusive." *Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 290 (6th Cir. 1992). In totality, they weigh heavily against antitrust standing here.

The State fails to allege a plausible "causal connection" between the Subcontract and any alleged antitrust injury. *See Southaven*, 715 F.2d at 1085; *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 405 (6th Cir. 2012) ("Antitrust causation is much more limited than Article III standing."); *see also Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 155

20

F.4th 795, 814 (6th Cir. 2025) (dismissing antitrust claims where plaintiff failed to "plausibly allege[] proximate causation".)

As explained above (*supra* section I.B.2), the State's own allegations show that pharmacy closures long pre-dated the Subcontract, *see* AC ¶ 45, and acknowledge various other causes of the claimed harms, *see id*. ¶¶ 21, 113. As a result, any reduction in output or quality of pharmacy services or any increase in healthcare costs is far "too attenuated" to establish antitrust standing. *Static*, 697 F.3d at 405; *Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Mich.*, 596 F. Supp. 3d 860, 872 (E.D. Mich. 2022) (no antitrust standing where chain of events did not show causation between alleged harm and relevant conduct).

Moreover, any injuries suffered by the State in any capacity are at best "byproduct[s]" of the Subcontract. *See Static*, 697 F.3d at 405; *Acad. of Allergy & Asthma in Primary Care*, 155 F.4th 795, 810 ("When third-party harm is mere 'collateral damage' to (or 'a tangential byproduct of') the [alleged] anticompetitive conduct, the harm does not count as an antitrust injury."). The AC identifies pharmacies as the only group of victims "direct[ly]" affected by the Subcontract. AC ¶¶ 88, 130. As such, pharmacies would have the ability to assert claims (and have asserted claims, *see supra* note 10) based on any direct injuries they may have suffered. *See Static*, 697 F.3d at 405 ("Where there are more-direct victims of the anticompetitive conduct, those victims have the standing to sue, rather than those

affected indirectly."). Finally, the alleged downstream injuries—conclusory allegations regarding reductions in quality and output—are harms to parties (*i.e.*, consumers) in a different market, not the alleged "PBM Services Market" that the State relies upon. *See Bodie-Rickett*, 957 F.2d at 291 (denying standing where injury did not occur in market where unlawful restraint was allegedly carried out).

## II. The Attorney General Is Not Authorized To Bring a Damages Claim Under Michigan Antitrust Law.

The State lacks authorization to seek damages under the MARA, which allows "[t]he state" to "bring an action for . . . actual damages" only when it has been "injured directly or indirectly in its business or property." M.C.L. § 445.778. As explained above (*supra* section I.C), the State does not identify any injury to its own business or property that could entitle it to damages. In addition, MARA limits the Attorney General to seeking "injunctive or other equitable relief and civil penalties"; it does not authorize damages. M.C.L. § 445.777. To the extent the AC seeks "damages to the State, trebled" under MARA, that claim should be dismissed. *See* AC ¶¶ 173–81, 207.

## III. The State's Federal and State Antitrust Claims Are Time Barred.

### A. The State Failed To Sue Within the Limitations Period.

The State's antitrust claims should also be dismissed because they were not brought "within four years after the cause of action accrued." 15 U.S.C. § 15b; M.C.L. § 445.781. A cause of action generally accrues "when a defendant commits

22

an act that injures a plaintiff's business." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 405 (6th Cir. 1999); M.C.L. § 445.784(2) ("[I]n construing all sections of [MARA], the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes."). For price-fixing conspiracies, as purportedly alleged here, the "'final act to effectuate that conspiracy'—that is, the last overt act—occurred," and thus the limitations period began to run, when Defendants "agreed . . . to fix prices." *Brave Optical, Inc. v. Luxottica of Am., Inc.*, 2025 WL 962827, at *8 (S.D. Ohio Mar. 31, 2025), *amended on reconsideration in part on other grounds by* 2026 WL 376931, at *1 (S.D. Ohio Feb. 11, 2026), (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009)).

The statutes of limitations on the State's antitrust claims thus began to run on December 19, 2019, when Defendants entered into the Subcontract, which the State claims fixes pharmacy reimbursement rates. AC ¶ 89; *see Brave Optical*, 2025 WL 962827, at *8. The periods expired on December 19, 2023. Because the State did not file its Complaint until April 28, 2025 (ECF No. 1), its antitrust claims are time barred. *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 595 (6th Cir. 2014) (affirming dismissal of time barred antitrust claims).

