# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE PEOPLE OF THE STATE OF
MICHIGAN,

                       Plaintiff,

     v.

EXPRESS SCRIPTS, INC., *et al*,

                    Defendants.

Case No. 2:25-cv-11215-JJCG-KGA

Hon. Jonathan J.C. Grey

# REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

**I.**    The State's Federal and State Antitrust Claims Are Time-Barred ..................2

**II.**    The State Lacks Standing..........................................................................5

     A.     The State Lacks *Parens Patriae* Standing to Seek Damages. ..............5

     B.     The State Lacks *Parens Patriae* Standing for Injunctive Relief. .........7

     C.     The State Also Lacks Antitrust Standing.............................................9

**III.**    The State's Antitrust Allegations Fail to State a Claim. ...........................10

     A.     The Court Should Review the Subcontract.......................................10

     B.     The Subcontract Is Not "Horizontal Price Fixing." ..........................12

     C.     The Complaint Does Not State a Claim Under the Rule of Reason. ......................................................................................15

**IV.**    The State Fails to Plead a State Law Public Nuisance Claim. .....................17

**V.**    The State Fails to Plead a State Law Unjust Enrichment Claim. .................19

**VI.**    Evernorth Is Not a Proper Defendant. ........................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*,
   2025 WL 2886701 (6th Cir. Oct. 10, 2025).......................................................10

*Acrisure, LLC v. Hudak*,
   618 F. Supp. 3d 642 (W.D. Mich. 2022) .........................................................19

*Amir v. AmGuard Ins. Co.*,
   606 F. Supp. 3d 653 (E.D. Mich. 2022) ..........................................................11

*Benjamin Franklin Franchising SPE LLC v. David Michael Plumbing Inc.*,
   2024 WL 3997056 (E.D. Mich. Aug. 29, 2024) ...............................................19

*Brave Optical, Inc. v. Luxottica of Am., Inc.*,
   2025 WL 962827 (S.D. Ohio Mar. 31, 2025)..................................................4, 5

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979)..............................................................................................13

*Cascade Elec. Co. v. Rice*,
   70 Mich. App. 420 (1976)..................................................................................19

*Connecticut v. Sandoz*,
   No. 20-cv-00802, 2025 WL 3043397 (D. Conn. Oct. 31, 2025).........................4

*Cont'l TV, Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977)........................................................................................13, 14

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
   523 F.2d 389 (6th Cir. 1975)...............................................................................5

*Ealey v. Benjigates Ests., LLC*
   2013 WL 6409987 (E.D. Mich. Dec. 9, 2013) .................................................19

*Esurance Prop. & Cas. Ins. Co. v. Mich. Assigned Claims Plan*,
   968 N.W.2d 482 (Mich. 2021) .....................................................................18, 19

*Express Scripts, Inc. v. Anne Arundel Cnty.*,
   2026 EL 797872 (Md. Mar. 23, 2026) ..............................................................17

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
    244 F.3d 521 (6th Cir. 2001)................................................................16

*Georgia v. Penn. Railroad*,
    324 U.S. 439 (1945)................................................................7, 8

*Grand Rapids Plastics, Inc. v. Lakian*,
    188 F.3d 401 (6th Cir. 1999)................................................................4

*Hadid v. Hartman & Tyner, Inc.*,
    1999 WL 33453817 (Mich. Ct. App. Mar. 5, 1999) ........................................18

*Hadley v. Chrysler Grp., LLC*,
    624 F. App'x 374 (6th Cir. 2015)................................................................9

*Hamilton Cnty. Bd. of Comm'rs v. NFL*,
    491 F.3d 310 (6th Cir. 2007)................................................................2

*In re Automotive Parts Antitrust Litig.*,
    29 F. Supp. 3d 982 (E.D. Mich. 2014) ................................................................8

*In re Keurig Green Mtn. Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................14

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*,
    No. 18-CV-00825, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) ......................3

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023)................................................................17

*In re Theos Dark Chocolate Litig.*,
    750 F. Supp. 3d 1069 (N.D. Cal. 2024)................................................................10, 11

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009)................................................................3, 4

*Int'l Bhd. of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*,
    762 F.3d 592 (7th Cir. 2014)................................................................13

*Kraft v. Detroit Ent., L.L.C.*,
    683 N.W.2d 200 (Mich. Ct. App. 2004)................................................................6

Case 2:25-cv-11215-JJCG-KGA   ECF No. 74, PageID.3538   Filed 04/27/26   Page 5 of 28

*Mayor of Detroit v. Arms Tech., Inc.*,
258 Mich. App. 48 (2003)..............................................................................18

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008)........................................................................16

*Miller v. Allstate Ins. Co.*,
751 N.W.2d 463 (Mich. 2008) ........................................................................6

*Moyer v. Government Employees Insurance Company*,
114 F.4th 563 (6th Cir. 2024)......................................................................11

*New York v. Facebook*,
549 F. Supp. 3d 6 (D.D.C. 2021) ..................................................................8