## B.    The State Fails To Allege Fraudulent Concealment

Recognizing that its claims are time barred, the State tries—but fails—to allege fraudulent concealment. To plead fraudulent concealment, the State must

23

allege that: (i) Defendants "actively concealed the conduct constituting the cause of action"; (ii) "this concealment prevented [the State] from discovering the cause of action within the limitations period"; and (iii) "until discovery, [the State] exercised due diligence trying to learn about the cause of action." *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 992–93 (S.D. Ohio 2020) (quoting *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009)).  The first element requires alleging "affirmative acts of concealment." *Hamilton Cnty. Bd. of Comm'rs v. NFL*, 491 F.3d 310, 319 (6th Cir. 2007).  The State must plead any such acts **with particularity**, *see Solis*, 459 F. Supp. 3d at 993 ("[T]he heightened pleading standards of Rule 9(b) apply to a plaintiff seeking to rely on fraudulent concealment to toll a limitations period."), by supplying "the time, place, and content of" each alleged act, *United States v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 505 (6th Cir. 2007).

The AC lacks any allegation of any affirmative act of concealment by Defendants—much less any pleaded with particularity.  Although the State conclusorily alleges that Defendants "concealed their unlawful behavior" by both "misleading" pharmacies (but not the State) to believe that reimbursements were "set . . . at competitively determined rates" and not by the Subcontract, and by "hid[ing]" from pharmacies how their reimbursement rates would be set under the Subcontract (*see* AC ¶¶ 146–49), such self-contradictory "naked assertion[s]" are devoid of sufficient "factual enhancement" and need not be presumed true.  *Iqbal*,

24

556 U.S. at 678. And they certainly do not specify (as they must) the time, place, and content of any such conduct. *See* AC ¶ 152 (claiming Defendants "took steps to conceal" their conduct but failing to identify a single step).

The State's other "concealment" allegations are equally insufficient. The claim that Defendants "publicly misrepresented that they did not engage in anticompetitive conduct" (AC ¶¶ 150–51) is insufficient because "mere silence or unwillingness to divulge wrongful activities is not sufficient" to allege concealment. *Browning v. Levy*, 283 F.3d 761, 770 (6th Cir. 2002). The assertion that Defendants had "private communications and meetings" and "regularly attended invitation-only industry events where they discussed" the Subcontract (AC ¶¶ 155–56) is conclusory because undated, unspecific allegations of "clandestine meetings and telephone conversations are not sufficient to establish the requisite 'affirmative acts.'" *See Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 841 F. Supp. 212, 218 (E.D. Mich. 1993) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1471–72 (6th Cir. 1988)) (secret meetings and calls in furtherance of price-fixing conspiracy were insufficient to establish concealment). And the State fails to explain at all how the publicly disclosed Subcontract constitutes an "inherently self-concealing conspiracy." AC ¶ 153; *see, e.g.*, *Dry Cleaning*, 841 F. Supp. at 217 ("If the deception is not an essential element of the wrong, then it follows that fraudulent concealment is not inherent in every price-fixing scheme.").

The State's baseless assertion of fraudulent concealment is contradicted by its own allegations and publicly available information.  The State admits that "ESI and Prime announced" the Subcontract on December 19, 2019 (AC ¶ 89), which is corroborated by Defendants' press releases and regulatory filings from December 2019 and early 2020.  Exs. 3–5 (announcing and discussing the Subcontract); *see In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 223–24 (E.D.N.Y. 2003) (no fraudulent concealment where defendants affirmatively disclosed information pertaining to the challenged agreements in press releases and public filings).  The State acknowledges that Defendants affirmatively disclosed the Subcontract to pharmacies in January 2020 when Prime sent notice explaining the collaboration.  *See* AC ¶ 94.  And the AC alleges that Prime's former CEO's open discussion of the Subcontract "ma[de] clear that [it] . . . effectuates a naked price-fixing arrangement" and *divulged* rather than concealed its nature.  *Id.* ¶¶ 91–95.