*New York v. Microsoft Corp.*,
209 F. Supp. 2d 132 (D.D.C. 2002)...............................................................7

*Ogden v. Little Caesar Enters., Inc.*,
393 F. Supp. 3d 622 (E.D. Mich. 2019) ......................................................14

*Ohio v. American Express*,
585 U.S. 529 (2018)......................................................................................16

*Osterhaus Pharmacy, Inc. v. Express Scripts, Inc.*,
768 F. Supp. 3d 1186 (W.D. Wash. 2025)..............................................12, 13

*Palmer v. BRG of Georgia*,
498 U.S. 46 (1990)........................................................................................14

*Peck v. Gen. Motors Corp.*,
894 F.2d 844 (6th Cir. 1990)..........................................................................4

*Phhhoto Inc. v. Meta Platforms, Inc.*,
123 F.4th 592 (2d Cir. 2024)..........................................................................3

*Precision, Inc. v. Kenco/Williams, Inc.*,
66 F. App'x 1 (6th Cir. 2003)......................................................................20

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997)........................................................................17

v

*Robinson v. Nat'l Collegiate Athletic Ass'n*,
   2025 WL 2773123 (E.D. Mich. Sept. 26, 2025)..................................................2

*Rouse v. Caruso*,
   2011 WL 918327 (E.D. Mich. Feb. 18, 2011)...................................................20

*Southaven Land Co. v. Malone & Hyde, Inc.*,
   715 F.2d 1079 (6th Cir. 1983)...........................................................................9

*Sun Microsys. v. Hynix*,
   622 F. Supp. 2d 890 (N.D. Cal. 2009)..............................................................20

*Texaco v. Dagher*,
   547 U.S. 1 (2006)..............................................................................................15

*Toys "R" Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000)............................................................................17

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024).....................14

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
   822 F.2d 656 (7th Cir. 1987)............................................................................16

## Statutes & Rules

Clayton Antitrust Act, 15 U.S.C.A § 15.................................................................6

M.C.L. § 14.28.......................................................................................................6

M.C.L. §§ 445.771, .777–778 ...........................................................................5, 6

M.C.L. § 600.3801................................................................................................18

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Statutes:**

1. Clayton Antitrust Act, 15 U.S.C. § 15
2. M.C.L. § 14.28
3. M.C.L. §§ 445.771, .777–.778
4. M.C.L. § 600.3801

**Cases:**

1. *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 2025 WL 2886701 (6th Cir. Oct. 10, 2025)
2. *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653 (E.D. Mich. 2022)
3. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)
4. *Brave Optical, Inc. v. Luxottica of Am., Inc.*, 2025 WL 962827 (S.D. Ohio Mar. 31, 2025)
5. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979)
6. *Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)
7. *Esurance Prop. & Cas. Ins. Co. v. Michigan Assigned Claims Plan*, 968 N.W.2d 482 (Mich. 2021)
8. *Hamilton Cnty. Bd. of Comm'rs v. NFL*, 491 F.3d 310 (6th Cir. 2007)
9. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)
10. *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008)
11. *Miller v. Allstate Ins. Co.*, 751 N.W.2d 463 (Mich. 2008)
12. *Ohio v. American Express*, 585 U.S. 529 (2018)
13. *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997)
14. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983)
15. *United States v. Brewbaker*, 87 F.4th 563 (4th Cir. 2023), cert. denied, 145 S. Ct. 545 (2024)

This lawsuit concerns a contract that—by the State's own allegations—resulted in lower pharmaceutical drug costs and secured significant savings to the benefit of Michigan citizens and health plans.  The State ignores these benefits and instead asks the Court to give the Amended Complaint ("AC") a free pass because other supposedly "identical" cases have advanced beyond the pleadings.  But that is not the standard on which a complaint should be evaluated.

When subjected to the proper standard, the AC does not withstand scrutiny. The State, through its private counsel, filed this suit *more than one year after* the statute of limitations ran on its claims and without conducting any investigation into the 2019 Subcontract on which it based its claims.  Defendants attached that Subcontract to their Motion  to illustrate the fundamental defects in the AC.  Rather than seriously engage with the Subcontract, the State argues that the Court should ignore the Subcontract and deny Defendants' Motion because materially different cases have not been dismissed.  But those other cases cannot cure the fatal defects in *this* case.  Critically, unlike in those cases, the State's claim here is untimely.  And the State's theory of harm suffers from unique standing problems:  The State's *parens patriae* claims are not allowed under Michigan law, and the State has alleged no plausible causal connection between the alleged conduct and its theory of supposed harm to Michigan pharmacies.  The State's antitrust and state law claims also fail on the merits.  The AC should be dismissed with prejudice.

## I.  The State's Federal and State Antitrust Claims Are Time-Barred

The State does not dispute that it knew about the Subcontract in 2019 when it was publicly announced.  Nor does the State dispute that it took no action for more than five years before it filed this lawsuit, well after the four-year statute of limitations expired.  Instead, the State tries to excuse its untimeliness by invoking "fraudulent concealment" and the "continuing violation" doctrine.  But the State has not pled facts supporting either.