It is inconsistent for the State to claim that Defendants fraudulently concealed the Subcontract while quoting heavily from ***timely*** lawsuits that asserted materially identical antitrust claims based on the exact same Subcontract.  *E.g.*, AC ¶¶ 93, 106; *see also* Complaint, *AIDS Healthcare Found. v. Prime Therapeutics LLC*, No. 21-CV-4979 (C.D. Cal. June 18, 2021) (relying on the above-mentioned press release, regulatory filings, and pharmacy notices); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) (lawsuit pre-dating plaintiff's suit should

26

have caused plaintiff to investigate and failure to do so "was not the exercise of due diligence required in order to employ the fraudulent concealment doctrine").

The State also fails to allege that it exercised due diligence in investigating its antitrust claims. The State was placed on inquiry notice of its claims on or around December 19, 2019, when Defendants publicly announced the Subcontract in press reports, regulatory filings, and pharmacy notices. *Supra* Background Section B. But the State does not allege that it ever investigated the Subcontract or identify a single fact it could not have discovered during the limitations periods. The State thus fails to plead fraudulent concealment.

## C. The Continuing Violation Doctrine Does Not Apply.

The State also incorrectly argues that the continuing violation doctrine tolled the limitations periods because "[e]ach claim processed by [Defendants] subject to their unlawful agreement constituted an overt act that inflicted a new and accumulating injury on the People of Michigan, and these acts have occurred daily within the past four years." AC ¶ 163.

The Sixth Circuit has repeatedly rejected this very argument. Under the continuing violation exception, a "cause of action accrues" and the limitations period begins to run anew each time the plaintiff is injured by an "overt act" of the defendants. *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996). An "overt act" that restarts the statute of limitations must "be a new and independent

27

act that is not merely a reaffirmation of a previous act" and "must inflict new and accumulating injury on the plaintiff." *Id.* (citation omitted). Injuries that are merely "ripples" or consequences of a single past violation are not "distinct injuries themselves" and do not reset the limitations period. *Z Techs.*, 753 F.3d at 600.

The Sixth Circuit has "repeatedly emphasized that profits, sales, and other benefits accrued as the result of an initial wrongful act are not treated as 'independent acts.'" *Cf. id.* at 604 (price increases following a merger were not "overt acts" because "[n]o new or subsequent action was undertaken to obtain a monopoly because one had already been accomplished" pursuant to the original agreement). In *Grand Rapids Plastics*, for example, the Sixth Circuit rejected the argument that "each payment" pursuant to an allegedly unlawful agreement "was an independent wrongful act that started the statute of limitations running" because "the individual payments . . . were only a manifestation of the previous agreement" that did "not constitute a 'new and independent act.'" 188 F.3d at 404–06. District courts have followed suit. In *Brave Optical*, the plaintiffs alleged that each payment of "higher inventory prices for low quality merchandise" due to purportedly anticompetitive agreements that pre-dated the limitations period restarted the statute of limitations as to each injury. 2025 WL 962827, at *7. Following Sixth Circuit precedent, the district court ruled that each payment made pursuant to the challenged agreements were "unabated, inertial consequences of a past act," rather than "independent, overt

28

acts," which did not reset the limitations period. *Id*. at \*6.

This case is no different: each claim processed under the Subcontract is merely a "manifestation" thereof that cannot reset the statutes of limitations. *See id*. There is good reason the Sixth Circuit has not endorsed the State's theory, and why the Court should not do so now: "[T]he applicable limitations period for a [Sherman Act] claim would be infinite—an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct." *Id.* at \*8.[13]

## IV.    The State's Antitrust Claims Should Be Dismissed on the Merits.

The AC fails to state a claim under Section 1 of the Sherman Act and Section 2 of MARA because the Subcontract does not fit within the "small group of restraints" that have been held to be "unreasonable *per se*," *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) ("*Amex*"), and the State fails to allege what is necessary to state a claim under the rule of reason.[14]

---

[13] The State's prayers for equitable relief on its untimely antitrust claims are barred by the concurrent remedy doctrine. *Med. Ctr. at Elizabeth Place v. Premier Health Partners*, 2016 WL 9460026, at \*14 (S.D. Ohio Oct. 6, 2016) ("[E]quity will withhold its relief where the applicable statute of limitations would bar the concurrent legal remedy." (cleaned up)). The statutes of limitations may also "apply by analogy" to bar the public nuisance and unjust enrichment claims, s*ee Taxpayers Allied for Const. Tax'n v. Wayne Cnty.*, 450 Mich. 119, 127 n.9 (1995), which are "equitable in nature," *see, e.g.*, M.C.L. § 600.2940(5).