*First*, the AC does not plead affirmative acts of concealment with the degree of particularity required by Rule 9(b), as the Sixth Circuit requires.  *See Robinson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 2773123, at *1, 10 (E.D. Mich. Sept. 26, 2025); *see also Hamilton Cnty. Bd. of Comm'rs v. NFL*, 491 F.3d 310, 319 (6th Cir. 2007).  And the State's Opposition does not point to any allegations that satisfy this basic requirement.  The only acts or statements alleged in the AC to support its assertion of fraudulent concealment are benign corporate policies that have nothing to do with the Subcontract and cannot conceivably be construed as efforts at "fraudulent concealment."  (AC ¶¶ 150–151, 162.)  The other allegations that the State points to are vague and conclusory allegations that Defendants stated their conduct was "lawful collaboration," that their rates were set competitively, and that Defendants shared certain pricing data.  (*See* MTD 23–25.)  None of these amount to affirmative acts of concealment.  Indeed, the State points to no allegation that

2

Defendants concealed the details of their agreement or any collaboration between them.[1]  If such allegations were sufficient to allow time-barred claims to survive a motion to dismiss, statutes of limitations would never preclude any claim from reaching costly discovery.

*Second*, the State also has pled no facts sufficient to show that the "continuing violation" doctrine applies here. The Sixth Circuit cases Defendants cited unambiguously hold that where allegations of anticompetitive conduct are based on an agreement, subsequent transactions adhering to that agreement do not restart the limitations period.  (*See* MTD 27–29.)  Contrary to the State's assertions (Opp. 41–42), that controlling rule is not limited to cases involving "monopolization and other unilateral conduct" allegations, as opposed to price fixing.  The Sixth Circuit has never recognized such a distinction and, to the contrary, has repeatedly applied the very same rule to conspiracy and price-fixing cases.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (no continuing violation based on

---

[1] The out-of-circuit cases that the State cites are not to the contrary. Both involved factual omissions or misrepresentations that concealed or misrepresented the relevant conduct.  *See In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, No. 18-CV-00825, 2019 WL 5386484, at *10 (W.D. Ky. Oct. 21, 2019) ("[F]alse statements fostered a misimpression on Plaintiffs' behalf that Defendants had no inter-franchise constraints on their hiring and employment practices."); *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 605 (2d Cir. 2024) ("[I]n listing three specific criteria on which the algorithm was based, Meta implied that other factors, such as the posting account's status as a competitor, were not in play.").  The State alleges only that Defendants' implied their conduct was competitive or legal, not that they concealed the substantive nature of their conduct.

"participation in the alleged conspiracy"); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) ("individual payments . . . were only a manifestation of the previous agreement"); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (no continuing violation theory where plaintiffs "felt the adverse impact of GMC and GMAC's conspiracy as recently as 1988").[2]

*Brave Optical, Inc. v. Luxottica of America, Inc.*, which the State incorrectly brushes aside as being "out of step" (Opp. 41 n.17), is instructive because it carefully considered the existing Sixth Circuit precedent on this exact point. There, like here, the court considered allegations of "an unlawful 'horizontal agreement' between competitors to fix . . . reimbursement rates." 2025 WL 962827, at *5 (S.D. Ohio Mar. 31, 2025). After considering the same Sixth Circuit precedent cited by Defendants here, the court concluded that "under Sixth Circuit caselaw, the only overt violations Plaintiffs plausibly allege are the [agreements] themselves, not the later transactions predicated on those agreements." *Id.* at *6; *see also id.* ("[A] defendant's 'final act to effectuate [the alleged] conspiracy occurred' when it agreed with its competitors to fix prices, not when the plaintiffs suffered the conspiracy's 'rippling effect[s]'" (quoting *Travel Agent*, 583 F.3d at 902)). The court further considered the same statement from *Klehr* cited by the State here (*see* Opp. 42), and

---

[2] The State's reliance on *Connecticut v. Sandoz* is misplaced, as that out-of-circuit decision applies the Second Circuit's version of the continuing violation doctrine. No. 20-cv-00802, 2025 WL 3043397 at *8 (D. Conn. Oct. 31, 2025).

found (1) it was *dicta*, (2) it involved a different statute, and (3) the Sixth Circuit had adopted a view "under which not every above-price sale restarts the limitations period." *Id.* at \*7.

*Finally*, the State argues it had no reason to exercise due diligence, even though the Subcontract was publicly announced and other plaintiffs filed timely claims in other jurisdictions. (*See* Opp. 44–45; MTD 26–27.)  Here again, the State ignores Sixth Circuit law.  *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) (lawsuit pre-dating plaintiff's suit should have caused plaintiff to investigate; failure to do so "was not the exercise of due diligence").  If a public announcement and other lawsuits targeting the Subcontract are not sufficient to trigger a need to exercise due diligence, essentially nothing would.