[14] The State's MARA claim rises and falls with the State's Sherman Act claim. *See* M.C.L. § 445.784(2); *Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*, 221 F.3d 913, 919 n.6 (6th Cir. 2000).

29

### A.   The Subcontract Is Not *Per Se* Unlawful.

Setting aside the legal conclusions in the AC (*e.g.*, AC ¶ 129), the Subcontract is not a *per se* unlawful "horizontal price-fixing" agreement.  There is "an automatic presumption in favor of the rule of reason standard" in the Sixth Circuit, and "the *per se* rule is reserved only for those infrequent occasions of clear cut cases in which the trade restraint is so unreasonably anticompetitive that they present straightforward questions for reviewing courts." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978))).

*Per se* treatment thus applies "only if a restraint *clearly and unquestionably* falls within one of the handful of categories that have been collectively deemed *per se* anticompetitive.'"  *Innov. Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 340–41 (6th Cir. 2018) (emphasis added).  These categories include price-fixing and bid-rigging, as well as customer and territorial allocation agreements— so-called "naked restraint[s] of trade with no purpose except stifling of competition." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979) ("*BMI*") (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)).  Thus, in characterizing conduct under the *per se* rule, courts focus on "whether the practice

30

facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than less, competitive." *Id.* at 19–20. (internal quotation marks and citation omitted).

On its face, the Subcontract is not "a restraint of trade with no purpose except stifling of competition." *Id.* at 20.  No part of the complex, heavily negotiated, 390-page business arrangement with myriad interacting definitions, provisions, and schedules, expressly or impliedly evidences an agreement to fix reimbursement rates for pharmacies.  *See* Ex. 1.  Indeed, the Subcontract contains ██████████████

██████████  ████████  ███████████████████████

████████  ██  ████████████████

Moreover, as its name indicates, the Subcontract is *vertical* in nature, which places it outside the *per se* rule.  "[T]he analysis of any agreement having *some vertical component* is complex and not amenable to a *per se* approach."  *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 634 (E.D. Mich. 2019) (emphasis added).  That is because vertical restrictions have the "potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition" by "allowing the [upstream entity] to achieve certain efficiencies in the distribution of [its] products."  *Id.* (quoting *Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–55 (1977)) (alterations in original).  ██████████████████████████



As the State acknowledges, the Subcontract enables Prime's customer plans to benefit from ESI's services to negotiate "lower rates of compensation" with pharmacies than Prime could negotiate (AC ¶ 12). That makes it exactly the type of vertical arrangement that has the potential to "promote interbrand competition by allowing [Prime] to achieve certain efficiencies in the distribution of [its] products," *Cont'l TV*, 433 U.S. at 54, and therefore renders it unsuitable for *per se* treatment.

The State's repeated conclusory labeling cannot transform the Subcontract into a "price fixing" agreement.[15] It is well established that such conclusory labels—like "price fixing"—that are merely "legal conclusion[s] couched as factual

---

[15] *See* AC ¶¶ 2, 13, 74, 87–89, 91, 95, 99–100, 129, 165, 174, 184, 205.

allegations" need not be "accept[ed] as true." *Iqbal*, 556 U.S. at 678; *e.g.*, *In re Allergan Erisa Litig.*, 975 F.3d 348, 355 (3d Cir. 2020) (allegation that "Allergan and several of its pharmaceutical industry peers colluded to fix generic drug prices in violation of federal antitrust laws" was "not well-plead" and was a "conclusion[] entitled to no deference"); *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1266 (11th Cir. 2019) (allegations that "insurance companies have agreed and conspired with respect to price" had "no basis in the facts actually alleged" and were "merely conclusions"). Tellingly, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████   ██████████   ██████████████████████

██████████████████████████████████████████████████

████████████████   ███   ██████████████████

Similarly, the State's labeling of the Subcontract as a "horizontal" agreement—which purposefully ignores a *subcontract*'s inherently vertical nature— also does not compel application of the *per se* rule. "[H]orizontality alone does not necessarily justify invocation of the per se rule." *Innov. Ventures*, 912 F.3d at 341; *see Se. Milk*, 739 F.3d at 273 ("[A]pplying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations."). And the Supreme Court has long recognized "[n]ot