## II. The State Lacks Standing

### A.    The State Lacks *Parens Patriae* Standing to Seek Damages.

The State's claims are also defective because the State lacks standing to bring them.  MARA—the Michigan law under which the State seeks damages—does not authorize *parens patriae* claims.  The State argues that MARA authorizes "any [such] person" to "bring an action for . . . damages" (Opp. 31 (citing M.C.L. §§ 445.771, 445.778(2))), asking the Court to ignore M.C.L. § 445.778(1), which specifies that the State can "bring an action for . . . actual damages sustained" only when *the State* is "injured directly or indirectly in its business or property."  The

5

provision in MARA concerning actions by the Attorney General in *parens patriae* cabins the relief available to "injunctive or other equitable relief and civil penalties"; it too does not provide for damages.  M.C.L. § 445.777.  Because the State is not claiming any injury "in its business or property"—but rather injuries to pharmacies and citizens—the State's damages claim is impermissible under Michigan law. Furthermore, the legislature's deliberate choice to exclude *parens patriae* claims is evidenced by the fact that the Clayton Act, on which MARA was modeled, explicitly includes certain *parens patriae* claims, even though they existed in the common law. *See* M.C.L.A. § 445.778 (West); *cf.* 15 U.S. Code § 15c(a)(1).[3]  Moreover, "if a statute provides for an exclusive remedy . . . any conflicting common law simply cannot apply." *Kraft v. Detroit Ent., L.L.C.*, 683 N.W.2d 200, 206 n.5 (Mich. Ct. App. 2004).

---

[3] Notably, other states replicated the Clayton Act's *parens patriae* provision in their state antitrust laws, but Michigan did not. *See* Ohio Rev. Code § 109.81(A); *see also, e.g.,* 6 R.I. Gen. Laws § 6-36-12(a).  The State also tries to rely, incorrectly, on a general provision in a different statute concerning the Attorney General's ability to *intervene* in matters on behalf of the State.  (*See* Opp. 30–31 (citing M.C.L. § 14.28).)  But even if that statute applies to suits brought by the State, the antitrust-specific legislation—MARA—controls. *See Miller v. Allstate Ins. Co.*, 751 N.W.2d 463, 470 (Mich. 2008).  Even if MARA allowed *parens patriae* claims, they would be limited, like those available under the Clayton Act, to claims brought on behalf of natural persons.  MARA was modeled on the Clayton Act.  *See* M.C.L.A. § 445.778 (adopting "the private right of action for injury to business or property found in section 4 of the Clayton Act (15 U.S.C.A § 15)").

6

**B.      The State Lacks *Parens Patriae* Standing for Injunctive Relief.**

The State also lacks standing to bring a *parens patriae* claim for injunctive

relief because it has failed to allege either a quasi-sovereign interest or a causal

connection between the alleged conduct and the alleged harm.  *First*, the State

focuses almost exclusively on alleged injuries to Michigan pharmacies (AC ¶ 179),

on whose behalf the State is *not* authorized to bring *parens patriae* claims.  The

State's tangential and conclusory allegations of "broad-based harms" to consumers

(Opp. 27) do not save its claims.  Where "the primary thrust of [the] alleged wrong

is injury to a narrowly limited class of individuals, and the harm to the economy as

a whole is insignificant by comparison," that is insufficient to confer *parens patriae*

standing.  *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 152 (D.D.C. 2002).[4]

*Second*, the State misreads *Georgia v. Pennsylvania Railroad Company*, 324

U.S. 439 (1945), for the proposition that preventing antitrust harms to a state's

citizenry is a quasi-sovereign interest.  (*See* Opp. 25.)  The alleged harm in

*Pennsylvania Railroad* was materially different from what is alleged here—namely,

alleged harm to state economic development and "prosperity and welfare of [the]

State" itself.  324 U.S. at 450.  The Supreme Court explicitly stated that there would

be no *parens patriae* standing where "a State is a mere nominal plaintiff, individual

---

[4] The State argues that Defendants "concede" that the Attorney General can seek injunctive relief.  (*See* Opp. 30 n.13.)  That is not the case. While MARA authorizes such relief under certain *circumstances*, the State cannot seek such relief here.

7

shippers [*i.e.*, industry participants] being the real complainants." *Id.* at 450–52.  But that is precisely what the State purports to do here; indeed, the State's admitted focus on "standing in the shoes of Michigan pharmacies" illustrates why it lacks any legitimate quasi-sovereign interest, and thus standing.  (Opp. 35.)[5]

*Third*, the State fails to plausibly plead *any* sufficient causal connection between the Subcontract and the alleged pharmacy closures in Michigan.  The State does not deny that (i) closures of pharmacies in Michigan began well before the Subcontract was executed in 2019 (*see* AC ¶¶ 45–46); and (ii) pharmacies totally unrelated to the Subcontract have closed (*see* AC ¶¶ 49–53; MTD 17).