33

all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints." *BMI*, 441 U.S. at 23; *see, e.g.*, *Dagher*, 547 U.S. at 6 (pricing policy of competitors' joint venture "may be price fixing in a literal sense, it is not price fixing in the antitrust sense"). That is why agreements containing both horizontal *and* vertical elements are not automatically condemned as *per se* unlawful. "The only restraints that the Supreme Court has held to be *per se* unreasonable are purely horizontal, or, in other words, are agreements between entities who are *only* related as competitors." *United States v. Brewbaker*, 87 F.4th 563, 576, 579 n.9 (4th Cir. 2023), *cert. denied*, 145 S.Ct. 544 (2024) (emphasis added). Where a restraint does not "fit neatly into either the horizontal or vertical definition," but "fits into both," "the restraint alleged" is a "hybrid restraint" that "hasn't been held to be *per se* unlawful" and thus is subject to the rule of reason. *Id*. at 576, 579.

At most, the Subcontract may be viewed as creating a form of dual-distribution relationship, one such "hybrid restraint" that must be assessed under the rule of reason. *See, e.g.*, *id.* at 580. In a typical dual-distribution arrangement, a manufacturer both supplies a distributor with products to sell to retailers (a vertical relationship) and competes against that distributor by selling those products directly to retailers (a horizontal relationship). *Id.* at 580–81. Despite the horizontal element, these arrangements are analyzed under the rule of reason because their vertical

element promises to "increase[] distributive efficiency" and improve inter- and intrabrand competition. *Id.* at 581. Here, ESI—acting as a subcontractor—makes its pharmacy network services available to Prime under the Subcontract (a vertical relationship), and therefore to Prime's health plan customers. At the same time, Prime competes with ESI (a horizontal relationship) by creating its own pharmacy networks and by making those networks available to its plan customers as well.

For the same reasons, "quick look" treatment is also inappropriate. *Contra* AC ¶¶ 166, 175; *see Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *see, e.g.*, *Ogden*, 393 F. Supp. 3d at 627 (ruling that plaintiff failed to allege facts justifying "quick look" review, particularly "where the agreements display both vertical and horizontal components, and therefore require a more in-depth analysis to determine unreasonableness).[16] Accordingly, the rule of reason must apply.

### B.     The State Fails To Allege a Rule of Reason Violation.

The State's antitrust claims should be dismissed because the AC fails to allege that the Subcontract has anticompetitive effects in any properly defined market. To state a claim under the rule of reason, the State must plausibly allege that the Subcontract "has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 585 U.S. at 545–46. To do so, it must provide an "accurate

---

[16] No "observer with even a rudimentary understanding of economics could conclude that the [Subcontract] would have an anticompetitive effect on customers and markets." *Cal. Dental*, 526 U.S. at 770.

definition of the relevant market" to "measure [Defendants'] ability to lessen or destroy competition." *Id*. at 543. And the State must show anticompetitive effects, which it can do in two ways: with direct evidence, or "proof of actual detrimental effects . . . such as reduced output, increased prices, or decreased quality in the relevant market," or with indirect evidence, or "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 542 (cleaned up).

### 1. The State fails to plead anticompetitive effects in a properly defined relevant product market.

The State fails to identify that the relevant product market is a two-sided market, involving not only pharmacies but also plans (and their members). The Supreme Court has held that with two-sided markets plaintiffs must allege anticompetitive effects "on the two-sided . . . market as a whole." *Amex*, 585 U.S. at 547. Because the State "wrongly focuses on only one side of the two-sided market"—and ignores the other side altogether—it has not sufficiently alleged "anticompetitive effects in the relevant market," *id*., and its claims should be dismissed, *see Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (where a plaintiff "fail[s] to identify a relevant product market," the "court must dismiss the case for failure to state a claim").

The State instead contends incorrectly that the relevant product market is a one-sided "Retail Pharmacy Dispensing Services" market in which "PBMs like Prime and ESI function as buyers and aggregators of buying power of pharmacy

dispensing services from retail pharmacies."  AC ¶ 130.  It thus focuses only on anticompetitive effects flowing exclusively from PBM-pharmacy transactions.  *See id.* ¶ 137.  But the State's own allegations and the commercial realities of the PBM industry unequivocally show that the relevant product market is *two-sided*, in which PBMs intermediate between pharmacies *and plans*.  *See id.* ¶¶ 55–70.