Although the State claims it need only draw a "traceable path" from the alleged injury to Defendants' conduct[6] (Opp. 29), it has not pleaded—and cannot plead—any "traceable path" here.  The State does not plausibly allege that even a *single* pharmacy closure or any consumer harm[7] can be traced to the Subcontract.

---

[5]  The State also claims that "[c]ourts have routinely affirmed *parens patriae* standing in comparable antitrust actions," but cites only one case: *New York v. Facebook*.  (Opp. 27.)  Unlike here, the pleaded harm in *Facebook* was quasi-sovereign, based on "consequences for Plaintiffs' economies" and "the damage to their quasi-sovereign interests in economic supervision."  549 F. Supp. 3d 6, 23 (D.D.C. 2021) (internal quotation marks and citation omitted).

[6] The State misleadingly omits the remainder of this quotation, which specifies that the alleged injury must not be "the result of the independent action of a third party." *In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 997 (E.D. Mich. 2014).

[7] Far from harming consumers, the Subcontract stands to *lower* pharmaceutical prices for insurance plans and their customers.  (*See, e.g.*, MTD 2, 38.)  Indeed, the Subcontract allowed Prime to "provide lower cost options to its customer plans,"

8

Indeed, the State itself alleges that Prime possesses only "roughly 3% of the national PBM services market" (AC ¶ 10), making it inherently implausible that an alleged 20% decrease in reimbursement rates for Prime transactions flowing through the Subcontract (Comp. ¶ 13) could itself be a material cause of pharmacy closures. *See Hadley v. Chrysler Grp., LLC*, 624 F. App'x 374, 377–79 (6th Cir. 2015) ("[P]laintiffs have not alleged any concrete injury traceable to the defendants' misconduct."). In addition, the State now effectively admits the tenuous nature of its claims, having amended its Complaint to remove reference to the number of Walgreens pharmacies that closed in the State since 2024. (*See* ECF No. 41 ¶ 52.)[8]

█████████████████████████████████████████████

█████████████████████████████████████████████

## C. The State Also Lacks Antitrust Standing.

The State also fails to allege that it is an "efficient enforcer" of the antitrust laws under the *Southaven* factors, and it therefore lacks antitrust standing. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983); (MTD 19–20). The State does not even attempt to argue that those factors give it standing, but instead incorrectly asserts that the factors are unnecessary because it

---

because Prime was poorly situated to do so, "pay[ing] pharmacies roughly 20% more than large competitors." (AC ¶ 91.)

[8] ████████████████████████████████████████████

████████████████████████████████████

9

has alleged a price-fixing conspiracy.  (*See* Opp. 34–35.)  Alleging a price-fixing conspiracy does not render the *Southaven* factors irrelevant.  *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.,* 155 F.4th 795, 806–08 (6th Cir. Oct. 10, 2025); (*see also* MTD 19–20).[9]

### III.    The State's Antitrust Allegations Fail to State a Claim.

#### A.    The Court Should Review the Subcontract.

In support of their motion, Defendants submitted the Subcontract to show that, on its face, it is not a "horizontal price-fixing agreement" with "no purpose except stifling competition," and therefore does not fall within the *per se* rule.  (MTD 30–31.)  In response, adopting a strategy that itself speaks volumes, the State refused to address the Subcontract, arguing instead that the Subcontract (i) was not incorporated by reference in the AC, and (ii) does not reflect the "full" agreement between Prime and Express Scripts.  (Opp. 7–10.)  Both arguments are wrong.

The State cannot credibly contend that the Subcontract is not the very same thing as the "Prime-ESI Agreement" the State describes throughout its AC.[10]  (*Id.* at

---

[9] Furthermore, Michigan consumers are not direct purchasers and so, pursuant to the "bright line" rule established in *Illinois Brick* (applicable to federal antitrust law, not MARA), would lack standing to sue Defendants for damages under federal claims. (*See* MTD 12–13.)  Tellingly, the State does not even mention *Illinois Brick* or address the indirect purchaser rule at all.

[10] Even if the State did not name the Subcontract in its Complaint (which it does), incorporation by reference—and consideration of the Subcontract by this Court—is absolutely appropriate as the Subcontract "forms the basis of plaintiff's claim". *In re*

10.)  The AC is replete with explicit references that confirm they are one and the same thing:  The AC identifies the parties to the Subcontract (AC ¶ 2), the date it was signed (*id.* ¶ 13), ███████████████████████████████████████████ ████████████████████████████████████████████, and other allegations specific to the Subcontract (*id.* ¶¶ 14–16, 89, 91–93, 97, 107, 108, 133, 159, 166, 175, 184).  Since the Subcontract "contradicts the factual allegations in the complaint, the document trumps the allegations." *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 664 (E.D. Mich. 2022) (internal quotation marks omitted) (granting motion to dismiss).