Indeed, the AC makes clear that PBMs operate in a two-sided market in which they "offer[] different . . . services to two different groups who both depend on [PBMs] to intermediate between them."  *Amex*, 585 U.S. at 534.  With respect to the adjudication of prescription drug reimbursement claims, PBMs are a "special type of two-sided platform known as a 'transaction' platform."  *Id.* at 535.  Like the credit-card networks at issue in *Amex*, no prescription drug reimbursement transaction can occur unless both the pharmacy and the plan "simultaneously agree to use the same [PBM]."  *Id.*  Lower courts have interpreted *Amex* to hold that transaction platforms like these "must always receive two-sided treatment."  *E.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019).

Because the AC ignores the two-sided nature of PBMs, the State fails to plead anticompetitive effects after considering both sides of the relevant market.  As the Supreme Court explained in *Amex*, an antitrust plaintiff must allege anticompetitive effects "on the two-sided . . . market as a whole."  *Amex*, 585 U.S. at 547.  Here, the AC focuses *exclusively* on the rates at which PBMs reimburse pharmacies.  But

37

evidence of a price impact on only one side of a two-sided market "cannot by itself demonstrate an anticompetitive exercise of market power." *Id.* And the AC lacks any non-conclusory allegation concerning effects on the other side of the market— *i.e.*, how lower reimbursement rates for pharmacies impact prescription drug costs for health plans. *Contra* AC ¶ 106. The State's failure to correctly define the two-sided market allows it to ignore the Subcontract's procompetitive effects, including the promise of lower prices for plans and members. The State was required to consider both sides of the market and allege that the Subcontract's *net effect* is anticompetitive. Because it does not, its claims should be dismissed.

### 2. The State fails to plead that Defendants have market power in any properly defined relevant geographic market.

A "plaintiff must show that his defendant has market power in the relevant market." *Found. Interior Design v. Savannah Coll.*, 244 F.3d 521, 530–31 (6th Cir. 2001). "The purpose of defining a geographic market is to reveal whether, or to what extent, market power exists." *Se. Milk*, 739 F.3d at 277. The State vaguely claims that the "relevant geographic market is the United States, or narrower markets therein, including the State of Michigan." AC ¶ 137. To the extent the alleged geographic market is the United States, the State fails to allege that Defendants have "market power" that could provide indirect evidence of anticompetitive effects. *Amex*, 585 U.S. at 542. To the extent the alleged geographic market is the State of Michigan, the State's market definition fails as a matter of law.

38

To the extent the State contends that the relevant geographic market is the United States, the State fails to allege that Defendants enjoy "market power" in that market. A market share of 30% is an insufficient basis from which to infer market power. *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 27 (1984). The AC's allegations do not reach even that threshold. The State alleges that ESI has 23% and Prime just 3% of the national PBM services markets, amounting to a 26% combined share in the United States. AC ¶¶ 10, 72. The State thus fails to plead that Defendants possess market power in the United States. *Found. Interior Design*, 244 F.3d at 531 (affirming dismissal where plaintiff "did not allege that the [defendant] ha[d] market power in the relevant market").

To the extent the State alleges a geographic market of the State of Michigan, *see* AC ¶ 137, the State's market definition allegations are insufficient as a matter of law. The State provides just one reason in support of this narrow market definition: that Michigan "imposes regulations on PBMs specifically" so "PBMs compete only with others operating in the State of Michigan." *Id*. The AC does not identify these regulations or try to explain how they shape the commercial realities of or impose legitimate barriers to entry into an alleged Michigan-specific market. These omissions—themselves critical defects—are understandable given that there are effectively no barriers to entry to operate as a PBM in Michigan: a PBM need only be "certified" as a Third-Party Administrator, submit two forms, and pay a nominal

39

$5,000 fee.  *See* M.C.L. § 550.821.  The State's own website confirms this: *over 30 PBMs are licensed to operate in Michigan.  See* Ex. 7.

A Michigan-only geographic market also fails for other reasons.  The AC does not identify any other PBMs that compete in Michigan but not other states, or that do not compete with them in Michigan because of state-specific regulations.  *See* AC ¶ 137; *Total Benefits*, 552 F.3d at 437 (affirming dismissal in part for failure to allege other competitors within the alleged geographic market).  Even if the relevant geographic market was Michigan, the AC *still* does not properly allege market power because it does not allege that *any* market share in Michigan whatsoever.  Because the State fails to show that the Subcontract violates the rule of reason, the Court should dismiss its antitrust claims with prejudice.