Nor can the State dispute that it explicitly relies on the Subcontract as the basis for its claims. (*See, e.g.*, AC ¶¶ 89–106).  Instead, the State cites a single inapplicable case, *Moyer v. Government Employees Insurance Company*, to argue that Defendants must provide "a complete set of governing documents" addressing the Defendants' relationship.  (Opp. 8–9.)  In *Moyer*, defendants attached obviously incomplete versions of documents that "contained redlines, handwritten notes, and electronic comments."  114 F.4th 563, 567–68 (6th Cir. 2024).  Here, Defendants attached the final, executed 2019 Subcontract that is the document the State relies on throughout the AC.

---

*Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1080 (N.D. Cal. 2024) (citation and internal quotion marks omitted).

11

The State cannot avoid this result by mischaracterizing the AC and now speculating that the "Prime-ESI Agreement" may somehow be part of a broader "multifaceted conspiracy" that "may not have been reduced entirely to writing." (Opp. 9.)  The AC alleges neither a "multifaceted" conspiracy nor the existence of an agreement not "reduced entirely to writing," and the State cannot replead through their Opposition.  The AC's passing references to the "Ascent" agreement in a single paragraph (AC ¶ 101; *see also* Opp. 9–10), do not help.  The Subcontract is the agreement referred to in the AC, it contains the precise provisions that the State incorrectly labels "price fixing" (MTD 32–33), and the AC itself describes the Subcontract as the singular "anticompetitive scheme" in this lawsuit (AC § V).[11]

## B.    The Subcontract Is Not "Horizontal Price Fixing."

As an initial matter, the State's attempt to piggyback off the results in other cases as its primary argument betrays the weaknesses of its own AC.  In any event, the *Osterhaus* decision was largely based on allegations and arguments that the parties have not made here.  *See Osterhaus Pharmacy, Inc. v. Express Scripts, Inc.*,

---

[11]  The State argues that Defendants implicitly "confirm[ed] that other governing documents exist" by seeking a stay of discovery after producing the Subcontract. (Opp. at 10.)  But Defendants sought to stay discovery that would have also included, among other things, "all documents" in a confidential arbitration.  (*Id.*)  And this argument simply misses the point.  Defendants have never denied the existence of later-in-time amendments or other documents regarding the 2019 Subcontract.  But the 2019 Subcontract is the document that captures the agreement that is the subject of the AC and repeatedly mischaracterized therein.

768 F. Supp. 3d 1186, 1197 (W.D. Wash. 2025). Likewise, the State's reliance on an arbitrator's interim award in *AIDS Healthcare Foundation*—which the State mischaracterizes as a "Final Judgment" (Opp. 2)—should be rejected. "It is black letter law that arbitration awards are not entitled to the precedential effect accorded to judicial decisions." *Int'l Bhd. of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 597 (7th Cir. 2014).

The State's repeated incantation of the phrase "horizontal price fixing" (*e.g.*, Opp. 2, 13, 17) is not a substitute for well-pleaded facts. *First*, the AC itself alleges that Prime pays Express Scripts "administrative fees" for "each transaction Prime pays at the [Express Scripts] rate" (AC ¶ 14), which confirms the vertical nature of the Subcontract, rendering the *per se* rule inapplicable. *See Cont'l TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57 (1977). Failing to assess the benefits that arise from the Subcontract will ultimately result in harm to competition and consumers.

*Second*, contrary to the State's argument (Opp. 13), the fact that Prime and Express Scripts compete in some respects does not automatically make the Subcontract horizontal in nature. *See BMI*, 441 U.S. 1, 23 (1979). ███████████

███████████████████████████████████

███████████████████ (*See* MTD Ex. 1 §§ 3.1, 4.1, 6.10(b), (e); Sched. 3 § 2.1.) Courts recognize that companies that compete in some respects can also provide services to one another, and that those relationships are vertical in nature

13

and outside the scope of the *per se* rule.  *See Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 634 (E.D. Mich. 2019); *Cont'l TV, Inc.* 433 U.S. at 54–55. Were it otherwise, the scope of the *per se* rule would be expansive and risk chilling a broad range of legitimate, procompetitive business arrangements.

*Third*, the State incorrectly argues that this Court should "disregard" the vertical nature of the Subcontract, citing two cases that bear no resemblance to the allegations here:  *Palmer v. BRG of Georgia*, 498 U.S. 46 (1990) and *In re Keurig Green Mtn. Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019).  But both of those cases concerned *express agreements not to compete*—which are plainly horizontal arrangements.  ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████  (*See* MTD 7.)

Furthermore, the State effectively concedes that the Subcontract is at least a form of "hybrid restraint" (Opp. 14 n.5), which courts have consistently held are not subject to the *per se* rule.  (MTD 34.)  And the State also does not even address *United States v. Brewbaker*, which held that hybrid restraints, which combine horizontal and vertical components, *must* be analyzed under the rule of reason. 87 F.4th 563, 576, 581 (4th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024).