## V.    The State Fails To Plead a State Law Public Nuisance Claim.

The State fails to state either a statutory or common law public nuisance claim.  The State frivolously seeks abatement for a public nuisance under M.C.L. § 600.3801.  *See* AC ¶¶ 197–200.  But that law does not remotely apply to this case.  *Contra id*. ¶ 198.  Section 600.3801 "was designed to eliminate the use of property for or in connection with prostitution, gambling and the illicit possession or transfer of intoxicants."  *State ex rel. Oakland Prosecuting Att'y v. Ginell*, 407 N.W.2d 59, 60 (Mich. Ct. App. 1987).  By its plain text, it declares to be a nuisance a "building, vehicle, boat, aircraft, or place," "[a]ll furniture, fixtures, and contents" thereof, and

40

"all intoxicating liquors" therein that are used for the wholly inapposite purposes listed in subsection 1, such as lewdness, prostitution, or gambling.   M.C.L. § 600.3801(1)–(2).   A person commits a nuisance only if they "own[], lease[], conduct[], or maintain[]" the property described in subsection (1).   *Id.* § 600.3801(4).  The Subcontract has nothing to do with the proscribed uses of any such property.  Notwithstanding the AC's selective quotation of the statutory text, the statute is not a valid basis for the State's claim.

The State also fails to plead a common law public nuisance.  Michigan courts have recognized public nuisance claims only where tangible harms are caused by the actual use of property.  *See, e.g.*, *State v. McQueen*, 811 N.W.2d 513, 530–31 (Mich. Ct. App. 2011) (drug distribution facility); *Ypsilanti Charter Twp. v. Kircher*, 761 N.W.2d 761, 775 (Mich. Ct. App. 2008) (raw sewage contamination).  A "[p]ublic nuisance is found when there are conditions **at a property** that pose 'clear and immediate risks to the general health, safety, and welfare.'"  *City of Lansing v. Woodside Meadows Apts. Owner LLC*, 2024 WL 4892721, at *5 (W.D. Mich. Sept. 18, 2024) (emphasis added) (quoting *Ypsilanti Charter*, 761 N.W.2d at 775); *see also Mount Clemens Recreational Bowl, Inc. v. Dir. of Dep't of Health & Hum. Servs.*, 998 N.W.2d 917, 925 (Mich. Ct. App. 2022) ("Long ago it was recognized that all property . . . is held under the implied obligation that the owner's use of [property] shall not be injurious to the community.").  A contract—however

41

objectionable—is not by itself a condition or use of property, nor does it create a physical condition that threatens public health or welfare.  Other state courts have recently rejected attempts to expand public nuisance law beyond its historical contours.[17]  The State's novel public nuisance theory should meet the same fate.

## VI.     The State Fails To Plead a State Law Unjust Enrichment Claim.

The State also fails to plead an unjust enrichment claim under Michigan law. First, Defendants' express written contracts with Michigan pharmacies foreclose the State's unjust enrichment claim on behalf of those pharmacies.  "[U]njust enrichment is a quasi-contractual theory of recovery that is inapplicable when the parties are bound by an express contract covering the same subject matter." *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 2001 WL 34089607, at *11 (E.D. Mich. Apr. 16, 2001), *aff'd*, 323 F.3d 396 (6th Cir. 2003).  The AC repeatedly alleges that retail pharmacies must contract with Defendants to service consumers in Michigan. *See* AC ¶¶ 7, 60, 66–67, 134.  Those contracts govern pharmacies' relationships with Defendants, rather than any implied contract under unjust enrichment doctrine.  For this reason, any unjust enrichment claim on behalf of pharmacies fails as a matter of law and must be dismissed.  *See Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003) ("[A] contract will be implied only if there is no express

---

[17] *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, --- N.E.3d ----, 2024 WL 5049302, at *7 (Ohio Dec. 10, 2024) (rejecting recasting of abstract harms—such as societal consequences of opioid proliferation—as public nuisances).