The State oddly devotes several pages to the "ancillary restraints" doctrine

14

(Opp. 16–18), even though Defendants did not even mention that doctrine in their motion. In explaining why the Subcontract is not within the scope of the *per se* rule, Defendants cited key principles articulated by the Supreme Court and other courts regarding the proper scope and application of the *per se* rule when it comes to collaborations between competitors. *See, e.g., Texaco v. Dagher*, 547 U.S. 1, 7–8 (2006). The State's attempt to mischaracterize Defendants' arguments as arising under the "ancillary restraints" doctrine is both misconceived and irrelevant to the motion. Under the fundamental principles articulated in the cases cited by Defendants, the Subcontract cannot plausibly be characterized as *per se* unlawful.

### C. The Complaint Does Not State a Claim Under the Rule of Reason.

The State's argument that it has alleged "direct anticompetitive effects" and therefore does not need to define a relevant market or the existence of market power (Opp. 18–19) is fundamentally mistaken. Importantly, the State's contention would allow it to prevail without demonstrating that the alleged anticompetitive effects of the Subcontract outweigh its benefits in a properly defined market. Such a finding would doom such agreements, even if they lead to significant benefits to consumers.

*First*, PBMs operate in a two-sided market, which requires the State to allege a net anticompetitive effect, accounting for the impact of the Subcontract on both sides of that market. (*See* MTD 5, 36–38.) Because the market is two-sided, the State cannot allege a direct anticompetitive effect merely by alleging a price decrease

on one side of that market, *i.e.*, "that Prime paid pharmacies 20% less" as a result of the Subcontract.  The State must account for the cost savings achieved by health plans and their beneficiaries.  *Ohio v. American Express*, 585 U.S. 529, 546–47 (2018); (MTD 2.)  Considering both sides of the market, the Subcontract's net effect is procompetitive.  (*Id.* at 38.)

*Second*, the State has failed to *both* define the relevant geographic market *and* allege that Defendants have market power.  Courts regularly emphasize the importance of pleading standards in costly antitrust claims and have dismissed claims where pleadings regarding market definition and market power are facially inadequate.  *See, e.g.*, *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008); *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531, 533 (6th Cir. 2001).

As to market power, the State fails to identify Defendants' competitors in the Michigan market, as is required to define the geographic market.  (MTD 39–40.) And an alleged 26% market share in the purported U.S. market is insufficient to establish market power within the State.  (Opp. 23.)  The State's cited authority does not say otherwise.  In *Renfield*, the court merely stated in dicta that "the lowest possible market share legally sufficient to sustain a finding *of monopolization* is between 17% and 25%," *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987); the court did not hold that a 26% share in one market

16

automatically equated to market power within another, different market. In *Toys "R" Us*, the court found evidence of direct anticompetitive effects, making a showing of market power unnecessary. *Toys "R" Us, Inc. v. F.T.C.,* 221 F.3d 928, 937 (7th Cir. 2000). And in *RealPage*, 28 of the plaintiffs' 33 submarkets had a market share of 30% or more. *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 526–27 (M.D. Tenn. 2023); *see also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) (30% share "standing alone, provides an insufficient basis from which to infer market power").

## IV.     The State Fails to Plead a State Law Public Nuisance Claim.

The State's common law and statutory nuisance claims share the same fundamental deficiency: the State cannot identify a single case that applies nuisance law to circumstances like those in the AC, or where a public nuisance claim was not premised on damages caused by the use of real property.[12]

Instead, the State offers the Court broad language divorced from any factual context or judicial application. For example, the State quotes language—purportedly from the Michigan Court of Appeals—for the proposition that "***private***

---

[12] On March 23, 2026, opining on a public nuisance claim involving allegations of harm to public health, the Supreme Court of Maryland joined the Supreme Courts of Ohio, Oklahoma, Maine, Rhode Island, Illinois, and New Jersey in holding that the public nuisance tort cannot be used as a vehicle to address widespread social harms through damages. *Express Scripts, Inc. v. Anne Arundel Cnty.*, 2026 WL 797872, at *42 (Md. Mar. 23, 2026).

nuisance is related to the use of land[,] . . . *public nuisance* is not similarly limited."

(Opp. 37.)  But this language is a quotation of the trial court's opinion, which was

*reversed.  Mayor of Detroit v. Arms Tech., Inc.*, 258 Mich. App. 48, 55, 71 (2003).[13]

The State's reliance on quoted language from *Hadid v. Hartman* is equally

unavailing.  (Opp. 37.)  That case involved allegations that a shattered glass door

constituted a public nuisance—precisely the type of tangible, property-based harm

that Defendants argued is required (but missing here) for a nuisance claim.  *Hadid*

*v. Hartman & Tyner, Inc.*, 1999 WL 33453817, at *1 (Mich. Ct. App. Mar. 5, 1999).

Likewise, on statutory nuisance, the State again cites no case in which M.C.L.