contract covering the same subject matter."). Second, the State fails to allege an unjust enrichment claim on behalf of Michigan consumers. Under Michigan law, a plaintiff must allege that the defendant received some benefit *directly* from the plaintiff. *See Smith v. Glenmark Generics, Inc.*, 2014 WL 4087968, at *1 (Mich. Ct. App. 2014). The AC does not allege that consumers have directly conferred a benefit on Defendants. Rather, the AC demonstrates that consumers have an ***indirect*** relationship with Defendants. *See* AC ¶¶ 3–4, 7, 44, 55–56, 65–66, 133, 137. That dooms the State's claim on behalf of consumers. *See Storey v. Attends Healthcare Prods., Inc.*, 2016 WL 3125210, at *12–13 (E.D. Mich. June 3, 2016) (dismissing for failure to allege plaintiffs "directly conferred a benefit on Defendant").[18]

## VII.   Evernorth Is Not a Proper Defendant.

Evernorth Health, Inc. is not a proper defendant to this action. "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1, 4 (6th Cir. 2003) (quoting *United States v.*

---

[18] The unjust enrichment claim fails for two other reasons. As explained above (*supra* section I.B.1), the State identifies no quasi-sovereign interest in its claim, which it brings only on behalf of the "interests of particular private parties." AC ¶ 206; *Chapman*, 940 F.3d at 305. And the claim is entirely duplicative of and dependent on the State's antitrust claims. *See* AC ¶ 203. If those claims prevail, disgorgement is duplicative. If they fail because they are deficient, the unjust enrichment claim must fail for the same reason. *See, e.g.*, *Beazley Ins. Co. v. Foster Poultry Farms*, 746 F. Supp. 3d 828, 867–68 (E.D. Cal. 2024).

*Bestfoods*, 524 U.S. 51, 61 (1998)).  Absent allegations of independent wrongdoing, a plaintiff must "plead such a complete identity between the defendant and the corporation as to suggest that one was simply the alter ego of the other."  *Id.*

Here, the State has not satisfied either requirement.  Substantive allegations against Evernorth appear only in the AC's description of the parties.  AC ¶¶ 26–28. Evernorth is conspicuously absent from the allegations of "Defendants' anticompetitive scheme," *see id.* ¶¶ 87–128, leaving alter ego liability as the State's sole theory of liability.  Yet even that theory lacks support.  The AC merely alleges that Evernorth "actively participates in . . . shaping the company policies at issue," *id.* ¶ 26, and that upon information and belief, "its executives are directly involved in major strategic decisions concerning Express Scripts," *id.* ¶ 27.  Such generic allegations of "participation" and "involvement" fall far short of establishing the complete unity of interest required for alter ego liability and cannot demonstrate that "the separate personalities of the corporation and its owner cease to exist." *Precision*, 66 F. App'x at 4–5 (court previously rejected alter ego liability even where parent corporation was involved in daily decision-making, operations, and had financial control over subsidiary); *see also In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *10–12 (D. Minn. Apr. 5, 2022) (dismissing claims against parent Express Scripts Holding Co., n/k/a Evernorth, for alleged conduct by subsidiary, Express Scripts).  Evernorth should be dismissed.

## CONCLUSION

For the foregoing reasons, the AC is legally deficient, amendment would be futile, and the Court should dismiss it in full with prejudice.

Dated:  March 23, 2026

Respectfully submitted,

/s/ *Timothy G. Cameron*
Timothy G. Cameron
Andrew C. Finch
Michael J. Zaken
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
tcameron@cravath.com
afinch@cravath.com
mzaken@cravath.com


Scott T. Seabolt (P55890)
**HICKEY HAUCK BISHOFF JEFFERS & SEABOLT, PLLC**
706 South Main Street
Plymouth, MI 48170
(734) 544-5525
sseabolt@hhbjs.com

*Counsel for Defendant Prime Therapeutics LLC*

/s/ *Meghan McCaffrey* (with permission)
Mike Bonanno
Meghan McCaffrey
Alec Levy
Michael Sebring
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
mikebonanno@quinnemanuel.com
meghanmccaffrey@quinnemanuel.com
aleclevy@quinnemanuel.com
michaelsebring@quinnemanuel.com


Howard B. Iwrey (P39635)
**DYKEMA GOSSETT PLLC**
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
hiwrey@dykema.com

Cody D. Rockey (P78653)
**DYKEMA GOSSETT PLLC**
2723 South State Street, Suite 400
Ann Arbor, MI 48104
(734) 214-7655
crockey@dykema.com

*Counsel for Defendants Express Scripts, Inc. and Evernorth Health, Inc.*