§ 600.3801 has *ever* been applied to conduct beyond what is expressly enumerated

in the statute.  Instead, the State argues that the word "all" in subsection (3) (covering

remedies) somehow expands the applicability of the statute beyond the specific

conduct enumerated in subsections (1) and (2).  (Opp. 37–39.)  But subsections (1)

and (2) define a nuisance for purposes of the entire statute. § 600.3801(1), (2).  When

subsection (3) refers to "all nuisances," it clearly means all instances of the

*statutorily defined conduct*.  And while the State purports to invoke the provision's

"unambiguous plain text" (Opp. 38), subsections (1) and (2) would be entirely

nugatory under the State's reading, which is improper.  *See Esurance Prop. & Cas.*

---

[13]  In any event, the trial court's opinion does not support the State's position.  In the passage the State cites, the trial court merely observed that public nuisance claims could arise from not only land, but harmful *products*.  *Id.* at 55.

18

*Ins. Co. v. Mich. Assigned Claims Plan*, 968 N.W.2d 482, 488 (Mich. 2021).

## V.  The State Fails to Plead a State Law Unjust Enrichment Claim.

The State's arguments against dismissal of its unjust enrichment claim likewise fall flat.  *First*, while the State argues that express contracts do not bar unjust enrichment claims where the alleged misconduct "occurs entirely *outside*" the contract (Opp. 39), the State makes clear that its unjust enrichment claim seeks recovery for "artificially inflated fees" (*id.*), which are not "outside" the contract at all.  Indeed, the State expressly alleges, the "[n]etwork contracts specify . . . any fees the pharmacy must pay the PBM" (AC ¶ 7).  For this reason, the claim here stands in stark contrast to the claim in *Cascade Elec. Co. v. Rice*, where the court permitted a claim of quantum meruit despite the express contract because "recovery [wa]s sought for items *not contemplated* in the original contract."  70 Mich. App. 420, 426 (1976) (emphasis added).[14]  *Second*, courts routinely dismiss unjust enrichment claims where, like here, they are foreclosed by an express contract.  *See, e.g.*, *Acrisure, LLC v. Hudak*, 618 F. Supp. 3d 642, 649 (W.D. Mich. 2022) (unjust enrichment claim "not viable" where "there is an express contract"); *Ealey v. Benjigates Ests., LLC*, 2013 WL 6409987, at *5 (E.D. Mich. Dec. 9, 2013) ("[T]he

---

[14]  Courts interpret the exception described in *Cascade* narrowly.  *See Benjamin Franklin Franchising SPE LLC v. David Michael Plumbing Inc.*, 2024 WL 3997056, at *3 (E.D. Mich. Aug. 29, 2024) (explaining the "narrow" *Cascade* exception does not apply where there are no allegations "that [the plaintiff] performed any extra work beyond what was contemplated by the [contract]").

19

complained of transaction was covered by an express contract"). The State also fails to address, and thus concedes,[15] that it does not identify a quasi-sovereign interest in pursuing the unjust enrichment claim. (Opp. 39–40.)

## VI.     Evernorth Is Not a Proper Defendant.

The State's allegations regarding Evernorth's alleged role in this case are boilerplate and devoid of any substance. The State cites *Sun Microsys. v. Hynix*, 622 F. Supp. 2d 890, 901–02 (N.D. Cal. 2009), to argue that a "parent may be liable for antitrust violations of [a] subsidiary *if it participated in [the] conspiracy*" (Opp. 45 (emphasis added)). But the State only makes unsupported generic assertions that Evernorth "shap[ed] the company policies" and was "involved in major strategic decisions." (AC ¶¶ 26-27.) If such generic allegations were sufficient, plaintiffs could rope any parent company into any antitrust lawsuit. That is not the law. *See Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1, 4 (6th Cir. 2003).

## CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice.

Dated:  April 27, 2026               Respectfully submitted,

| | |
|---|---|
| */s/ Timothy G. Cameron* | */s/ Meghan McCaffrey* |
| Timothy G. Cameron | Mike Bonanno |
| Andrew C. Finch | Meghan McCaffrey |

---

[15] *Rouse v. Caruso*, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011) ("[A] court may treat . . . arguments that the plaintiff failed to address as conceded").

20

Michael J. Zaken
**CRAVATH, SWAINE &
MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
tcameron@cravath.com
afinch@cravath.com
mzaken@cravath.com


Scott T. Seabolt (P55890)
**HICKEY HAUCK BISHOFF
JEFFERS & SEABOLT, PLLC**
706 South Main Street
Plymouth, MI 48170
(734) 544-5525
sseabolt@hhbjs.com

*Counsel for Defendant Prime
Therapeutics LLC*

Alec Levy
Michael Sebring
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
mikebonanno@quinnemanuel.com
meghanmccaffrey@quinnemanuel.com
aleclevy@quinnemanuel.com
michaelsebring@quinnemanuel.com


Howard B. Iwrey (P39635)
**DYKEMA GOSSETT PLLC**
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
hiwrey@dykema.com


Cody D. Rockey (P78653)
**DYKEMA GOSSETT PLLC**
2723 South State Street, Suite 400
Ann Arbor, MI 48104
(734) 214-7655
crockey@dykema.com


*Counsel for Defendants Express
Scripts, Inc. and Evernorth Health, Inc.*

21